*SM*

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**Marci Marie Webber** )
(Full name under which convicted) )
PETITIONER )
)
_____ )
(Prisoner number) )
)
)
vs. )
)
**IDHS, Ricardo Fernandez** )
(Warden, Superintendent, or authorized )
person having custody of petitioner) )
RESPONDENT, and )
)
**(Fill in the following blank only if judgment** )
**attacked imposes a sentence to commence** )
**in the future)** )
)
ATTORNEY GENERAL OF THE STATE OF )
)
**Illinois** )
(State where judgment entered) )

**1:21-cv-05444**
**Judge Charles P. Kocoras**
**Magistrate Judge Sunil R. Harjani**
**PC 10/Direct**
_____
(Supplied by Clerk of this Court)

**RECEIVED**

OCT 13 2021

**THOMAS G. BRUTON**
**CLERK, U.S. DISTRICT COURT**

Case Number of State Court Conviction:

_____

**PETITION FOR WRIT OF HABEAS CORPUS – PERSON IN STATE CUSTODY**

1. Name and location of court where conviction entered: **NGRI**

   **DuPage County 505 N. County farm Rd Wheaton, IL 60187**

2. Date of judgment of conviction: **NGRI**

   **June 7, 2012**

3. Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)

   **1st degree murder**

4. Sentence(s) imposed: **NGRI with a commitment Into IDHS Custody**

5. What was your plea? (Check one)       (A) Not guilty **RI** (✓)
   **NGRI**                              (B) Guilty ( )
                                          (C) Nolo contendere ( )

   If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

   _____

Revised: 06/04/15

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

## PART I – TRIAL AND DIRECT REVIEW

1. Kind of trial: (Check one):    Jury ( )        Judge only (✓)

2. Did you testify at trial?        YES ( )        NO    (✓)

3. Did you appeal from the conviction or the sentence imposed? YES (✓) NO ( )
    My appeal was initiated by the State after I was Conditionally released Dec 11, 2019 by a wrongfully obtained
    (A) If you appealed, give the
    Stay. The appeal was decided in the State's favor by a misapplication of law on June 6, 2021 and The IL Supreme Ct denied my PLA on Sept 29, 2021 exhausting state remedy

    (1) Name of court: 2nd District in Elgin, IL

    (2) Result:    Trial Court reversed

    (3) Date of ruling:    June 6, 2021

    (4) Issues raised:
    Did Judge Bakalis error (abuse discretion) against the manifest weight of evidence & did I require inpatient treatment

    (B) If you did not appeal, explain briefly why not:

4. Did you appeal, or seek leave to appeal, to the highest state court? YES (✓)    NO ( )

    (A) If yes, give the

    (1) Result:    Denied

    (2) Date of ruling:    September 29, 2021

    (3) Issues raised: Judge Bakalis' did not abuse his discretion - the appellate Court errored and the appellate Court ignored the requirement that I was in need and benefitting from Inpatient Treatment

    (B) If no, why not:

5. Did you petition the United States Supreme Court for a writ of *certiorari*? Yes ( ) No (✓)

    If yes, give (A) date of petition: _____ (B) date *certiorari* was denied: _____

Revised: 06/04/15

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

## PART II – COLLATERAL PROCEEDINGS

1. With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

   YES (X)    NO

   With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

   A. Name of court: DuPage County

   B. Date of filing: August 2014 and 2018

   C. Issues raised: I'm Not the required "Mentally ill and dangerous" and do not meet the requirement of being in need and benefitting from inpatient treatment in IDHS

   D. Did you receive an evidentiary hearing on your petition?    YES (✓)    NO ( )

   E. What was the court's ruling? On 1st petition - do 2 months grounds passes, 3 months off grounds and return in may 2017 for Conditional release. On 2nd IDHS was

   F. Date of court's ruling: again ordered to transition me out but ignored the order and I was conditionally released Dec 11, 2019

   G. Did you appeal from the ruling on your petition?    YES ( )    NO (✓)

   H. (a) If yes, (1) what was the result? The State did Judge Bakalis (trial) was reversed

   (2) date of decision: June 6, 2021

   (b) If no, explain briefly why not: _____

   I. Did you appeal, or seek leave to appeal this decision to the highest state court?

   YES (✓)    NO ( )

   (a) If yes, (1) what was the result? Denied a Motion for Supervisory Order & denied the PLA

   (2) date of decision: Sept. 29, 2021

   (b) If no, explain briefly why not: _____

   _____
   _____
   _____
   _____
   _____
   _____

Revised: 06/04/15

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?     YES ( )     NO (✓)

NGRI is not Appealable

A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

1. Nature of proceeding                    _____

2. Date petition filed                     _____

3. Ruling on the petition                  _____

4. Date of ruling                          _____

5. If you appealed, what was
   the ruling on appeal?                   _____

6. Date of ruling on appeal               _____

7. If there was a further appeal,
   what was the ruling ?                   _____

8. Date of ruling on appeal               _____

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?     YES (✓)     NO ( )

A. If yes, give name of court, case title and case number: **1:21 CV 00656**

**Judge Charles Kocoras**

B. Did the court rule on your petition? If so, state

(1) Ruling:   **dismissed without prejudice**

(2) Date:   **? May or June 2021**

4. With respect to this conviction or sentence, are there legal proceedings pending in any court, other than this petition?     YES ( )     NO (✓)

If yes, explain:

_____

_____

_____

_____

_____

_____

_____

_____

4

Revised: 06/04/15

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

## PART III – PETITIONER'S CLAIMS

1. State briefly every ground on which you claim that you are being held unlawfully. Summarize briefly the facts supporting each ground. You may attach additional pages stating additional grounds and supporting facts. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

(A) Ground one __I am not "mentally ill and dangerous" - BOTH required__
Supporting facts (tell your story briefly without citing cases or law):

The NGRI (2012) was decided on a diagnosis of major depression with psychotic features. I was committed with ineffective counsel by way of reports from Elgin with material facts falsified and no expert on my behalf. In 2017 after years without any indication of that mental illness returning my diagnosis was "in full remission" and 5 doctors testified (all witnesses) to this while my DHS psychologist blamed me not being released on "Administrator, Dr Corcoran" after the denial I repetitioned and was released on Dec 11, 2021. It is noteworthy that Dr. James P. Corcoran (my jail psychiatrist) testified in 2017 that he had "successfully treated me in jail" yet I was committed and my motion to lift the appellate stay has an attached Feb 14, 2021 court report noting a diagnosis "bipolar in full remission".

(B) Ground two _____
Supporting facts:

At both the 2017 and 2019 hearings the majority of testimony (except a discredited Elgin psychiatrist Richard Malis who went unrebutted that he told a nurse not to write positive chart notes because he wanted to build a case against me for forced meds) stated I was not ill or a dangerous benefitting from inpatient treatment which is repeated in the Feb 14, 2021 court report. Exculpatory material facts have been concealed for years and my records falsified. On Oct 27, 2020 Judge Bakalos gave me permission to have a hearing on these falsifications and that motion is pending before the new judge (as of Dec, 2021) Daniel Guerin to correct these falsifications. The State who under Brady v. Maryland is not suppose to preclude favorable evidence keeps thwarting my efforts to correct material facts they should be offering.

5

Revised: 06/04/15

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

(C) Ground three __On the dangerousness prong__
Supporting facts:

The Appellate Court concluded I am not dangerous to others but did not properly apply the law to dangerous to self as a "reasonable expectation" and that Judge Bakalis could have "personally concluded" that after only 2 attempts — both while taking a combination of medications under traumatic and stressful situations (one in 2010 and one in 2017 while extremely restricted in an abusive situation at Chicago Read testified to as situational by my IDHS psychologist 2 days after I was denied release) — and having 2 years without another attempt being

(D) Ground four
Supporting facts: More than enough time and proof since Dr Corcoran testified civil committees are discharged without conditions after only a couple weeks or so following suicide attempts. Also, I was manipulated into holding back on my testimony and had to fight treatment induced learned helplessness to even testify to any of the abuse I've suffered. The IME also concluded at the 2019 hearing that I was on no "imminent danger" of suicide yet the state forced me back on a dishonest motion to stay Judge Bakalis' decision &

2. Have all grounds raised in this petition been presented to the highest court having jurisdiction?
YES ( ) NO (✓)

*The clear and convincing standard is too high*

3. If you answered "NO" to question (2), state briefly what grounds were not so presented and why not:
① That the clear and convincing standard on a defendant is too high, that ② dangerousness requires a "reasonable EXPECTATION" and ③ "in remission" means not mentally ill by law. The appeal argued its unconstitutional to hold a "harmless mentally ill person" and that I did not meet the requirement for inpatient treatment despite my request for Equip for Equality to address the 3 other issues going into the rule that one must be "Both mentally ill and dangerous" — Foucha v. Louisiana and can't be held ANY LONGER ← my confinement is punishment. U.S. v. Jones Precluded by the Supreme Court for any NGRI ← Equip for Equality ignored my reques

Revised: 06/04/15

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Please attach
these Exhibits
to my Habeas
Corpus petition
to be Filed under
a request for expedition
Since I should have been
allowed to continue my
Conditional release in 2019
✗ On 9/29/21 the IL Supreme Court
denied me my PLA : State Court
remedies are exhausted considering the State's opposition

EXHIBIT

A

State of Illinois
Department of Human Services

**PROGRESS NOTES - Lined**

_Dr. Anatoliy Pyslar_
_Psychiatric_
_Note_

Each note must be dated and signed including title of recorder.

4/23/21
16:00

Psychiatry note

(1) Progress note

(D) Ms. Webber was seen daily in the past week. Either briefly on the unit or in the examination room, on B-south (by this provider). Ms. Webber has indicated she has been anxious to hear from the appellate court. She expressed the same wishes as before, that she is allowed to go to Arizona as she has been offered a job there, and she has a psychologist and a psychiatrist who are willing to work with her and the court system. She expressed her frustration the team (at CRMHC) would not recommend that she go to Arizona, she asked this writer if the team would have any problems with her going to Arizona had her case been fixed. She was explained that if her case was cut. This provider

_cont'd_ —

| | |
|---|---|
| Individu | **Name:** WEBBER, MARCI |
| Date of | **DOB:** 03/26/1967  **Sex:** F |
| | **ID:** 000906420  **Unit:** 4564 |
| Identific | **Facility:** CHICAGO READ M.H.C. |
| Facility: | **Intake Date:** 12/23/2019  6:45:00PM |
| Subunit: | |

Enter individual's identification above

IL 462-0039 (N-07-15) (Formerly DMHDD-38/IL444-0038) Progress Notes - Lined
Printed by Authority of the State of Illinois  0 Copies

Page # of ##



State of Illinois
Department of Human Services

## PROGRESS NOTES - Lined

Each note must be dated and signed including title of recorder.

_____ cont'd psychiatry note 4/03/21 _____

(D) Ms. Webber has not been willing
to work on conditioned release
plan that would keep her
in Illinois. She strongly believes
she has a right to move to Montana
she believes she can only succeed
in "getting back on my feet" in Montana
since there are people there willing to
support her int, that state. She
was informed her request was
fully discussed with legal and it is
not an option at this time.
Ms. Webber states she is of the opinion
that because of the "ugly publicity"
of her case (in her words) she might
be targeted by someone (verbally or
possibly even physically). She remains
adamant about working with the team
on conditional release plan in Illinois.

_____ Ryno?

| Individual | Name: WEBBER, MARCI |
|---|---|
| Date of Bir | DOB: 03/26/1967   Sex: F |
| | ID: 000906420   Unit: 4564 |
| Identificatio | Facility: CHICAGO READ M.H.C. |
| Facility: | Intake Date: 12/23/2019   6:45:00PM |
| Subunit: | |

Enter individual's identification above

EXHIBIT
B

1-4

1

1 | STATE OF ILLINOIS )
)  SS:
2 | COUNTY OF DU PAGE )

3        IN THE CIRCUIT COURT OF DU PAGE COUNTY
   FOR THE EIGHTEENTH JUDICIAL CIRCUIT OF ILLINOIS
4

THE PEOPLE OF THE        )
5 | STATE OF ILLINOIS,     )
                          )
6 |         Plaintiff,     )
                          )
7 |         -vs-           )   No. 10 CF 2643
                          )       STATUS
8 | MARCI M. WEBBER,       )
                          )
9 |         Defendant.     )

10

11        REPORT OF PROCEEDINGS had at the hearing of the

12 | above-entitled cause, before the Honorable GEORGE J.

13 | BAKALIS, Judge of the said Court, on Wednesday, the 10th

14 | day of January, 2018.

15

      PRESENT:
16

          MR. ROBERT B. BERLIN,
17        State's Attorney of DuPage County, by
          MR. JOSEPH LINDT,
18        Assistant State's Attorney,

19            Appeared on behalf of the People of the
              State of Illinois;
20

21        MR. JEFFREY YORK;

              Appeared on behalf of the Defendant.
22

23

24

Chris Kachiroubas
e-filed in the 18th Judicial Circuit Court
DuPage County
TRAN# : 1704312755537( 4574979
2010CF002643
FILEDATE : 01/29/2020
Date Submitted : 01/29/2020 09:16 AM
Date Accepted : 01/29/2020 09:45 AM
ENSALACO,ANGELA

2

1     THE CLERK:   Marci Webber.

2     MR. LINDT:   Joe Lindt on behalf of the People.

3     MR. YORK:   Jeff York on behalf of Miss Webber, who is

4   not present.  She's in the Department of Human Services.

5   I don't intend on discussing or arguing anything

6   substantive, but procedurally Miss Webber had a hearing on

7   her petition for discharge or release.  The Court denied

8   that, and set a bunch of conditions for both Miss Webber

9   and DHS.  I would like to address some of the, whether or

10  not both parties are following that order.  However,

11  procedurally since she did file a notice of appeal at her

12  request, even after discussions she wanted to do that and

13  she did.  I don't know procedurally you have jurisdiction

14  to even hear anything, so that's why I motioned it up

15  today.

16     THE COURT:   I think I have jurisdiction to enforce the

17  orders that I have entered in this case.  And I have some

18  real concerns about Department of Human Services and what

19  they are doing.  As far as I can see they are not, I

20  understand why they are doing it, but they are not

21  implementing what I ordered to be done.  So what I would

22  like to do is set this matter down, I want someone here

23  from the Department of Human Services to tell me why they

24  are not doing what I ordered to be done in this case.

4

1   Services.   They are not part of the appeal so they have to

2   do what I told them to do.   *In 2021 they still refuse!*

3        MR. YORK:   That's fine, I just wanted to clarify that

4   before I brought Miss Webber

5        THE COURT:   I am also going to tender to each of you a

6   lengthy letter obviously from Miss Webber.

7        MR. YORK:   Okay.   I guess a couple of things.   First

8   we will need to pick a date, and the sooner the better

9   frankly from Miss Webber's perspective because her

10  treatment or her ability to do certain things at DHS is

11  such that she would like to address with the Court as soon

12  as possible.

13       THE COURT:   I understand the other aspect of it as to

14  what happened, and maybe there's a legitimate reason to

15  not do these things, but I would like to hear from

16  somebody rather than getting these reports that are -- I

17  will leave it at that.   Want to pick a day to do this?

18       MR. LINDT:   Does your Honor prefer to hear from -- the

19  incident occurred at Chicago Reed and then that's why it

20  got transferred.   Do you want to hear from someone from

21  Elgin?

22       THE COURT:   I want to hear from someone who has some

23  authority as to what goes on in the Department of Human

24  Services, someone who knows the facts of the case, maybe

EXHIBIT
C

1

1      IN THE CIRCUIT COURT OF THE 18TH JUDICIAL CIRCUIT
              DU PAGE COUNTY, ILLINOIS
2
       THE PEOPLE OF THE                    )
3      STATE OF ILLINOIS,                   )
                                            )
4              Plaintiff,                   )
                                            )   No. 10 CF 2643
5          -vs-                             )   STATUS
                                            )
6      MARCI WEBBER,                        )
                                            )
7              Defendant.                   )

8

9

10                   REPORT OF VIDEOCONFERENCE PROCEEDINGS

11     had at the hearing of the above-entitled cause, before

12     the Honorable GEORGE J. BAKALIS, Judge of said court,

13     DuPage County, Illinois, by SUZANNE AUSTIN, Certified

14     Shorthand Official Court Reporter, commencing on the

15     27th day of October, 2020.

16     PRESENT:

17
            MR. ROBERT B. BERLIN,
18          State's Attorney of DuPage County, by
                MS. JENNIFER LINDT and
19              MS. MARY FLEMING,
                Assistant State's Attorneys,
20
                appeared on behalf of The People of the
21              State of Illinois;

22       MS. MARCI WEBBER,

23              appeared pro se on behalf of herself.

24

—Suzanne Austin, CSR #084-004839—

To: 17737943957        Page: 43 of 51        2021-02-17 16:57:25 GMT        13122685136        From: terry johnson

2

1      THE CLERK:  10 CF 2643, Marci Webber.

2      THE DEFENDANT:  Marci Webber, pro se, representing

3    myself.

4      MS. LINDT:  Jennifer Lindt and Mary Fleming for

5    the People, your Honor.

6      THE COURT:  All right.  Ms. Webber, I have

7    received numerous filings from you regarding your

8    desire to have a hearing regarding the reports that are

9    being generated by the Department of Human Services.

10   There's no way that I can hear your cases as the dates

11   that you have indicated.  I can give you a date for

12   setting for your motion, but that's the best I can do.

13     MS. LINDT:  Your Honor, if the People could

14   address a couple things before anything is set.

15         Your Honor, as to the filings that have been

16   made by Ms. Webber, the first thing I would want to

17   note is the most recent one that you were -- entitled

18   as a rebuttal, obviously the request to issue an

19   advisory order discrediting IDHS, like they deserve,

20   for the incoming judge is a request that just can't be

21   heard by any court.

22         Your Honor, the other request, are specific

23   prayers for relief that will require a hearing is the

24   People's position, but even if they were interpreted as

Suzanne Austin, CSR #084-004839

1    that, your Honor, the defendant is represented by a

2    Equip for Equality, private counsel, for the matter

3    that went up for appeal. So that's part of this case.

4    And then pursuant to the statute, your Honor, under

5    730 ILCS 5/5-2-4 subsection C: Every defendant

6    acquited of a felony by reason of insanity and

7    subsequently found to be in need of mental health

8    services shall be represented by counsel in all

9    proceedings under this section and under the mental

10    health and disabilities code.

11         I know Ms. Webber constantly refers to

12    herself as pro se, but pursuant to statute, that is

13    prohibited. She was allowed to appear before the Court

14    without counsel on occasions to advise the Court of her

15    opinion and provide documentation --

16      THE COURT: I think we have been through that --

17      MS. LINDT: She cannot represent herself at a

18    hearing.

19      THE COURT: I think we have been through that once

20    before, and I think there were cases that said she

21    could.

22      MS. LINDT: Your Honor --

23      THE COURT: I'm going to give you -- Listen to me.

24    I'm going to give a date for setting. The only thing

Suzanne Austin, CSR #084-004839

4

1    to be heard in this case is her position that the

2    reports from the Department of Human Services are false

3    or incorrect.  That's all.  Now, I'm --

4         THE DEFENDANT:  Your Honor?

5         THE COURT:  Yes.

6         THE DEFENDANT:  May I ask for an order requiring

7    the State to give me access to a computer with a

8    modem --

9         THE COURT:  No, I cannot --

10        THE DEFENDANT:  -- that I will pay for --

11        THE COURT:  No, I cannot --

12        THE DEFENDANT:  -- to do real research --

13        THE COURT:  Ms. Webber, listen to me.

14        THE DEFENDANT:  -- that all parties are entitled

15    to --

16        THE COURT:  Listen to me.  I'm not going to do

17    that.  I'm giving you a date in January for setting of

18    your motions.  It's not for hearing, merely for setting

19    of your motions.  January 12th, 9:00 o'clock.  Okay?

20        THE DEFENDANT:  Yes, your Honor.

21                    (Which were all of the proceedings had

22                     in the above-entitled matter.)

23

24

-Suzanne Austin, CSR #084-004839-

To: 17737943957

Case: 1:21-cv-05444 Document #: 1 Filed: 10/13/21 Page 20 of 87 PageID #:20
Page: 46 of 51           2021-02-17 16:57:25 GMT        13122685136

From: terry iohnson

5

```
 1            IN THE CIRCUIT COURT OF THE 18TH JUDICIAL CIRCUIT

 2                        DU PAGE COUNTY, ILLINOIS

 3

 4

 5            SUZANNE AUSTIN, do hereby certify that the

 6     foregoing Report of Proceedings, consisting of Pages 1

 7     to 5, inclusive, was reported in shorthand by me via

 8     Zoom videoconferencing, and the said Report of

 9     Proceedings is a true, correct and complete transcript

10     of my shorthand notes so taken at the time and place

11     hereinabove set forth.

12

13

14

15     _____

16                    Official Court Reporter
              Eighteenth Judicial Circuit of Illinois
17                       DuPage County
                    C.S.R. License No. 084-004839
18

19

20

21

22

23

24
```

EXHIBIT

D

To: 17737948957        Page: 01 of 51        2021-02-17 16:57:25 GMT        13122685136        From: terry johnson

## IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
### DUPAGE COUNTY, ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS ) | |
| ) | |
| ) | **Judge Daniel P. Guerin** |
| Plaintiff, ) | |
| ) | **Previously before** |
| vs. ) | **Judge Bakalis** |
| ) | |
| ) | **No. 2010 CF 002643** |
| MARCI M WEBBER ) | |
| ) | |
| Acquittee / Petitioner | |

### MARCI WEBBER'S RENOTICE OF MOTION
### TO SET A HEARING DATE

**Regarding Judge Bakalis's Ruling on October 27, 2020
Granting my Request to Have a Hearing on
"False or Incorrect" Entries by the
Illinois Department of Human Services
In my Charts and in their 90-Day Reports to this Court**

**Submitted: Wednesday, February 17, 2021**

Marci Webber
Chicago Read
4200 N. Oak Park Avenue
Chicago, Illinois 60634
773-794-4036
MarciWebber101@gmail.com,

*Pro Se.*

**Procedural History for Judge Guerin Who is New to My Case**: Because you are new to this Case, I thought it appropriate to give you, Judge Guerin, a short procedural history; since Judge Bakalis had previously heard my case since 2010 and both acquitted me of the criminal charges and granted my conditional release in 2019.

### Short Procedural History
### and
### Statement of Underlying Facts

In June 2012, Judge Bakalis acquitted me of any criminal charges surrounding an incident that occurred on November 3, 2010. Therefore, I appeared before this Court not as a defendant, but as an acquittee.

I went to high school in the Chicago area. I served in the U.S. Army in Germany, having graduated with a distinguished honor grade for Pershing Missile School and held a Secret Clearance for nuclear weapons. I was honorably discharged in April 1989. Thereafter, I came back to Chicago and received a scholarship for full tuition and attended the University of Illinois at Chicago with funding under the G.I. Bill. My last semester, I made the Dean's List with a 4.0 GPA.

Later, I attended Albany Law School in Albany, New York, starting in 2001.

During the time I was in law school, I had a custody dispute with the father of one of my children. As a result, medical doctors prescribed and over-prescribed me with medication for stress resulting from that situation. I took a leave of absence from law school and attended religious services at the Catholic Church's Divine Mercy Shrine in Stockridge, Massachusetts. I attended daily services there and during one of those days, my daughter, Maggie (age 3 at the time), was sexually fondled by a male religious person while I attended Confession. Because of that, I left the Divine Mercy Shrine and came back to Chicago.

During that trip back, I forgot my medication; and, according to many doctors, including those who have treated me at Elgin Mental Health Center and Chicago Read, I went into a psychosis due to the sudden withdrawal of those over-prescribed medications.

While in that psychosis, I believed I was trying to protect my daughter, Maggie, from being abused by these Diving Mercy religious. And so, the crime from which I was acquitted was killing my daughter. At the scene, I wrote "Divine Mercy = Satan" referring to the sexual abuse she encountered there.

At the trial before Judge Bakalis, the State's own medical expert testified that I did not have the capacity to commit a crime and so I was acquitted. Technically, I am an "NGRI acquittee".

To: 17737943957     Page: 03 of 51     2021-02-17 16:57:25 GMT     13122685136     From: terry johnson

Specifically, the State's witness psychologist Orist Eugene Wasyliw stated, "But for that situation, there was 'no chance whatsoever' I would harm anyone." Before the crime and after that time, I have never physically attacked anyone.

Under the U.S. Supreme Court opinion in *Foucha v. Louisiana* 504 U.S. 71 (1992), an NGRI acquittee can only be held by the State as long as a person is BOTH mentally ill and a danger to themselves or others. This case has been cited in numerous Illinois decisions. The opinion specifically states these limits of when a State can detain an NGRI acquittee.

Specifically, the U.S. Supreme Court holds that an NGRI acquittee "may be hled as long as he is both mentally ill and dangerous, BUT NO LONGER." (my emphasis) *Foucha* at 77.

Contrary to the constitutional protections annunciated in *Foucha* and later cases, I have been punished by the State. I have been told by numerous personnel at Elgin and Read that I am a "murderer", "baby-killer" and that I deserve to be punished. One healthcare professional at Elgin even told me I should commit suicide and gave me a plastic bag. I previously brought this to the attention of this Court years ago.

I have been the victim of "pencil-whipping", a term of art used by in-staff personnel at Elgin; which refers to a pattern and practice of purposely making false entries in my charts at Elgin and Read so that I would be seen in a false and detrimental light. As more particularly described in the "Offer of Proof and Videotaped Affidavit" that I filed on January 8, 2021 in preparation for the setting of a hearing which Judge Bakalis granted – false charting has made its way into the official reports given by Elgin and Read to this Court.

At my 2019 discharge hearing, Nurse Terry Nichols testified that he was told by my psychiatrist, Dr. Richard Malis, not to write positive chart notes because Dr. Malis wanted to build a case against me for forced medication.

Specifically, Judge Bakalis referenced this in his Memorandum Opinion of September 18, 2019 when he stated, "This causes the court pause to consider whether or not the ninety-day reports which have been submitted to the court, are completely accurate regarding the petitioner." Judge Bakalis gives context to the above quote:



> Similar testimony was elicited from Dr. Craig Jock, a clinical psychologist at Chicago Read. Dr. Jock was treating petitioner as a patient since October 2016. At the first hearing he testified that petitioner does not meet criteria for mental illness and no longer needed to be confined. He also could not explain why, if these were his beliefs, he continued to sign treatment s plan letters to the court stating petitioner continued to need treatment in a secured environment. This prior testimony and the present testimony of Mr. Nicholas seems to indicate to the court that employees of the Illinois Department of Human Services are directed by their superiors to endorse their superiors' diagnoses even if they disagree with it. Although the testimony at the prior hearing was not while petitioner was under the care of Dr. Malis, it calls into question the manner of which IDHS makes reports and what pressure is placed on employees to conform to what supervising doctors feel should be done even if they disagree. This causes the court pause to consider whether or not the ninety-day reports which have been submitted to the court, are completely accurate regarding the petitioner. *Memorandum Opinion, Judge Bakalis, September 18, 2019, p. 6*

On December 11 2019, Judge Bakalis granted my *pro se* petition to be conditionally released; and denied the State's motion for a stay of that ruling. I was released and did well for 12 days until the State filed an emergency notice of appeal, without notice to me.

### This Court Retains Jurisdiction to Receive 90-Day Reports
### And, Therefore, Retains Jurisdiction to Determine
### Whether Those Reports Contain Purposefully False Entries,
### Regarding Which I Have Submitted Sworn Testimony and Affidavits

So, yes, there are proceedings in the Appellate Court regarding whether Judge Bakalis abused his discretion in hearing all the evidence, listening to all the experts, and hearing my testimony, in granting my conditional release.

However, this Court RETAINS JURISDICTION to receive 90-day reports from Elgin or Read. And clearly, therefore, retains jurisdiction to have a hearing as to whether those 90-day reports are purposefully false and even fraudulent.

### Judge Bakalis Grants My Motion to Have a Hearing
### Regarding these False Entries:
### He Continued the Matter to January 12, 2021
### To Set a Hearing Date

In the Fall of 2020, I filed an emergency petition before Judge Bakalis requesting a hearing on these knowingly false entries made by the State against me.

The attached transcript of the October 27, 2020 hearing before Judge Bakalis confirms that I (Marci Webber), Judge Bakalis, and State's Attorneys Jennifer Lindt and Mary Fleming were present.

The transcript states as follows:

**[MARCI WEBBER]: Marci Webber, *pro se*, representing myself.**

**MS. LINDT: Jennifer Lindt and Mary Fleming for the People, your Honor.**

**THE COURT [Judge Bakalis]: All right. Ms. Webber, I have received numerous filings from you regarding your desire to have a hearing regarding the reports that are being generated by the Department of Human Services. There's no way that I can hear your cases [sic] as the dates that you have indicated. <u>I can give you a date for setting for your motion, but that's the best I can do.</u> Tr. at p. 2 (my emphasis).**

...

**THE COURT [Judge Bakalis]: ...I'm giving you a date in January for setting of your motions. It's not for hearing, merely for setting of your motions. January 12, 9:00 o'clock. Okay?**

To: 17737943957

Case: 1:21-cv-05444 Document #: 1 Filed: 10/13/21 Page 26 of 87 PageID #:26

Page: 05 of 51

2021-02-17 16:57:25 GMT

13122685136

From: terry johnson

**[MARCI WEBBER]: Yes, your Honor. Tr. at p. 4**

When State's Attorney Joe Lindt suggested at the last hearing that Judge Bakalis had not granted my request to set a hearing date on these motions regarding false entries in my charts and in reports to this Court...he was incorrect. He wasn't even at the hearing on October 27; as Jennifer Lindt and Mary Fleming were.

These falsifications in the 90-day reports submitted to this Court for the past number of years affect the decision-making of the Court over a significant interest of my liberty, guaranteed by various provisions of both the U.S. and Illinois Constitutions.

**Specific Relief Requested:**
The Setting of a Hearing Date Consistent with
Judge Bakalis's Ruling of October 27, 2020.

I am specifically requesting that this Court honor Judge Bakalis's ruling...it is the law of the case...it has already been decided by this Court that I get to have a hearing on these important issues. These issues affect my liberty and the integrity of the mental health system in the State of Illinois.

Therefore, I request that a hearing date be set on or before March 17, 2021 consistent with Judge Bakalis's ruling on October 27, 2020.

In that regard, I have previously filed my Offer of Proof (Attached).

Specifically, I am requesting to call or subpoena witnesses identified in my Offer of Proof; to cross examine them under oath as to the false entries made in my charts and other facts outlined in my Offer of Proof.

Attached:
1. Offer of Proof and Videotaped Affidavit of Marci Webber
   Regarding False or Incorrect Entries in my Charts
   Filed: Friday, January 8, 2021. (33 pp. – Exhibits and Video Link
   Of my Videotaped Affidavit Included)

2. Transcript of Proceedings October 27, 2020 – Judge Bakalis Grants my Motion
   to Set a Date for Hearing on Incorrect and False Entries in my Chart,
   and Continues the Matter for Setting of a Date until January 12, 2021. (5 pp.)

3. Affidavit of Marci Webber dated Friday, January 29, 2021
   Regarding Targeting and Oppressive Room Searches and
   Request for an Order of Protection Filed in Federal District Court, Chicago
   Case No. 1:20-cv-07807, Judge Norgle, (4 pp.)

To: 17737943957    Page: 06 of 51    2021-02-17 16:57:25 GMT    13122685136    From: terry johnson

Respectfully Submitted,

Marci Webber
Wednesday, February 17, 2021

*Pro Se.*

Marci Webber
Chicago Read
4200 N. Oak Park Avenue
Chicago, Illinois 60634
773-794-4036
MarciWebber101@gmail.com

## IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
## DUPAGE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS )
)
)
                                 )          **Judge Daniel P. Guerin**
         Plaintiff,              )
                                 )          **Previously before**
vs.                              )          **Judge Bakalis**
                                 )
                                 )          No.   2010 CF 002643
         **MARCI M WEBBER**      )
                                 )
         **Defendant / Petitioner**

*Candice Adams*
e-filed in the 18th Judicial Circuit Court
DuPage County
TRAN# : 170431306357 ( 4605821 )
2010CF002643
FILED DATE : 01/08/2021
Date Submitted : 01/08/2021 10:35 AM
Date Accepted : 01/08/2021 10:40 AM
ENSALACO,ANGELA

### MARCI WEBBER'S OFFER OF PROOF
### &
### VIDEOTAPED AFFIDAVIT

Regarding Judge Bakalis' Ruling on October 27, 2020
Granting my Request to Have a Hearing on
"False or Incorrect" Entries by the
Illinois Department of Public Health
In my Charts and in their Reports to this Court

Submitted: Friday, January 8, 2021

Marci Webber
Chicago Read
4200 N. Oak Park Avenue
Chicago, Illinois 60634
773-794-4036
MarciWebber1010@gmail.com,

                              *Pro Se.*

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more. 2021-02-17 16:57:37 # 4605821/170431306357

## *Prefatory Note*

I am an NGRI Acquittee who was granted conditional release by Judge Bakalis on December 11, 2019 (13 months ago). Judge Bakalis denied the State's Motion to Stay that order. Shortly thereafter, the appellate process ensued: after being released, I voluntarily returned myself to Chicago Read from where I had just been released by Judge Bakalis.

Though, I am represented in the Appellate Court proceedings by a non-profit organization, Equip for Equality, I am representing myself and am *pro se* in these proceedings. Judge Bakalis specifically ruled that I was entitled to represent myself. For reasons beyond the scope of this pleading, I believe the Public Defender's Office, who previously represented me, may have a conflict. I would be happy to explain this to the Court outside the presence of the State's Attorney, as it is an issue regarding my effective representation.

On October 27, 2020, Judge Bakalis granted my written petition to have a hearing on false and incorrect entries that permeate my charts at Elgin and Chicago Read. And, therefore, these false, knowingly false, and incorrect statements permeate the Official Reports by IDHS to this Court; which falsehoods are designed to keep me illegally detained when I am, in fact, neither mentally ill nor a danger to myself or others.

Specifically, Judge Bakalis referenced this in his Memorandum Opinion of September 18, 2019 when he stated, "This causes the court pause to consider whether or not the ninety-day reports which have been submitted to the court, are completely accurate regarding the petitioner." Judge Bakalis gives context to the above quote:

> Similar testimony was elicited from Dr. Craig Jock, a clinical psychologist at Chicago Read. Dr. Jock was treating petitioner as a patient since October 2016. At the first hearing he testified that petitioner does not meet criteria for mental illness and no longer needed to be confined. He also could not explain why, if these were his beliefs, he continued to sign treatment s plan letters to the court stating petitioner continued to need treatment in a secured environment. This prior testimony and the present testimony of Mr. Nicholas seems to indicate to the court that employees of the Illinois Department of Human Services are directed by their superiors to endorse their superiors' diagnoses even if they disagree with it. Although the testimony at the prior hearing was not while petitioner was under the care of Dr. Malis, it calls into question the manner of which IDHS makes reports and what pressure is placed on employees to conform to what supervising doctors feel should be done even if they disagree. This causes the court pause to consider whether or not the ninety-day reports which have been submitted to the court, are completely accurate regarding the petitioner. *Memorandum Opinion, Judge Bakalis, September 18, 2019, p. 6*

**Videotaped Affidavit:** At my request, a Videotaped Affidavit and Offer of Proof was made through a Zoom video conference with me and Terry Johnson. For the last number of years I have asked that videotaped interviews be made of me and that I be able to appear in court *pro se*, so I can show to the Court that I am not mentally ill; and am not a danger to myself or others.

There have been many knowingly false statements put in my charts designed to keep me wrongly confined by the State. Many of the psychiatrists and psychologists employed by the Illinois Department of Public Health have admitted to me that I am not

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

mentally ill, that I am not a danger to myself or others, and that I should be released from confinement.

Unfortunately, any number of these same individuals have admitted to me that they are fearful of losing their jobs and their pensions; and so, they do not want to testify candidly about their opinions because they go contrary to those higher-ups at Read and Elgin.

In addition, the staff at these same institutions that have confined me have a term called "pencil whipping." As I explain in the attached Videotaped Affidavit, this is a practice in which Elgin or Read staff purposely chart false entries designed to make a detainee look bad; while failing to chart positive entries.

In the end, these false entries, and knowingly false entries, have violated my constitutional rights protected by the United States and Illinois Constitutions.

Recently, I filed a *pro se Habeas Corpus* petition in Federal District Court, Chicago which is now pending under 1:20-CV-7807 (Judge Norgle). This petition was received and filed by the clerk of the Federal District Court on December 30, 2020. I personally handwrote the petition and mailed it to the Court and parties from Chicago-Read where I do not have access to a computer or legal research.

I believe Judge Bakalis was correct in properly releasing me 13 months ago.

I welcome the opportunity to have a hearing on the false, knowingly false and incorrect entries that have been made in my charts and in official reports to this Court by employees of the State.

I encourage this Court to watch the videotape of my testimony and Offer of Proof which is provided in a digital link on the front and last pages of my Videotaped Affidavit which is attached.

**Appendix:** In addition to the transcript of my Videotaped Affidavit and Offer of Proof dated December 10, 2020, I have attached the following in an Appendix through a Dropbox link:

1. Transcript of Proceedings, October 27, 2020 (5 pp.)
   Judge Bakalis grants my motion for a hearing.
2. Memorandum Opinion of Judge Bakalis, September 18, 2019 (10 pp.)
   Judge Bakalis grants my petition for conditional release.
3. My Brief to the Appellate Court, Defendant / Petitioner / Appellee
   (the Statement of Facts in my brief is a reasonably accurate summary of the factual and procedural history in my case before this court.)

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

Respectfully Submitted,

Marci Webber
Friday, January 8, 2021

**Marci Webber**
**Chicago Read**
**4200 N. Oak Park Avenue**
**Chicago, Illinois 60634**
**773-794-4036**
**MarciWebber1010@gmail.com,**

                                      *Pro Se.*

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

1                                                                    TMJ/F

2                          Videotaped Affidavit and

3                      Offer of Proof of Marci Webber

4                            December 10, 2020

5                    Link: https://youtu.be/bNY-NEIaeuq.

6

7        Q: Marci do I have your permission to record this

8    videotaped affidavit and offer of proof?

9        **A: Yes, you do.**

10       Q: Do you also give me your permission to assist you in

11   filing this with the court before Judge Bakalis or his

12   successor?

13       **A: Yes, you do.**

14       Q: For the record, this is the Offer of Proof and the

15   Videotaped Affidavit of Marci Webber who is an NGRI acquittee

16   under Case No. 2010CF2643 pending in the Circuit Court of...

17   [~~Cook County~~ DuPage County]. And are you appearing *pro se* in

18   those proceedings?

19       **A: Yes, I am.**

20       Q: And just for the record, you have submitted affidavits

21   to the court before, by, through attestation. So, do you swear

22   that all the facts that you will give today will be the truth,

23   the whole truth, and nothing but the truth so help you God under

24   the pain and penalties of perjury?

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

25      A: Yes, I do. I also want to just make sure the date –

26  Today is December 10, the year is 2020 and it is Thursday.

27      Q: Ok. And that's – and where are you standing or sitting

28  right now?

29      A: I am in the Group Room. It's outside the Day Room on B

30  South Unit at Chicago Read.

31      Q: Ok. And you have been detained by the State at either

32  Elgin or Read, what was the first year?

33      A: Well the underlining crime happened November 3, 2010.

34  The acquittal was June 2012 and I was sent to Elgin Mental

35  Health Center up until October 11th of 2016. Then I had a hearing

36  and the decision was November 13th, 2017. The decision, yes, it

37  was 20 – November 13, 2017. Then I was sent back to Elgin on

38  November 22, 2017. Then after Judge Bakalis' September 18th,

39  2019 decision I was sent back to Chicago Read on October 2,

40  2019. I was released on December 11, 2019 and then forced to

41  return on my own, no incident, December 23rd, 2019. And I have

42  been here since.

43      Q: Ok. And you didn't even have any notes in recalling

44  those dates. You have a pretty photographic memory from my

45  experience in doing dates and recalling conversations, is that

46  fair?

47      A: Yes, it's pretty good.

2

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

48    Q: Alright, first of all, Judge Bakalis had granted your

49    request to have a hearing and file documents in court regarding

50    the false and knowingly false things that have been entered in

51    your charts and in submissions to the Court, is that fair?

52    **A: Yes.**

53    Q: Alright. And this recording will be transcribed, but as

54    you understand this is an Offer of Proof which will tell the

55    Court and the parties what you intend to prove through various

56    witnesses and recitations of admissions from employees and

57    professionals at either Elgin or Chicago Read, is that fair?

58    **A: Yes.**

59    Q: Alright. Also as preliminary, had you given to the Court

60    recordings that you made of some of these professionals

61    regarding their admissions, some of which indicated that you

62    were not mentally ill in their opinion or a danger to yourself

63    or other?

64    **A: Yes.**

65    Q: Did you send recordings to Judge Bakalis?

66    **A: I sent one recording initially after Dr. Corcoran had**

67    **perjured himself on October 11, 2017.**

68    Q: And this is what – this is what – First of all, this is

69    what you told the Court those plain words right. This is what

70    you have informed Judge Bakalis?

71    **A: Yes.**

3

72     Q: Alright and – and – go ahead. I'm sorry.

73     **A. One of the reasons why I sent that recording in**

74     **particular, well a couple of reasons, was because Dr. Corcoran**

75     **testified I screamed at him for 10 minutes. And it clearly shows**

76     **no screaming and it shows admission that, just like I have been**

77     **saying the entire time, the medications caused the behavior at**

78     **the time of the crime. That's why I sent that to him.**

79     **Subsequently, he, a couple of months later, Judge Bakalis, I**

80     **asked him once I was before him in court if he had received and**

81     **listened to Dr. Corcoran's recording. And he said "Yes, I'd like**

82     **to hear more." So, I sent him about 25 out of several years of**

83     **recordings to give him an idea of what was going on.**

84     Q: Right, and did you – and that was at his invitation, is

85     that correct?

86     **A: Yes. He asked me specifically his words were "I would**

87     **like to hear more."**

88     Q: And did you expect that those recording that Judge

89     Bakalis requested in your case in open court were to be made

90     part of the Record in your proceedings when you represented

91     yourself *pro se*?

92     **A: Yes. As a matter of fact, I thought everything I was**

93     **sending Judge Bakalis was part of the Record.**

4

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

94     Q: And you have a copy of the recordings that you sent to

95    Judge Bakalis, if somebody asks you to send them copies of what

96    you sent Judge Bakalis and the Court in your proceedings?

97     **A: Well, of course I don't have a copy on my person. Other**

98    **people have copies.**

99     Q: Right. So, you could direct copies to be sent again if

100    they are not in the Record, is that fair?

101    **A: Yes.**

102     Q: Alright. Alright. First of all, I would like to ask you

103    - to see if I can ask you a couple of things that we would like

104    to do today. First of all I would like to first identify - you

105    and I have previously chatted correct? And we have tried to

106    identify those psychiatrists or psychologists who have treated

107    you or have seen you at either Elgin Mental or Read regarding -

108    **A: No, Elgin or Chicago Read.**

109     Q: I'm sorry, Elgin or Chicago Read. I have that on my mind

110    - Elgin or Chicago Read that have either admitted to you that,

111    one, you are not mentally ill or that you are not a danger to

112    yourself or others which are standards as you know under U.S.

113    Supreme Court and Illinois Supreme Court rulings regarding NGRI

114    acquittees, you understand that?

115     **A: Those are the only standards. You have to be both**

116    **mentally ill and dangerous and reasonably expected to commit**

117    **serious bodily harm on yourself or others from that mental**

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

118   **illness to be detained in an in-patient unit like I am. And I am**

119   **not being in forensics. I'm on a special unit for psychotic**

120   **people.**

121   Q: And my question is – You have a list. I would like to

122   identify the list. First of all, just the names of those

123   physicians, medical doctors, psychologists, or psychiatrists who

124   have admitted to you and those who are employees of either Elgin

125   or Read that, one, you are not mentally ill or you are not a

126   danger to society or others. I would just like you to identify

127   the list of those psychiatrists or psychologists. Please spell

128   their name and these lists of these people consistent with your

129   affidavit are only those individuals or will be those

130   individuals – there may be others – who have said those things

131   to you, fair enough?

132   **A: Sure.**

133   Q: And then at the end of our listing of those physicians,

134   I will ask you again "Marci, are these physicians people that

135   have admitted to you that you are neither mentally ill or a

136   danger to yourself or others?" And then we'll go back, and I

137   think we will have time today to talk specifically about what

138   two physicians have told you: Dr. Obaid and Dr. Rohrbacher. Is

139   that ok?

140   **A: Yes.**

6

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

To: 17737943957

Case: 1:21-cv-05444 Document #: 1 Filed: 10/13/21 Page 38 of 87 PageID #:38
Page: 18 of 51          2021-02-17 16:57:25 GMT          13122685136

From: terry johnson

141  Q: Alright. So, first of all, I'd like - And you have some
142  notes in front of you, correct?

143  **A: Right. I have a list in front of me starting in**
144  **chronological order from the most recent person who actually is**
145  **Dr. Ziuddin.**

146  Q: Ok, first of all I am just going to ask please feel free
147  to reference your notes. I know many of this you, you know very
148  well. So first of all, I would like to see if you can go through
149  and identify just by name, and maybe pronounce their name
150  phonetically, and see if you can spell it if you know, and tell
151  us whether or not they are a psychologist or a psychiatrist, and
152  how they interface with you; not about what they have told you,
153  but just identify them. Okay? And we will just keep track of
154  them by number. How about number 1?

155  **A: Okay well Dr. Ziuddin, is Z-I-U-D-D-I-N, I believe, she**
156  **is a medical doctor. She was my medical doctor from 2016 in**
157  **through 2017 for 13 months before. She is my current medical**
158  **doctor. I asked her -**

159  Q: Ok, first of all we are not going to talk about what she
160  said. We are just going to go through and identify the
161  physicians by name.

162  **A: Oh okay, okay.**

163  Q: So, as an example, let's go to number 2. Who's the
164  second doctor we have on your list?

7

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

165     **A: The Medical Doctor I had prior to Dr. Ziuddin, Dr.**

166     **Shareef, S-H-A-R-E-E-F, he is a medical doctor as well that**

167     **works here.**

168     Q: Ok. And I apologize because I don't know, are either of

169     the doctors psychologists or psychiatrists or just medical

170     doctors?

171     **A: They are medical doctors.**

172     Q: Okay, fair enough. Next please.

173     **A: Well they work in this field. They know a person's**

174     **mentally ill.**

175     Q: No, I understand. They have seen you at Chicago Read,

176     for example, those two?

177     **A: Yes.**

178     Q: Alright, and these are all physicians that you are going

179     to name have either seen you at Chicago Read or Elgin Mental

180     Health Center, is that fair?

181     **A: Yes.**

182     Q: So, let's go to the third physician.

183     **A: So, the next in time would be Dr. Anna Rohrbacher, R-O-**

184     **H-R-B-A-C-H-E-R. She is a psychiatrist who met me in October of**

185     **2016 and has known me now – minus the stay in Elgin – she has**

186     **been around me second most of all doctors in IDHS.**

8

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

To: 17737943957
Case: 1:21-cv-05444 Document #: 1 Filed: 10/13/21 Page 40 of 87 PageID #:40
Page: 20 of 51          2021-02-17 16:57:25 GMT          13122685136          From: terry johnson

187     Q: And we will come back to this again because I am just

188     trying to identify this, but Dr. Rohrbacher has told you that -

189     told you what just in summary, short version?

190     **A: She said that I am not mentally ill. That medications**

191     **can make a normal brain mentally ill. She said that, well, her**

192     **exact words "you are not mentally ill now."**

193     Q: Ok, fair enough. We are going to - we will just do that

194     by way of description. We will come back later on for some more

195     information.

196     **A: Ok.**

197     Q: I think the next doctor up is whom?

198     **A: Dr. Mir Obaid, M-I-R, and his last name is O-B-A-I-D. He**

199     **is also a psychiatrist who has done two 18-month periods as a**

200     **medical director here back I think around 2008 was one of the**

201     **times. He did not want to do it permanently and he started back**

202     **in the 80's as a psychiatrist. So, he has been around for a very**

203     **long time and also Dr. Anna Rohrabacher has known me since**

204     **October of 2016. I have had constant contact with them.**

205     Q: Alright, and just a quick question I know we will come

206     back to it, but I just want to get through the list, but Dr.

207     Obaid has admitted to you that in his opinion you are not

208     mentally ill and he has also admitted to you in his strong

209     opinion, you are not a danger to yourself or others. Is that

210     fair?

9

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

211    **A: Yes, they both have stated also "you don't need**

212    **medication, you need to go home." They know I am being hurt; he**

213    **has admitted that to me that this is harming me.**

214    Q: Right, and you're not on any – you have refused

215    medication for how long now?

216    **A: Since September 25th of 2013.**

217    Q: Right, and from my view and the view of many others and

218    from the view of this videotape, you seem to be not mentally ill

219    and conversing easily and with linear thinking. Is that fair

220    with respect to your opinion?

221    **A: Yes, I am completely different than I was in 2010.**

222    Q: Okay, alright. Let's just go down the list again. The

223    next doctor, or psychiatrist or psychologist?

224    **A: My current psychiatrist is Dr. Anatoliy Pyslar. The**

225    **spelling of his name is A-N-A-T-O-L-I-Y, Pyslar is, P-Y-S-L-A-R.**

226    **He is Ukrainian, he has been here for a couple of years. He is**

227    **relatively new, he is young. He has called me, quote, "one of**

228    **the normals." He has said that if I was a civil committee I**

229    **would have been released. Prior to my release he said that I am**

230    **fine if the Judge releases you.**

231    Q: And just stepping back, many or if not all of these

232    reports and admissions that you are not mentally ill or a danger

233    to yourself or others, these never made it in the reports in

10

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

234  your medical charts nor did they make it to the reports to the

235  court of Judge Bakalis, is that fair?

236       **A: That's correct.**

237       Q: And that is one of the reasons you believe that there

238  have been falsifications and knowingly falsifications made in

239  the reports to the Court contrary to the opinions of many of

240  these physicians, psychiatrists, and psychologists who have

241  treated you, is that fair?

242       **A: I know they are false. I have had a staff say to me,**

243  **"the people you say are lying, are lying."**

244       Q: Ok.

245       **A: And he used that word.**

246       Q: Alright, lets go -  let's just go to the next names

247  because we are not going to get through explanations of all of

248  these physicians. I would like just to get through the names

249  next. Ok, who's the next one?

250       **A: Ok, my last psychiatrist before Dr. Corcoran and Dr.**

251  **Sullivan in 2017 just before my hearing, I think about a month**

252  **or so before my hearing, September 26, 2017 was the hearing. Dr.**

253  **Helena Radomska, R-A-D-O-M-S-K-A, was my psychiatrist and she**

254  **had told Dr. Watson - it's in his report - that quote, "meds may**

255  **have caused my mental illness or exacerbated something." Off the**

256  **- on the side she admitted to me that she felt that akathisia**

257  **had caused it. That unchecked akathisia can cause what happened**

11

258   and that I was not mentally ill. She was quite apologetic saying

259   "that wasn't you." When doctors start to get to know me they

260   start to feel my guilt and they start saying to me "that wasn't

261   you" and trying to make me feel better about what happened 10

262   years ago.

263       Q: And those reports of their opinions and assessments of

264   you never make it into the charts and the reports to the court,

265   is that fair?

266       A: No. Even Dr. Rohrbacker...

267       Q: No, is that - I'm sorry. Is that true, what I said?

268       A: Yes, that is true.

269       Q: Ok. Alright.

270       A: The positive things don't get in there.

271       Q: Right. You have - just a little bit of an aside - you

272   have filed documents in court I think when you were being

273   detained at Elgin that you reference a word that people at Elgin

274   use called - what was it - something about charting, pistol

275   whipping or something like that?

276       A: Oh, pencil whipping.

277       Q: Pencil whipping.

278       A: Yea, he told me "don't let them pencil whip you." And

279   Martha Stroud was saying to me, "we know you are not mentally

280   ill, I am going to keep doing this until you go to jail." And

281   another person, Becky - Rebecca Nikolov, who is retired from

12

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

282   there, had said the same thing that they pencil whip you. And

283   another person from here, Pat Pierce, had said that they have

284   their marching orders, they didn't do a good enough job

285   basically pencil whipping me when I was here before and that I

286   can't leave unless I can get along with people. So -

287        Q: Alright, let me ask you this. Do you believe that pencil

288   whipping as they have described it to you - and these are

289   employees of the Illinois Department of Public Health -  have

290   told you about that concept that they used, pencil whipping,

291   correct?

292        A: Yes.

293        Q: And that is, for lack of a better word, putting

294   knowingly false information in your chart to make you look bad,

295   designed to keep you detained or retained at those facilities,

296   is that fair?

297        A: Yes. As a matter of fact, Dr. Mir Obaid showed me where

298   - they have a list of what they are supposed to do with each

299   patient each day as far as the charting. I forgot - I wrote down

300   the name - what the paper says. But he says - because it says

301   they're supposed to all interactions with me each shift. Which

302   is not true because they don't write the positive chart. See,

303   they can write something in paper, but they will tell certain

304   staff something opposite, so it's not noticed. But, Dr. Obaid

13

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

305  said that "you are the only one in this facility with these
306  instructions."

307      Q: Alright, let me ask you this. Do you believe that these
308  false chartings, knowingly false charting, has violated your
309  constitutional rights both of the U.S. Constitution and the
310  Illinois Constitution with respect to the actions of various
311  employees and officials of the State of Illinois, Illinois
312  Department of Public Health?

313      A: Absolutely. I think it's violated - -

314      Q: Right. Can we go to the next name please?

315      A: Sure. Dr. Taneer Shan, he was my first psychiatrist
316  here. His name is spelled T-A-N-E-E-R, I believe. And last name
317  is S-H-A-N. I saw him through October, November, and December of
318  2016. And after he wrote the words in my chart quote, "no
319  psychosis, no mood disorder", he was removed as my doctor.

320      Q: Do you believe people have been removed from seeing you
321  because they have made some positive findings about you that are
322  inconsistent with you being detained at either Elgin or Read?

323      A: Absolutely. Staff Latanya Simmons at Elgin had told me
324  "don't talk to me too much because they will see it and they
325  will move me off the unit." Anybody who was friendly to me, or
326  wrote positive things - Dr. Rohrbacher wrote 2 positive chart
327  notes that never made it into my court reports either.

14

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

328    Q: Ok. How many — little bit of an aside, how many years
329    did you study law in law school?

330    **A: I had 5 semesters of law.**

331    Q: Ok. Right.

332    **A: 2 and a half years. And I got B minuses in psychiatry of**
333    **the law.**

334    Q: Ok, fair enough.

335    **A: I was asked by my professor to ... [not decipherable]**
336    **... the law review. I was very honored by that and my paper was**
337    **on [not decipherable].**

338    Q: So, you have come to understand the significance of
339    Illinois and U.S. Supreme Court decisions that control how long
340    the state can keep a person who is not guilty by reason of
341    insanity, NGRI acquittees, is that true?

342    **A: Yes.**

343    Q: Alright, and –

344    **A: By the way, Dr. Corcoran testified that he successfully**
345    **treated me in jail. I believe I should have never been brought**
346    **into the mental health system regardless because I did not meet**
347    **the criteria where the burden is on the state to prove that I am**
348    **mentally ill and dangerous. And Judge Bakalis actually ordered –**
349    **when I was representing myself – ordered Jeff York to give me**
350    **the medical records. He gave me all but the last year of the**
351    **medical records from the very beginning of those medical records**

15

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

352    that have my diagnosis listed as delirium psychosis, meaning it

353    is caused by a chemical like the medications.

354        Q: Alright, in your review, have people admitted to you

355    that you were being overprescribed various types of medication

356    and they believed that that or the withdrawal - the sudden

357    withdrawal from those medications caused your psychosis?

358        A: Oh yes. I was on two of the highest doses - or two

359    antidepressants at the highest dosages and -

360        Q: Let me ask you this. Sorry. Let me ask you this. You

361    were being prescribed those medications by a physician, is that

362    correct?

363        A: Yes.

364        Q: Alright. And did people - and were there psychiatrists

365    or psychologists at Chicago Read or Elgin, have they admitted to

366    you that they believe that the medications, either the giving of

367    the medications in high quantities, or the sudden withdrawal was

368    a likely cause of the psychosis that lead to the crime?

369        A: Yes. I haven't had anybody -  I am trying to think -

370    really adamantly refute it. Maybe a couple of psychiatrists

371    dodged the issue. But, all of the medical doctors, for example,

372    Dr. Anthony Nadia said "of course those meds caused your

373    psychosis" back in February of 2015. Or 2016, sorry.

16

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

374    Q: Let's go back on track to the other physicians who have
375    told you, admitted to you, that you are either not mentally ill
376    or a danger to yourself or others.

377    **A: Ok, well we're next on Dr. Corcoran. Do we want to wait**
378    **for that for later?**

379    Q: No, I'm just - I just want to go through the names. I
380    really don't want to talk about what Dr. Corcoran said right
381    now. Let's just indicate who he is and whether he is a
382    psychologist or psychiatrist.

383    **A: He is a psychiatrist.**

384    Q: Alright.

385    **A: He is a psychiatrist who has seen me since I was in**
386    **jail.**

387    Q: Alright, let's go to the next name?

388    **A: Dr. Carol Rosanova. No, Dr. Rosanova on August 27 -**

389    Q: What type of doctor is she?

390    **A: Oh, I'm sorry. Dr. Rosanova, she is a psychiatrist who**
391    **saw me from December of 2015 into October 2016. Her name is R-O-**
392    **S-A-N-O-V-A.**

393    Q: My notes indicate that you told me she specifically
394    admitted to you that you are not dangerous.

395    **A: Yes, we were at a staffing on Jenks unit at Elgin on**
396    **August 27th, 2016 and right to Jeff York in front of me, said**
397    **very adamantly "she's not dangerous."**

17

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

398     Q: And that information never came out to any report to the
399 Court, as far as you know?

400     **A: No, actually what's funny, if you look at the Court**
401 **Reports from the beginning to the current, they've upped the**
402 **legal language in it. You can tell that there is someone, most**
403 **likely, that's helping with the legal language and they have**
404 **actually done the opposite and said that I am reasonably**
405 **expected to commit serious bodily harm to myself or others.**

406     Q: Right, and you think that is fraudulent and false
407 consistent with the other admissions that many doctors have told
408 you, that you are not mentally ill or a danger to yourself or
409 others, is that fair?

410     **A: I know that because of those admissions and also I know**
411 **myself.**

412     Q: Right. Have any doctors, psychologists, or psychiatrists
413 at Read told you that they are fearful to keep their jobs,
414 including their pensions, if they tell or chart these positive
415 things about you?

416     **A: Oh yes, it's a theme going all the way back to Elgin**
417 **starting with Fred Jones who was the Activity Therapist who said**
418 **I am not paranoid, I should have been released in 2014.**

419     Q: And the question was, have any people indicated to you
420 that they feel their jobs would be in jeopardy if they say
421 positive things about you?

18

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

422     A: Yes. Dr. Obaid has specifically - has said to me, "I'm

423     not testifying." This is a quote, "I am not testifying. I don't

424     want to lose my job or pension." And I don't want to call him,

425     but I need to go home. They are hurting me too much.

426     Q: Right. Is it your intention to put doctors who have

427     admitted to you these things that would qualify you to get out

428     immediately if you are not mentally ill or a danger to society

429     or others - is it your intent to subpoena these witnesses and

430     have them give sworn testimony before the Court as to, one, the

431     falsification in your chart and, number two, why you should be

432     released immediately pending the outcome of the Illinois

433     Appellate Court Decision in your case?

434     A: Yes.

435     Q: Alright. Let's go through the next physician please.

436     A: The next physician is Dr. Daniel Hardy. He was the

437     Medical Director at Elgin and he signed a piece of paper - he

438     was the medical doctor and psychiatrist. He signed a piece of a

439     paper along with Dr. Joan Langly, who was the director of

440     psychology, she is a psychologist at Elgin, on March 31, 2016.

441     And that piece of paper, that transfer paper, said quote,

442     "normal, not currently mentally ill."

443     Q: Let's just go to the next name, please.

444     A: Dr. Loay Sanduka. It's L-O-A-Y. And Sanduka is S-A-N-D-

445     U-K-A and he is a psychologist at Elgin.

19

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

446     Q: Ok. And I am just going through my notes, I think we

447     have a - Are there any other physicians, meaning psychiatrists

448     or psychologists, on the list? I think that was it for me -

449     **A: Dr. Craig Jock. And also, my very first doctor, Dr. John**

450     **Meisner. He wrote in my chart. He retired. He wanted to get out**

451     **of this case. And Bob's report talks about him being afraid that**

452     **my case was going to blow up in his face and was upset about**

453     **what the higher-ups were telling him to do. He wrote that I was**

454     **in a robust remission and on April 30, 2014, I saw in my chart**

455     **where he had written, "in no way meets the criteria for forced**

456     **meds." But, 3 days later the new doctor came in, Dr. Syed**

457     **Hussein, and stuck me up for a forced shot to show me that they**

458     **were bigger than me is what Maribel Martin called it -**

459     Q: Alright, there are other health care professionals,

460     nurses, and STAs who we can talk about later, but are these an

461     appropriate listing of the names of the physicians including

462     psychiatrists and psychologists who have either told you, one,

463     you are not mentally ill or you are not a danger to yourself or

464     others or you should be released from confinement at either

465     Elgin or Read?

466     **A: Yes, there's also a couple of more medical doctors. Dr.**

467     **Dipankar Banerjee, he was always real apologetic saying, "that**

468     **wasn't you." And Dr. Tralca, I think her first name is Carolyn,**

469     **at Elgin. And then Dr. Anthony Medea has adamantly blamed the**

20

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

470   **meds, early to me. But he told me he takes his instructions from**
471   **the psychiatrists. At the time that was Dr. Malis, Dr. Richard**
472   **Malis, the discredited doctor from Elgin. You know, the judge**
473   **discredited him. And actually, I sent the judge documents**
474   **showing that he has perjured himself as well as Dr. Corcoran.**

475   Q: Ok. Alright, so the doctors, the psychologists, and the
476   psychiatrists, and the medical doctors that you have described,
477   have they admitted to you while they were employees of the
478   Illinois Department of Public Health, whether it be Elgin or
479   Chicago Read, in summary that, one, you are not mentally ill
480   and, number two, you are not a danger to yourself or others.

481      **A: Yes.**

482      Q: And if called at the time of trial or other proceedings,
483   you could competently testify to those facts?

484      **A: Yes.**

485      Q: Alright. So, we have been going for about 30 minutes
486   today. And first of all I would like to see if, as facilitating
487   you to getting this Offer of Proof to the Court, do you give me
488   permission to send or transcribe this – and we can get it
489   transcribed – and also to post it on a private YouTube channel
490   so that link can be sent to the Court as well as to the State's
491   Attorney's Office?

492      **A: Yes.**

21

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

493     Q: Ok. Well that I think concludes the Offer of Proof and

494     Videotaped Affidavit for today. My question is if you - well I

495     will continue a little bit. You could come back and talk in some

496     significant detail about what each of those doctors specifically

497     told you about those admissions, would that be fair?

498     **A: Yes. And I can cite very specific examples of lies and**

499     **where staff had told doctors they are lying.**

500     Q: Alright. And we can come back at another time and talk

501     about specifics about what some non-doctors, non-psychiatrists,

502     non-psychologists, staff - you could chart and tell us what lies

503     they have specifically put in your chart, true?

504     **A: Correct. And -**

505     Q: Hold on, let me just, let me just ask. And there are

506     also people that have told you, employees of either Read or

507     Elgin, have told you, admitted to you, that they know various

508     individuals are lying in your chart, meaning pencil whipping you

509     for lack of a better word, is that fair?

510     **A: Yes.**

511     Q: And you could give sworn testimony when we come back in

512     another session about what admissions have been made by you

513     about false charts, false facts in your charts made by

514     nonphysicians, is that fair?

515     **A: Yes. And I can back it up with emails. I use a Google**

516     **phone number with emails regularly, constantly throughout the**

22

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

Case: 1:21-cv-05444 Document #: 1 Filed: 10/13/21 Page 54 of 87 PageID #:54

517  **day to document everything. My thoughts, feelings, and**

518  **behaviors. They never ask you why you behave a certain way, they**

519  **never ask you what are you thinking, what are your feelings.**

520  **Don't you think those are the most relevant things? And there is**

521  **no context in my court reports.**

522  Q: Alright, you understand as a person who has studied law

523  and also has studied case law with respect to NGRI acquittees

524  that the state cannot punish you for a crime that you are found

525  not guilty of, is that true?

526  **A: Correct. I have DVD video from depositions with quotes**

527  **from, for example, the Chief of Security, Bill Epperson states,**

528  **"this is a penal institute. They deserve punishment."**

529  Q: Ok. My question is, you are aware of the legal standard

530  that says it is illegal for the state to punish an NGRI

531  acquittee, is that correct?

532  **A: Yes. That is why it makes it harder on me mentally**

533  **because I know what they are supposed to be doing.**

534  Q: Right, and have there been a consistent group of people

535  that have told you things that you are being – you should be

536  punished for your actions and various very untoward things they

537  have called you names, and murderer, and the like. Could you

538  briefly talk about people who have tried to punish you from

539  their words by calling your certain names? And I am talking

540  about staff of either Elgin or Read.

23

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

541     A: I know what you are talking about. Marva Stroud told me

542   I should - that I am going to hell. People at Elgin were very

543   vicious towards me. They kept me from talking to my father as he

544   was dying. And then they pointed a finger, I mean a pen at my

545   face. Carey Frances did, and said "I am just doing my job."

546   Margot said "I have my orders." And she would mess with me one

547   day being very mean to me emotionally and then she would let

548   off. She'd say "oh up one day, down one day, you are bipolar."

549   That's not how you - oh. Terry Nichols, the nurse that

550   testified, he told me normally they squeeze a patient that

551   doesn't take meds for a month or two, not a couple of years. And

552   then he also said that they don't rule out mental illnesses they

553   build cases against mental illness. And I have seen that for

554   myself over the years and recorded several years to try to prove

555   I'm not mentally ill and dangerous, and I am being abused. And

556   Dr. Obaid said that "your reactions are normal reactions to the

557   milieu. I'd be worse."

558     Q: Have you been subjected to body searches and cavity

559   searches outside of any norm that you have seen at Read or

560   Elgin, and do you believe you have been singled out because of

561   the crime that you were found not guilty of?

562     A: Whatever the reason, if it's just because of the crime

563   or because of me speaking out, I think it is a combination, yes.

564   And Dr. Vicky Ingram said to me "We haven't done cavity searches

24

565   or anything like that in years." And she said that Dr. Malis was
566   lying on the witness stand that "it is documented that you were
567   cavity searched" and that traumatized me significantly. And the
568   room searches, they initially when I got to Elgin were 4 times a
569   week, by the time the hearing occurred Bernice Paige testified
570   it was twice a week. Here I have paperwork saying they were
571   supposed to do it 3 times a week. I have a Defense Security
572   Guard coming into my room when I am sleeping the majority of the
573   time and just trashing my room. Here recently - the last one
574   there was 6 people. The staff told me, the nurse manager Bisi,
575   you spoke to him yesterday, said, "Everybody who is available
576   come to her room." And nobody else on this unit has that done to
577   them. At Elgin I had to be body searched just to leave the unit
578   and body searched on the way back. And it was basically they -
579   this is what Dr. Obaid said, "they are expert manipulators of
580   situations in behavior." So, it was designed to deter me from
581   going off the unit doing things, to help me cope with the
582   environment. And Dr. Pyslar recently asked me if I was depressed
583   and I said "no." Later, I said to myself you know I should have
584   said "Is that what you are going for?" because of how
585   restrictive - I am extremely isolated here. And when I ask for
586   help, they stick it to me even more so.

587        Q: Ok. And do you believe from what you've just testified
588   about that you are being punished by people either at Elgin or

25

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

589    the State contrary to your constitutional rights, both U.S.

590    Constitutional Rights and the State of Illinois, because you

591    have been acquitted of any crime?

592    **A: Absolutely. I have no doubt in my mind I'm being**

593    **punished.**

594    Q: Alright, that will conclude the videotaped affidavit for

595    today. Thank you, Marci. And -

596    **A: Thank you, Terry.**

597    Q: If called, I will ask this question usually are at the

598    end of affidavits, could you competently testify to the above

599    facts?

600    **A: Absolutely. And I really appreciate you doing this for**

601    **me.**

602    Q: And you are giving this testimony under the pains and

603    penalties of perjury consistent with an affidavit attested to by

604    you, is that fair?

605    **A: Yes. I would never lie. One, I was not raised that way**

606    **and, two, I can't afford to even say a tiny white lie because it**

607    **will be twisted and held against me. I have different standards**

608    **held on me than other people.**

609    Q: Ok. Alright, thank you so much and again I'll have

610    permission to submit this to the Court as an Offer of Proof and

611    Affidavit and also in a YouTube - private YouTube link -  to the

612    court and to the parties, is that fair?

26

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

613     **A: Yes, thank you very very much Terry.**

614     Q: Ok, this is about 38 minutes and 59 seconds, so it is 39

615     minutes. Thank you much for your time and would you also thank

616     the people at Read that facilitated this?

617     **A: I definitely will.**

618

619                    **END OF VIDEOTAPED AFFIDAVIT**

620              **AND OFFER OF PROOF OF MARCI WEBBER**

621

622

623

624

625

626

627

628

629

630

631

632

633

634

635

636

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

637

638                           **Certification**

639       I certify that the above transcript of the Videotaped

640 Affidavit and Offer of Proof of Marci Webber is a true, complete

641 and correct report of her testimony, as videotaped with her

642 permission on December 10, 2020. A YouTube link to the actual

643 video and audio taped testimony of Marci Webber, as transcribed

644 above is at:  https://youtu.be/bNY-NEIaeug.

645       This Certification is made pursuant to Section 1-109 of the

646 Code of Civil Procedure.

647

648                                                       D.

649                 Terrence M. Johnson

650                 Date: Thursday, January 7, 2021

651 Terrence M. Johnson

652 North Pier, Chicago

653 505 E. Illinois Street,

654 Lower Level Suite 1

655 Chicago, Illinois 60611

656 (312) 922-4022

657 Terry.Johnson@tmj-esq.com,

658       Not as an attorney for Marci Webber, who is *pro se*, but as

659       a person who has assisted in the transcription of her

660       Videotaped Affidavit and Offer of Proof.

<center>28</center>

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

Case: 1:21-cv-05444 Document #: 1 Filed: 10/13/21 Page 60 of 87 PageID #:60

# Appendix to

# Marci Webber's Offer of Proof

# And Videotaped Affidavit

### Friday, January 8, 2021

1. Transcript of Proceedings, October 27, 2020 (5 pp.)
   Judge Bakalis grants my motion for a hearing regarding false entries
   in my charts and IDHS 90-day reports to this Court.

2. Memorandum Opinion of Judge Bakalis, September 18, 2019 (10 pp.)
   Judge Bakalis grants my petition for conditional release.

3. My Brief to the Appellate Court, Defendant / Petitioner / Appellee (75 pp.)
   (the Statement of Facts in my brief is a reasonably accurate summary of the
   factual and procedural history in my case before this court.
   [See Petitioner / Appellee's Brief at 1-27])


The above documents may be accessed in the Dropbox link below:

https://www.dropbox.com/sh/27w35ywj609nmww/AAAUD2k22SZ4zieuMH_qJaQCa?dl=0


M.W.

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARCI MARIE WEBBER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 1:20-cv-07807 |
| | ) |
| STATE OF ILLINOIS, et al., | ) The Hon. Charles R. Norgle, Sr. |
| | ) |
| Defendants. | ) |

### PLAINTIFF'S REQUEST FOR PROTECTION FROM HARASSMENT

Ms. Webber requested that I file with the court the attached Exhibit A describing her harassment by certain of the defendants. She hopes the court was will give her a hearing and order the harassment to cease.

Dated: January 29, 2021

Respectfully submitted,

By: */s/ Harold C. Hirshman*

Harold C. Hirshman (ARDC# 1226290)
DENTONS US LLP
233 S. Wacker Drive, Suite 5900
Chicago, IL 60606
Telephone: (312) 876-8000
Facsimile: (312) 876-7934
Harold.hirshman@dentons.com

To: 17737943957          Page: 49 of 51          2021-02-17 16:57:25 GMT          13122685136          From: terry johnson

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 29th day of January, 2021, I filed the

foregoing with the Clerk of the Court using the CM/ECF system. Pursuant to Fed. R. Civ. P.

5(b)(3) and the Northern District of Illinois' LR 5.9, I have thereby electronically served all

Filing Users.

*/s/ Harold C. Hirshman*

# EXHIBIT A

Case: 1:21-cv-05444 Document #: 1 Filed: 10/13/21 Page 64 of 87 PageID #:64
): 17737943957        Page: 51 of 51        2021-02-17 16:57:25 GMT        13122685136        From: terry johnson

Case: 1:20-cv-07807 Document #: 14-1 Filed: 01/29/21 Page 2 of 2 PageID #:266

**TO: HAROLD HIRSHMAN**
**FROM: TERRY JOHNSON**
**DATE: FRIDAY, JANUARY 29, 2021 at 12:15 p.m.**
**RE: MARCI WEBBER**

Harold,

Pleasure to speak with you a few minutes ago. When I spoke with Marci, she was in some considerable distress for what they are doing to her. I think the staff (and others) are targeting her, certainly a vulnerable person.

The following is a transcription that my daughter, Devin, did from the recording I made with Marci on a dictator. I have reviewed this. The following is what she said:

* * *

TMJ: Marci, I have your permission to record this to get this transcribed right?

Marci Webber: Yes.

Under the pains and penalties of perjury this is the sworn truth.

"On December 10, 2020 I did a video affidavit on the falsification of my records. On December 15, 2020 at 12:30 a.m., a security guard came to my room taking pictures of my room. Later on, that day, a nurse who was a defendant in my lawsuit, Pat Pearce, came with others to room search me. Since that day, I have been room searched 3 times a week, and on January 27, 2022, I was woken up while sleeping off a headache of which I am experiencing near daily, constantly along with stomach aches and other symptoms of this trauma, by defendant Pat Pearce, the nurse security guard Rodriquez, and mental health tech Miguel. Because of Pat Pearce accusing me and falsifying information and making my room a mess, on the third shift I asked for photographs of my room. Security came around 11:30 / 12 and took photographs. At 1 a.m. on January 28, 2021, they had come back to do a room search taking nearly every single item that was of comfort to me: a plastic cup, tea, soap, money, things that are harmless that I have a right to under the Constitution.

Today, is Friday, January 29, 2021, I am expecting another room search. I am sick to my stomach. My head hurts. I had a conversation with a staff yesterday named Rodney from another Unit who stated that the would want to end his life instead of living like this. A nurse named Sam Benez (phonetic) has said he would be depressed if he had to live like this. I am isolated. I don't have any visits. I don't have internet connection or access or to a computer. I don't have access to a gym since 2016. I live with IDP patients and patients who are acutely psychotic. So, I am extremely lonely. All of these things including sleep deprivation where they take notes off my door asking the staff to turn the door handle very slowly or screaming patients that wake me up is contributing to stress that is harming me significantly; so much so that I fear for my own life because of where this is going. And what they have done to me in 2017 leading to a suicide attempt 2 days after the judge refused my release being less severe than it is now. I am refused coping tools. My DVD player is extremely restricted. Now, they have taken all of my movies, so I don't have movies to watch. I am refused gummy bears that a doctor on September 23, Dr. Mary O'Baid, wrote a complaint form requesting that I get access to my snacks and more coping tools. I am refused the gummy bears and any snack...noodles that help my stomach. Anything that can make my life peaceful, comfortable, and supported is denied.

I am asking for an Order of Protection to help me."

Under the pains and penalties of perjury this is the sworn truth.

T: And your name is?

M:MarciWebber.

T: And it is approximately 11:45 a.m. on Friday, January 29, 2021, correct?

M: Yes. And I do want to add that the majority of the staff here are hostile towards me. The nice ones are peer pressured into not doing nice things for me, and several have implied that they would want to either end their life or that they would be depressed that they could not live this way. It is not mental health care.

T: And you are wishing for me to send this to?

M: Harold Hirshman

Finis.

EXHIBIT

E

IDHS still refuses to follow through in state Ct. The following court reports still support my release how can make what U of C mental health law prof. ret. Mark Heyman says are "illegal" unconstitutional demands

IDHS
Illinois Department of Human Services

JB Pritzker, Governor

Grace B. Hou, Secretary

Chicago-Read Mental Health Center
4200 North Oak Park Avenue • Chicago, Illinois 60634

Constitutionally I cannot be kept "ANY LONGER"

19 February 2021

Foucha v Louisiana & (US v Jones) My psychiatrist Dr. Anatoliy Puslar told me "there's nothing they can keep you here with in this" & "you should leave the state" See his 4/23/2021 chart note That if I was civilly committed (mental illness of NGRI's are no different) I would be discharged to where I have the most support - AZ Then he QUIT!

Honorable Judge Daniel Guerin
Circuit Court of the 18th Judicial Circuit
505 N. County Farm Road, Rm. 4006
Wheaton, IL 60187

RE: Webber, Marci
Docket No. 10-CF-2643

Dear Judge Guerin:

In compliance with 730 ILCS 5/5-2-4, enclosed is a copy of the most recent treatment plan report on Marci Webber for the court's review. Should you have any questions concerning the treatment program of this individual, please do not hesitate to contact me at 773-794-3707.

Thank you.

Sincerely,

[signature]

Debra S. Marsico, PhD
Director, Psychology Department/Forensic Coordinator

Enclosure

cc: Clerk of the Circuit Court
Joseph Lindt, State's Attorney's Office
Clinical Record
File

Bottom line is this RECOMMENDS my RELEASE but much of this report is inaccurate and some fabricated - See the Jan 10, 2018 transcripts with Judge Bakalis' Comments & his Oct 27, 2020 decision Let me hold a hearing on them falsifying my records to keep me tethered to "treatment" (still pending) Marci Webber 10/6/21

## 90-DAY NGRI TREATMENT PLAN REPORT
## MARCI WEBBER
### Docket # 2010-CF-002643
### 2/19/2021

### I.   IDENTIFYING INFORMATION

Ms. Marci Webber is a 53-year-old (DOB 3/26/1967) twice-divorced Caucasian female who was originally admitted to the Elgin Mental Health Center's Forensic Treatment Program from the DuPage County Jail on 6/18/2012 after having been acquitted Not Guilty by Reason of Insanity (NGRI) on 6/7/2012 by Judge Bakalis for the 11/3/2010 First Degree Murder of her 4-year-old daughter. She was thereafter remanded to the Department of Human Services (DHS) and found to be in need of mental health treatment on an inpatient basis. She was given a Thiem Date of 11/3/2110. Ms. Webber transferred to the Chicago-Read Mental Health Center (CRMHC) on 10/11/2016 but was returned to the medium secure setting at the Elgin Mental Health Center (EMHC) on 11/22/2017 following a reported suicide attempt. She remained at EMHC until her most recent transfer to the minimum secure B-South treatment unit at CRMHC on 10/2/2019 per the order of the Honorable George J. Bakalis. On 12/11/2019, Judge Bakalis conditionally released Ms. Webber to her own apartment located at 775 Pershing Avenue, #7A, Glen Ellyn, IL 60137. Conditions of the release included the following: "Petitioner admonished that she shall adhere to counseling required; she shall submit to alcohol/drug testing as directed, including through the Probation Department; and other proposed terms of the conditional discharge as were stated in the Memorandum dated September 18, 2019." On 12/20/2019, The State of Illinois Appellate Court's Second District granted the State's Attorneys' emergency motion for stay of enforcement of the trial court's 12/11/2019 order directing Ms. Webber's conditional release pending appeal. On 12/23/2019, Judge Bakalis ordered Ms. Webber back into the custody of the Department of Human Services pending the appeal. She was subsequently readmitted to CRMHC on 12/23/2019 to await the outcome of the appeal. Accordingly, Ms. Webber was returned to CRMHC on what amounted to a legal technicality and not because she did not conform to the requirements of her Conditional Release. She did not fail her discharge plan, nor were there any reports that her psychiatric status had deteriorated significantly during that approximately 2-week time interval.

### II.   BASIS FOR CONTINUED TREATMENT

Per the Unified Code of Corrections (730 ILCS 5/5-2-4): A person acquitted Not Guilty by Reason of Insanity is in need of mental health services on an inpatient basis if "due to that mental illness, [the individual] is reasonably expected to inflict serious physical harm upon him or herself or another and who would benefit from inpatient care or is in need of inpatient care." The Code further specifies that "If the [NGRI] defendant is found to be in need of mental health services, but not on an inpatient care basis, the Court shall conditionally release the defendant, under such conditions as set forth in this Section as will reasonably assure the defendant's satisfactory progress and participation in treatment or rehabilitation and the safety of the defendant, the victim, the victim's family members and others."  → To Arizona

Following our extended assessment of her mental health condition and treatment needs, as well as our accumulated knowledge of her history, the Treatment Team is of the opinion that Ms. Webber is no longer in need of inpatient psychiatric hospitalization and

Page 1 of 10

90-Day Report, Marci Webber

that her mental health needs could be better addressed in a less restrictive outpatient treatment environment. Ms. Webber believes quite resolutely that she is not suffering from any major affective or psychotic mental illness but acknowledges that she does have a significant trauma history that would benefit from ongoing treatment. She has nevertheless refused to routinely work with and interact with members of her Treatment Team in a constructive manner and has been quite resistant to participating in individual psychotherapy at CRMHC. That said, at the present time, she presents with no overt indications of any major mental illness, such as a Psychosis or Major Mood Disorder. What symptomatic indicators Ms. Webber does present with at the present time are much more suggestive of outstanding character pathology (i.e. a personality disorder). It remains a concern of the Treatment Team that her ability to manage her day to day social and personal interactions will be quite challenging however; the possibility of sincerely ameliorating symptoms of a personality disorder in an inpatient setting would be wholly unrealistic. While pharmacotherapy might ameliorate some of these symptoms, intensive psychotherapy with a clinician whose level of expertise and skill are commensurate with these types of disorders would be the most effective intervention. Ms. Webber's behaviors that are routinely described by team members involved in her care indicate that she continues to remain exceedingly confrontational (verbally), and that she frequently engages in harassing, demanding, oppositional, intrusive, provocative, antagonistic, profane, derogatory and demeaning exchanges with staff and patient peers. These types of behaviors (all be they quite provocative) do not imply that Ms. Webber will necessarily present as being an imminent physical threat to herself or others. In fact, she has not initiated any physical aggression toward others while at CRMHC. Although her behavior (whether intentional or not) can at times provoke aggressive responses from others, she does appear capable of controlling those types of impulses within herself. Ms. Webber explains her maladaptive way of treating others to be a type of "defense mechanism" she uses when she feels disrespected or mistreated. She takes very little personal responsibility for any of the aberrant behavior she exhibits, and she typically projects most blame and personal responsibility outside of herself. She summarizes her justification of these beliefs by stating that she has been victimized by IDHS, the doctors, the hospitals, the legal system and the pharmaceutical industry.

Ms. Webber has demonstrated narrow and somewhat limited coping and interpersonal skills, and her level of therapeutic insight is sub-optimal. Prior to her Treatment Team submitting a formal recommendation to the Court for her conditional release, Ms. Webber must acknowledge that she does in fact have viable mental health and substance-related needs that require ongoing intervention services in the community. Additionally, Ms. Webber must improve her collaboration with the Treatment Team as they need to be able to create together, a verifiable and validated aftercare plan. Specifically:

1.   Ms. Webber must be willing to permit staff to contact proposed outpatient psychotherapist (Dr. Laura Bauhof) regarding her identified mental health and substance abuse treatment needs. Her outpatient chemical dependency needs were assessed by Ms. Jennifer Mieszala, LCSW, CADC from Healthcare Alternative Systems (HAS) DuPage and determined to not meet criteria for an active substance abuse disorder due to Ms. Webber having negative results from

90-Day Report, Marci Webber

*[handwritten left margin: This is Unconstitutional — privacy matters / See Lee Robin case / IDHS wants some perfect future guarantee]*

a breathalyzer and UA test however; both Ms. Mieszala and her Treatment Team from CRMHC recommend that she follow up with Dr. Bauhof and allow for that clinician's ongoing assessment of both her mental health and substance abuse needs. The Team is aware that Ms. Webber has previously responded to stress by ~~abusing alcohol and incurring a number of DUI's.~~ Any future use of alcohol would dramatically increase her risk of becoming impulsive and possibly symptomatic of her mental illness. *[handwritten: 20 yrs ago! / Almost died due to alcohol use / Akathisia / Stress exacerbated the akathisia. / I'm NOT!]*

2.  Ms. Webber must also cooperate with allowing staff to contact any other appropriate collaterals or potential treatment providers within the community so as to discuss our treatment recommendations (e.g., the Front Door Project). *[handwritten: have offered, ie. Dr. Tasch, Patano, Watson, Stella & Terry & Bob:]*

3.  Ms. Webber must permit her Treatment Team to assess the viability of her support system network (such as relations with family, friends, etc.) and to verify her plans of how she will seek out and/or sustain existing funding and financial support for food, clothing, shelter (as well as other life necessities). This will require her to sign appropriate Releases of Information to permit these contacts. *[handwritten: See court record / only Stella Spoken w/ by Dr Paisler last Fri 2/19/]*

4.  Ms. Webber must collaborate with her Treatment Team in crafting a realistic discharge recovery plan that would help her to manage her daily life situations and stressors without resorting to substance abuse, violence or suicidal behaviors. *[handwritten: Done 4 x ! / See court record 2/11/]*

Ms. Webber's assessment is based on the following:

1.  <u>History of Dangerousness to Self and Others</u>: Although Ms. Webber has reported experiencing no recent self-destructive ideation or intent, it is important to recall that she has in fact made viable <u>self-harm gestures</u> in the past. She has typically described the precipitants of these behaviors as having been related to iatrogenic reactions from various psychotropic medications she had taken in the past however; some of these gestures had ~~clearly~~ occurred during time intervals when she was receiving no such medication. Ms. Webber also has an identified history of aggression and substance abuse, and in addition to these variables, she has exhibited numerous changes in mood and perception (i.e. irritability, impulsivity, affective lability, ~~episodic mood swings~~, mistrust of others, etc.). While these symptoms can be explained by a Mood Disorder and/or a Personality Disorder, at the present time they are thought to be more reflective of the latter. *[handwritten: I was on 2 medications & they know it / FALSE! / False! / 11/3/10 / 11/15/17 / @ CRMHc Both while taking some Kind of medication / False — due to / Headaches / abuse]*

2.  <u>Mood Instability/Persecutory Belief System/Interpersonal Skills Deficits</u>: Ms. Webber continues to exhibit <u>periodic mood shifts, affective instability</u> and a <u>belief system that allows her to project responsibility for conflict outside of herself</u>. She also still exhibits recurrent <u>irritability</u> and verbal aggression toward staff and peers, when she believes she is either being <u>misunderstood</u>, mistreated or "hurt" by their behavior. She also continues to struggle with appreciating and respecting appropriate boundaries between herself, her peers and the staff. *[handwritten: abuse, harassment & psych. Torture / Headaches & abuse / Sleep deprivation — milieu / They do]*

3.  <u>Alcohol Abuse by History</u>: Ms. Webber has a documented history of <u>serious alcohol abuse</u> however; she has been alcohol-free during her inpatient care commitment and has reportedly not used any mood-altering substances while outside of hospital custody. It is still believed by her Treatment Team that she would benefit from ongoing services, despite her belief that she has seen it all and heard it all and has "no (active) desire to ever use alcohol" or other mood-altering substances. She recently reported to her psychiatrist that she would be willing to attend AA meetings. *[handwritten: Subjective / was self-medication Akathisia @ med increases & under extreme stress — combined / No, I said only if I have a problem - I feel it could be a trigger!]*

*[handwritten bottom: I have many #'s for people in AA IF I need it. I feel it could be a problem / triggers / memories / — I don't want any thoughts about alcohol]*

90-Day Report, Marci Webber

4.  Non-Compliance with Treatment and Treatment Team Recommendations: Ms.
    Webber's Treatment Team is still concerned she remains reticent with her belief
    that she has no identifiable mental health disorder (other than a significant
    trauma history) or any related issues (such as a proclivity for using or abusing
    mood-altering substances); and despite having received numerous
    recommendations from treatment personnel to participate in individual therapy
    and consider taking psychotropic medication to help mediate her mood
    instability, she has declined to do so while in the hospital. However; she did
    comply with two outpatient individual psychotherapy sessions during that prior
    albeit brief conditional release and participated in one substance abuse
    evaluation.  She also has expressed a willingness to continue her outpatient
    treatment work with Dr. Bauhof.  Additionally, there was no evidence of any
    clinical decompensation while she was on that prior conditional release.

    *[handwritten: only happened when I was on SSRI's See Dr. David Healy.]*

5.  Continuing Care Planning & Relapse Prevention: In order to mitigate perceived
    risks, it is strongly recommended that Ms. Webber participate in at least weekly
    individual psychotherapy sessions that will also involve a monitoring of possible
    substance use/abuse and allow for ongoing drug and alcohol testing.  Although
    Ms. Webber denies having any history of using or abusing alcohol or any other
    mood-altering substances, she has stated that she believes she is suffering from
    an extensive trauma history.

    *[handwritten: I actually improved & they took this from me by ignoring. B.S. court record Brady v. Maryland]*

    *[handwritten left margin: Refused. Sentenced due to COVID]*

## III.  TREATMENT SERVICES

A.  Following are areas and issues targeted for treatment:
    1.  Mood instability, persecutory belief system and interpersonal skills
        deficits  *[handwritten: Normal for milieu]*
    2.  Alcohol abuse by history  *[handwritten: HCAS = Don't Qualify - Dr. Obaid=Same]*
    3.  Non-compliance with treatment and Treatment Team recommendations  *[handwritten: It's not]*
    4.  Room Care  *[handwritten: oh B.S. !]*
    5.  Continuing care planning and relapse prevention

    *[handwritten: alcoholism & I've had over a decade of rehab.]*

B.  Following is a description of the services recommended for treatment:
    1.  Individual sessions with Psychiatrist to discuss treatment options and
        monitor symptoms
    2.  Prescribed Group Therapies:  Daily AM and PM Community Meetings;
        Daily AM and PM Exercise; Solutions for Wellness; Symptom
        Management; Stress Management-on hold; Anger/Impulse Management;
        Moving Toward Change and Relapse Prevention with HAS personnel;
        AA-on hold; Goals; Recovery; Creative Expression
        NOTE:  Although on-unit groups resumed on 10/26/2020 facility-wide,
        the groups on B-South remain somewhat inconsistent due to almost
        continuous quarantine restrictions related to the COVID-19 pandemic
        being imposed since mid-November.  *[handwritten: off since end of Dec or begin. of Jan.]*

    *[handwritten left margin: There have been NO in unit groups since March 2020 (COVID)]*

    3.  Personal Safety Plan
    4.  Case Management Sessions
    5.  Medical interventions (labs, medications, etc.) as needed

90-Day Report, Marci Webber

C.  Following are the goals of treatment and the anticipated timetable for
    these goals:

    1.  Ms. Webber will handle interpersonal conflicts calmly, respectfully and
        with maturity and will have no more than one episode of screaming and ~~I don't~~
        swearing at others when she is angry (Target Date: 2/23/2021): Not Met, *scream*
        continue

    2.  Within the next two weeks, Ms. Webber will attend 100% of scheduled
        Impulse Management Groups in order to learn strategies for minimizing
        her angry outbursts and dealing with negative emotions (Target Date:
        2/23/2021): NA, group suspended due to unit quarantine status.

    3.  While in Impulse Management Group, Ms. Webber will actively
        participate and discuss her understanding of the principles/strategies
        taught and how she is applying these principles/strategies to her own life
        (Target Date: 2/23/2021): NA, group suspended due to unit quarantine
        status.

    4.  With ≤ 1 prompt from staff, Ms. Webber will focus on her own issues and
        treatment versus that of her peers both on the unit and on passes once
        authorized (as evidenced by peer report and staff observation and the
        absence of peer and/or family complaints that she is insinuating herself
        into their treatment programs), 100% of the time (Target Date:
        2/23/2021): Partially Met, continue        *False*

    5.  Ms. Webber will meet with her psychiatrist 1x/week to discuss her
        thoughts about her mental health and treatment (Target Date: 2/23/2021):
        Met, discontinue (NOTE: Sessions continue, however)     *He doesn't even do this*

    6.  Ms. Webber will attend at least 3 substance abuse related groups per
        week (e.g., AA, Relapse Prevention, Recovery and/or MISA) (Target
        Date: 2/23/2021): NA, groups suspended due to unit quarantine status.

    7.  Ms. Webber will actively participate in substance abuse related groups as
        evidenced by sharing her past difficulties with substance abuse/
        dependence, accepting feedback from the leader and her peers, offering
        constructive feedback to her peers, and discussing her plans for future
        sobriety (Target Date: 2/23/2021): NA, groups suspended due to unit
        quarantine status.

    8.  Within the next 3 months, Ms. Webber will develop a written relapse
        prevention plan that addresses triggers to drinking, how she will manage
        any urges to drink, and what treatment she will receive to monitor and
        maintain her sobriety (if granted a conditional release by the court)
        (Target Date: 2/23/2021): Not Met, continue     *Did MISA + Advanced MISA + 2015*

    9.  Ms. Webber will cooperate with a substance abuse evaluation conducted
        by CRMHC contractual staff from Healthcare Alternative Systems (HAS)
        (Target Date: 12/3/2020): NA, discontinue. HAS staff state they cannot
        conduct an evaluation because it has been so long since Ms. Webber last
        used alcohol.     *See bottom #Pg. 2     Did it on outside*

    10. Ms. Webber will collaborate with her Social Worker to identify an
        appropriate substance abuse treatment provider in the community. (Target
        Date: 12/9/2020): NA, discontinue. Community agencies that deal with
        substance abuse will not serve Ms. Webber given the length of time is has
        been since she last used.

    11. Ms. Webber will attend all prescribed/recommended groups at a rate of
        no less than 70% per month. Groups include: Anger/Impulse
        Management, Psychotherapy, MISA (aka Moving Toward Change and

90-Day Report, Marci Webber

Relapse Prevention), AA. Goals, Recovery, Stress Management,
Solutions for Wellness, Symptom Management, and daily AM and PM
Community Meetings (Target Date: 12/23/2021): NA, groups suspended
due to unit quarantine status.

12. Ms. Webber will discard used cups daily as reported by staff for the next
2 weeks (Target Date: 2/23/2021): Not Met, continue

13. Ms. Webber will eat her food in designated area(s) for meals/snacks for
the next 2 weeks (Target Date: 2/23/2021): Not Met, continue

14. Ms. Webber will refrain from defacing/destroying State property for the
next 2 weeks (Target Date: 2/23/2021): Partially Met, continue

*[handwritten: NEVER HAVE!]*

## IV. CLINICAL UPDATE

*[handwritten: Poems/Pics on my wall or (on paper) door is Not destroying!]*

### Behavior in the Milieu

Very limited progress has been noted with Ms. Webber's interpersonal behavior since
the time of her last reporting period. Her general demeanor toward staff and peers
continues to be reported as being rather hostile and disruptive to the milieu. She
continues to persistently challenge unit rules and regulations by storing and "hoarding"
excessive amounts of legal documents/paperwork, snacks, personal hygiene products
and other items deemed as being potentially unsafe for consumers. Ms. Webber
continues to periodically interfere with the clinical management of certain peers by
counseling them to not take certain prescribed medications or to challenge decisions
made either by Administration or by treatment personnel (such as restricting access to
the outside patio area during inclement weather). She also needs to be regularly
reminded to not interact with staff members who are involved in 1:1 observations of at-
risk consumers or to not intrude upon or interfere with staff involved in an emergency
intervention of an acutely agitated or impaired patient peer. The behavior Ms. Webber
continues to model to her peers remains very negatively influential, such as posting
derogatory and demeaning statements about treatment personnel on her door, writing on
walls, ordering staff and peers to not disturb her while she is in her room, staying up
very late and sleeping through meals and scheduled milieu activities. Ms. Webber also
uses the unit telephones excessively, usually to call her legal counsel or mediators to
complain about a perceived episode of abuse or mistreatment by staff or peers. She also
routinely challenges patient privacy and confidentiality by self-reporting the recording
of auditory exchanges between herself, staff or peers through that aforementioned
telephonic correspondence with her legal consultants (or through use of her Google
voicemail) and without the permission of those being recorded. In response to her
behavior, some of her peers have complained of her hostile and disrespectful abusive
treatment of them, as well as her generalized angry presentation, and certain of her more
impaired peers have become increasingly symptomatic as a result. Again, Ms. Webber's
behavior is believed to be predominantly a function of her Personality Disorder as
opposed to an affective or psychotic mental disorder.

*[handwritten annotations in margins: "Sabi; sw told Randy k. (esq) its the Styrofoam cups in my room — that is not"; "NEVER destroying"; "? FALSE!"; "SW, Chrisby said this is a coping skill"; "B.S. Name 'em!"; "refuse to test me: ie MMPI"]*

Community trips to medical appointments during this reporting period have included the
following:

12/12/2020: Optometry, Fahy Clinic in Chicago. Ms. Webber received glasses and paid
the difference between the standard glasses and the more expensive pair
she desired. She also received "trial" contact lenses.

1/21/2021: Dental, Dr. Mark Weigel, personal dentist. Regular check-up.

*[handwritten: No mention of chart notes stating I was great pt. Was behaved, polite, calm! "cooperative" included in my chart]*

90-Day Report, Marci Webber

<u>Summary of Sessions with Social Worker/Case Manager</u>
According to Ms. Esther Ellison (Ms. Webber's most recently assigned Social Worker and Case Manager): "My brief experience so far working with Ms. Webber depends upon her moods. Most days, she talks about the past and how much we are hurting her (in a loud tone of voice). On some particularly bad days, she will make threats of filing to the 'Federal' court on me if I do not comply with her immediate requests (such as copying and faxing documents for her, which is what I do for her routinely). When Ms. Webber is in an okay mood, she has been appropriate with me and recently even thanked me for helping her stating that 'when (she) says things, (she is not) saying it personally to me.' Overall, I mail things and fax and copy items for Ms. Webber." Ms. Ellison also listens to her vent about previous concerns.

*[handwritten left margin: head aches + result of long milieu or distance]*

<u>Summary of Sessions with Psychiatrist</u>
(Per the report of Anatoliy Pyslar, MD, Attending Psychiatrist for CRMHC's B-South Treatment Unit) the following opinions are tendered for the Court's review:

Dr. Pyslar reported having had multiple encounters with Ms. Webber over the past three months, and her response to these encounters has been quite variable, ranging from compliant and engaging to defensive, angry and derogatory. Dr. Pyslar noted that Ms. Webber has been more forthcoming with regard to coming to terms with her daughter's death and the circumstances of such. At the beginning of this current hospitalization here at CRMHC, Ms. Webber appeared to be in significant emotional turmoil and distress when the topic of her daughter's death would be raised. She was prone to expressing more anger (and possibly some unconscious anger toward herself), as well as blaming others for her situation. During recent months, Dr. Pyslar has noted that Ms. Webber has expressed more appropriate and productive emotional responses, including sadness and acceptance of her circumstances. This has been in contrast to her previous presentation, which had been more focused on an expression of anger, and either an inability or an unwillingness to process the events that led to her daughter's untimely demise. In general, she seems to be utilizing better coping skills now when dealing with that loss. Ms. Webber appears to be more future-oriented, expressing more hope for a positive resolution to her situation. She has also verbalized that she hopes to someday reconnect with her other two daughters. At times, Ms. Webber has used profane references about Dr. Pyslar and once came to inform him that he had been added to the lawsuit she has reportedly filed against the DHS. Despite having been encouraged to the contrary, Ms. Webber will continue to express her belief that "You guys will never let me out of here!" and that the clinical team is forever being manipulated by "higher administration" to keep her detained in the DHS. Despite her repeated verbalizations of believing that we "will never let (her) out," Ms. Webber has on occasion been able to express some realistic hope that these circumstances may change in the future. She has also reported a willingness to seek behavioral health services in the community "if" she were to be released. Ms. Webber has specifically stated that she would be amenable to seeking out individual therapy. She would not be willing to meet with an addictions counselor however; stating that alcohol use would not be a problem for her again, as she understands that substance use would have a detrimental effect on one's physical and emotional wellbeing. She also recently mentioned that she would consider attending AA meetings.

*[handwritten left margin: Normal for this!]*

*[handwritten left margin: Who's not taking responsibility & blaming the death of my daughter instead of me]*

*[handwritten right margin: aimless than 12/11/19 Now than I have debt, etc]*

*[handwritten right margin: Not + H/ now]*

*[handwritten bottom: only as a last resort - I said thinking about drinking/ Maggie = Counterproductive]*

*[handwritten bottom left: "I have Bob's" "3 times"]*

Page 7 of 10

90-Day Report, Marci Webber

When asked by Dr. Pyslar if she had been regretful over her actions at the time of her charged offense ten years ago she declared, "What do you think? I'm not a monster!" and "I would never have hurt my child had I been in the right state of mind... I would never hurt anyone!" Ms. Webber reported her belief that at the time of her index offense, she had been (in her words) "psychotic" and "manic" and attributed those behaviors to numerous psychotropic medications she had either been taking or withdrawing from at that time. Her understanding of what caused her illegal behavior differs from Dr. Pyslar's clinical assessment of her. Dr. Pyslar opines that Ms. Webber's psychosis and mania at the time of the offense had most likely been caused by an underlying mental disorder, possibly triggered by the use of multiple psychotropic medications, particularly multiple antidepressants with unopposed stimulating effect. Dr. Pyslar has discussed that opinion with Ms. Webber on numerous occasions, as well as the possible use of mood-stabilizing psychotropic medications, to which she had repeatedly declined.

It should be noted that Ms. Webber has been expressing a desire to move to Arizona, reporting that she has family members there, such as cousins, an aunt, uncle and a sister. She reports having only occasional contact with them; mostly in the form of receiving greeting cards for holidays and birthdays. Ms. Webber has also expressed a desire to rebuild her relationship with these relatives, who reportedly reside within 1-2 hours (driving distance) from Glendale, AZ. Dr. Pyslar also spoke of receiving some recent correspondence from a Ms. Stelia Corniciuc, who identified herself as being a friend of Ms. Webber's who would be available to help "Marci get back on her feet" in Glendale, AZ by providing her with "everything she would need," such as a car, a telemarketing job, medical benefits, etc. Ms. Corniciuc also mentioned that she has a psychiatrist who comes to her group home to see patients there (and might possibly be able to see Marci) if a move out of state would be deemed plausible.

During mental status examinations, Ms. Webber has persistently denied experiencing suicidal or homicidal ideations; nor has she endorsed any auditory or visual hallucinations. In short, she was not observed to be psychotic, grossly disorganized, manic, or clinically depressed.

Dr. Pyslar opines that Ms. Webber's behavior and clinical presentation here at Chicago-Read (over this last reporting period) has had some improvement and some progress, when compared to her previous presentations. Nevertheless, she continues at times to be defiant, oppositional, argumentative, etc., yet she has still not engaged in any physical aggression toward others; nor has she engaged in any recent behaviors indicative of suicidal ideation or intent. Dr. Pyslar's ongoing observation is that Ms. Webber's patterns of behavior fluctuate from being socially appropriate to exhibitions of maladaptive behavior that often interfere with her treatment and functioning, and as noted above, are most likely attributed to her personality traits and an underlying personality disorder. Dr. Pyslar notes that his opinion regarding Ms. Webber's clinical presentation has been formed and supported by his long-term, direct observation and clinical assessment of this patient over the past fifteen months. He further noted that given the complexity of Ms. Webber's clinical picture and history, it has been necessary and appropriate to monitor and assess her behavior for a reasonable length of time in order to reach a substantiated clinical opinion.

[Handwritten margin notes: "Dr. Nadia", "Dr. Redondo", "Dr. Rohrbach", "Dr. Obaisi agreed meds caused it", "OF COURSE I don't want meds but →", "where is Akathisia?", "I told him", ""Put me on what Dr.", "Corcoran testified he succeed fully TK'd Zoloft & Seroquel", "They declined", "he's trying help me by lying", "He & I spoke w/ Stelia Fri 2/19/21", "see how he dropped the earlier stuff a started Elgin pg. 2", "PROVE it see Watson & Paterno testimony 2016 Elgin mmpi b Dr. Mazahor Kahn", "B.S.", "It's worse due to DOM Search torment"]

90-Day Report, Marci Webber

**Current Medications:**
No psychotropic medications are currently prescribed for Ms. Webber. Although it is has been suggested that she could possibly benefit from at least the introduction of a mood-stabilizing agent, she refuses to take any psychotropic medication.

*[handwritten: Seroquel is considered this (see prior page notes of mine)]*

**Current Diagnoses:**

Primary:     Unspecified Bipolar Disorder (in full remission)
Secondary:   Personality Disorder, Unspecified, with Borderline, Narcissistic and Paranoid Features; Alcohol Use Disorder in full remission in a controlled environment
Medical:     History of recurrent headaches, chronic neck pain/degenerative joint disease

*[handwritten: ↳ 5 Bulging Discs from 8/25/14 attack]*

## V. PRIVILEGE STATUS

Ms. Webber was issued Patio Pass privileges on 12/24/2019. She was also issued Escorted Grounds Pass privileges on 12/26/2019. Per advice received from DHS Legal Counsel, CRMHC was instructed not to permit Ms. Webber to use the Independent Grounds Pass privileges granted to her by Judge Bakalis during her previous admission to CRMHC without the judge's decision to reauthorize those privileges. On 1/29/2020, Judge Bakalis indicated that he had no jurisdictional authority over Ms. Webber's case at that time while it was in the Court of Appeals, and thus he could not enter any Orders including those related to her request for Independent Grounds Pass privileges. As has been noted, since the onset of the COVID-19 pandemic, all patient pass privileges and all off-unit therapeutic programming have been temporarily suspended.

*[handwritten: see Julie Meglan Re: this]*
*[handwritten: see 11/13/19 decision - Julie Megland said IDHS legal blamed TX team]*
*[handwritten: despite Stay @ home lifted !]*

## VI. PLACEMENT

Following a prolonged assessment of Ms. Webber's mental status and her continued need for treatment, the Treatment Team is proposing that her continued inpatient commitment does not appear to be achieving any further measurable benefit for her. We have exhausted our efforts of trying to implement interventions and treatments that were believed to be of possible benefit to her. Ms. Webber obliged herself to very little of those efforts, and despite this, she has never come to demonstrate behaviors that rose to the level of her requiring restrictive measures such as contingency medications or restraints at CRMHC. The Team is aware that Ms. Webber was remanded to DHS due to a history of a serious and debilitating mental illness, and that there was a perceived risk that this mental illness would conceivably place herself and others at that same level of risk but her current mental health needs would be better served in an outpatient treatment environment. Her non-compliance with recommended inpatient treatment has been entirely volitional and decided competently. The fact that she has rejected this treatment is more the product of her personality disorder and not a direct result of an affective or psychotic mental disorder. Ms. Webber presents with active symptoms of rather severe character pathology, and her previous symptoms -- at different times diagnosed as Schizoaffective Disorder, Bipolar Disorder and/or Depression -- appear to be in a current state of remission. The basis of her NGRI acquittal was that her symptoms of an underlying disorder had suspended her ability to have appreciated the wrongfulness of her behavior or the criminality of her conduct. Recidivistic studies suggest that the chances of an NGRI acquittee perpetrating another offense of this nature are extremely low. There is nothing from Ms. Webber's current clinical presentation to suggest that she is at any increased risk for harming herself or others. Her behavior can at times be

*[handwritten left margin: I asked for Dr. Jock or Dr. Stout to do counseling & testing & fell 2020 & See Motions]*
*[handwritten: "It's smart to stay out of the lion's mouth"!]*
*[handwritten: almost 0%]*
*[handwritten right margin: its harming me & they know it?]*
*[handwritten: then how did cl raise 3 kids & do law school or Army etc !?]*
*[handwritten: # ?]*
*[handwritten: Delirium Psychosis is Not an Underlying M.I.]*

90-Day Report, Marci Webber

*[handwritten: defensive!]*

intensely provocative however; such behavior is willful and goal-directed and once again, not the current product of an affective or psychotic mental disorder. At the present time, the Treatment Team believes that there may be another, more optimal and less restrictive environment that would help to keep both the patient and the community safe. Ms. Webber has always spoken favorably about prior sessions with her outpatient therapist Dr. Bauhof and has reported a willingness to continue seeing this clinician and to follow any additional treatment recommendations afforded her from that therapy base.

*[handwritten: She's booked up. I want to go to AZ where her family will love me! I'm not chattel]*

*[handwritten: personality disorder]* *[handwritten: See recidivism 4/logic]* *[handwritten: No one]* *[handwritten: 13]*

**★ ★ ★ !☺  BOTTOM LINE – RELEASE ME!**

At the present time, the Treatment Team of B-South believes that Ms. Webber is no longer in need of continued inpatient psychiatric treatment, and that her mental health needs could be more adequately addressed in a less restrictive outpatient treatment environment. However; it will be necessary for Ms. Webber to remain in the hospital at this time to work collaboratively with her Treatment Team to create together, a verifiable and validated aftercare plan. The specifics of this plan were outlined in section II: Basis for Continued Treatment (#1-4) above. Should this plan be completed satisfactorily, the Team will submit a formal request to the Court for her conditional release.

*[handwritten: Unsafe if I've proved that w/... ]* *[handwritten: I Am NOT Mentally about that w/ 50... ]*

*[handwritten: UNConstitutional steps ✗ ✗ I Am NOT Mentally about that w/ 50 ]*

It remains the Treatment Team's professional opinion that in order to have a successful conditional release, Ms. Webber would require ongoing weekly individual counseling, substance abuse treatment and random drug and alcohol testing; and if living more independently, ideally assertive community treatment (or similar-type) services in order to mitigate the risk to herself and the community at large to the maximum extent possible. If Ms. Webber does not have these services in place, and *especially* if she uses/abuses alcohol, the probability that she will pose a risk to herself or others is likely to increase.

*[handwritten: All dangerous! Underserved assaults on me.]*

*[handwritten: There is NONE! As with anyone! UNConstitutional]*

**VII.  QUALIFIED PROFESSIONALS RESPONSIBLE FOR THE IMPLEMENTATION OF THE PLAN**

_____, MSW, SWI  
Esther Ellison, MSW  
Social Worker II

_____  
Sabi Kolath, MSW  
Director, Department of Social Work (TA)

_____  
Anatoliy Pyslar, MD  
Attending Psychiatrist

_____  
Adebisi Olasimbo, RN  
Clinical Nurse Manager

_____  
Timothy Cummings, PsyD  
Licensed Clinical Psychologist

_____  
Robert Sobut, MD  
Medical Director

EXHIBIT

F



*[Handwritten top margin:] My previous lawyer Justin Schwartz esq said he could not take what they do to me & would have ended it a long time ago. See below for reasons why I terminated with him — Dr. Jock never wrote like this*

*[Handwritten right:] supposed to be w/ the packet for the record*

**State of Illinois**
**Department of Human Services**
**PROGRESS NOTES**

Each note must be dated and signed including title of recorder

Psychology Progress Note:     Date: 2/28/2020     Time: 1435 hrs.     Length of Session: 35 min

*[Handwritten:] (This was written before the Appeal) I want Dr Jock or Dr Bauhof.*

I: Attempted to meet with patient at this time to once again to try and re-engage her in individual tx. Writer attempted to review some of what had been addressed in our weekly teleconference with Central Office and to review some of the concerns that had been expressed about her decision to ignore Judge Bakalis' previous mandates about her need to become fully involved in treatment and to stop treating staff and patient peers in an abusive manner. Writer acknowledged that the Appellate Court was now overseeing her case and her treatment involvement at CRMHC, but that this was no reason for her to ignore what the Circuit Court had instructed her to do. Patient was reminded that her lack of a sincere application to treatment could be interpreted negatively once she eventually came to re-petition for a Conditional Release.

*[Handwritten left margin notes:] Dr. Watson had no problem assessing me in 2015 in one setting*

*[Handwritten:] He appears whenever or is always late*    *How they*

D: Patient was initially somewhat hesitant in responding to this clinical inquiry, kept him waiting for her to complete a phone call and was told that writer would provide her with copies of the risk inventories she had completed and requested from him. She reported expecting a report to go along with these copies and was informed that due to the fact that we had never completed a full assessment, that no examination report could be completed and based solely on the results of two paper and pencil inventories. Patient then accused writer of having deceived her about *[handwritten: No change]* this, and she then went on to verbally berate the writer for the next half-hour or so before the session was eventually terminated. When asked about her lack of application to available treatment, patient declared, "Well, If you don't give me what I want and need, I won't give anything back to you. You people have only hurt me and have not helped me. *[handwritten: True]* When I have busted my a-- for you guys in the past, you've just turned it all around and lied about me and never *[handwritten: True]* gave me any credit for the good I was able to accomplish. You gave the State's Attorney everything he needed to put me back in here with all of your lies. Even though the Appellate Court has told you guys to restore me as I was *[handwritten: Did. not]* with my privileges, you defied that order and did what you wanted. Asses are not a privilege! They are a necessity!" *[handwritten: easy decision]* When patient was informed that her pass privileges were nothing we could address at this time, in that she had *[handwritten: like this]* elected to become completely disengaged from treatment, and that accordingly, we had nothing to advocate for her to save these privileges reinstated. The patient was also informed that a request for privileges needed to be presented to and approved by the Appellate Court. She then declared that "we would all be charged with perjury due to not correcting the false claims made about her by certain of the treatment staff in their charting documentations and due to signing off on a report claiming that she had encouraged one of her patient peers to try and harm himself after she allegedly did nothing but try and help this individual. Patient was once again encouraged to reconsider her position on becoming re-involved in treatment, and she stated that since we had denied her access to Dr. Stiava's Anger Management class, as well as other off-unit activities, she had no reason to trust us or work with us, as our only intentions were to hurt her and not help her, just as Dr. Tasche had previously told her we did.

*[Handwritten:] Dr. Kane said extradition was too much & that claim in this is more of the lie's. but even they should be*   *FALSE? my notes are*

*[Handwritten:] I did not say that but do they? See 3/17/2020 amendment! & Erick's affidavit!*

A: Patient was alert and correctly oriented in all spheres of perception. Her continued agitated demeanor and accusatorial declarations suggest that she remains rather fixated with her beliefs that her treatment staff have no other desires than to prolong her inpatient stay and continue our allegedly abusive treatment of her. Her recent moods have been described as not being the product of despair and desperation but more due to her beliefs that staff will do nothing but "hurt" her and keep her in a perpetually abusive environment. Patient continues to deny experiencing any major mood symptoms and reported no recent or current self-destructive or homicidal ideation/intent.

*[Handwritten:] By whom? from the Hell some are nice*

*[Handwritten:] Dr. Watson testified he believed that too & Dr. Malik in Nov 2015 threatened to "slow my progress"*

P: Writer will continue trying to encourage patient to become reengaged in treatment. He will also continue trying to meet with her at appropriate intervals and will remain available to her as she may need or request.

*[Handwritten:] They are + continue*   *for what?*

*[Handwritten left margin:] All me they see it as reactions to my environment + so has been pyslar*

*[Signature] 2/28/2020*

*[Handwritten:] Also - on 1/24/2020 said Dr. Cummings said "you don't belong here" "you don't require inpatient treatment" where's that in my CHART!*

Timothy C. Cummings, Psy.D.
Licensed Clinical Psychologist
(formerly PMHDP-2) IL462-0038 (R-5-00)

*[Handwritten:] I KNOW how I feel & why - you never... I hate this abusive Environment w/ Antonette*

| Individual | | |
|---|---|---|
| | Name: WEBBER, MARCI | |
| Date | DOB: 03/26/1967 | Sex: F |
| ID# | ID: 000906420 | Unit: 4564 |
| | Facility: CHICAGO READ M.H.C. | |
| Facilit | Intake Date: 12/23/2019 | 6:45:00PM |
| Subunit | | |

*[Handwritten:] Individual frustration & opportunity for notes like this?*

EXHIBIT
G

MMW:F-817

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

MARCI MARIE WEBBER,                )
                                   )
                                   )
          Plaintiff, *Pro se*      )
                                   )
vs.                                )
                                   ) Case No. 1:20-cv-07807
                                   )
STATE OF ILLINOIS, et al.,         ) The Hon. Charles R. Norgle, Sr.
                                   )
                                   )
                                   )
          Defendants.              )

**RECEIVED**

**AUG 18 2021** Cre

**THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT**

### MARCI WEBBER'S STATUS REPORT, *Pro Se*

1. **Emergency Complaint Filed On 12/30/20**
2. **Plaintiff's Request for Protection from Harassment Filed 1/29/21**
3. **Continued Harassment and Physical Injury – Request for Hearing**
4. **Request to File Discovery Requests Against Defendants within 28 Days**
5. **Certain Misstatements in the Letter Report of Dan Gallagher, Esq.**
6. **Request to Have Access to My Computer for Legal Research and Communication**
7. **90 Day NGRI Treatment Plan Report Dated February 19, 2021**

*Prefatory Note:* During the time that my Status Report was being typed, I spoke by phone on Tuesday, August 17, 2021 with attorney Harold Hirschman of the Dentons firm, Chicago. As the Court may recall, Mr. Hirschman was appointed by the Clerk to represent me but had to withdraw due to the press of other cases. Today, Tuesday, August 17, 2021, Mr. Hirschman advised me that he is willing to consider representing my interests in this matter. Mr. Hirschman further indicated that he would be able to have a conference call with the Court within the next two weeks and extended his cellphone number 312-307-8026. I would welcome Mr. Hirschman and his firm to assist me as I believe he has a good handle on the issues that are before the Court in this complaint. I shall continue with the finalization of this Status Report which I submit, *pro se*.     MMW

In June 2012 Judge Bakalis, the Trial Judge in the Circuit Court of DuPage County,

found me Not Guilty of any crime involving the death of my daughter, Maggie. Since that time, I

have been subject to a consistent pattern of punishment (which is unconstitutional) and

harassment including physical and mental abuse by Illinois Department of Human Services (IDHS) employees and officials.

**1.      Emergency Complaint Filed on December 30, 2020:** I filed a 70+ page *pro se* complaint on December 30, 2020, which factually details a pattern of unconstitutional conduct by the State. In addition, I have referenced in my complaint video taped affidavits that I have prepared that I incorporate by reference. These video taped affidavits are sworn testimony by me which has been the only effective means I have had to detail IDHS's illegal pattern of abusive and unconstitutional conduct.

IDHS's personnel have failed to intervene and have actually incited mentally ill detainees to pick physical fights with me saying "She is a baby killer" or "Marci's going to call the police on you." I have 5 bulging discs in my neck as a result of beatings while in IDHS custody during which IDHS personnel stood by and did nothing to intervene.

One IDHS employee (Marva Stroud) gave me two plastic bags and told me to go to my room and use the bags to commit suicide. I have a photograph of one of the plastic bags. Another IDHS employee (Velma Westbrook) similarly encouraged me to commit suicide while in IDHS custody.

I brought these matters to the attention of Judge Bakalis, but any relief was denied saying he was in DuPage County, the Elgin facility was in another. Later, Judge Bakalis would recognize my claim that IDHS was falsely charting entries: people signed court reports indicating that I was mentally ill, when it was their opinion and the opinion of others that I was not: If I was not mentally ill, I would have to be released immediately under Federal law protecting my constitutional rights (see Foucha v. Louisiana & U.S. v. Jones, both U.S. Supreme Court Opinions regarding rights of NGRI Acquitees)

2

I have no access
to place the exhibits
from 20 CV 07807
here showing the
Criteria for release
of an NGRI (they
use items that can be used
as evidence as if they are
Elements) by IDHS are
unconstitution — See above Case
Please

MMW:F-817

**2 & 3:  Request for Hearing on or before September 1, 2021, on my Request for Injunctive Relief to Protect My Person from Unlawful and Unconstitutional Conduct by State Employees as I am being Presently Harmed on a Weekly / Daily Basis:**

For this reason, I am requesting an immediate hearing so that this court can enter an order of protection or other relief from such punitive and unlawful conduct which is contrary to my rights under the U.S. Constitution.  I am desperate for intervention and help from beatings incited by and witnessed by State employees who watch and do nothing; seemingly in punishment for a crime I was found not guilty of.

**The Cumulative Effect:**  The cumulative effect of the physical and mental abuse factually outlined in my 70+ page complaint filed in December 2020 has been devastating on my physical and emotional health.  As one of my doctors, Dr. Mir Obaid at IDHS stated: "A person can only take so much."  However, the physical and mental abuse continues.

Specifically, I would ask this Court to issue a writ that orders IDHS to bring me to the Dirksen Building so that I can personally address the Court as I was able to personally address Judge Bakalis *pro se* prior to his order releasing me from IDHS custody in December 2019. Presently there is a Petition for Leave to Appeal (PLA) pending in the Illinois Supreme Court.  If they deny relief, it is my intent to refile a Habeas Corpus Petition which was pending before Judge Kocoras in Federal District Court, Chicago.

I am requesting such a hearing on or before September 1, 2021 as it has been pending since January 2020 without being addressed by Mr. Gallagher, my former counsel.  He is a nice man, no doubt, but did little to advance my case and filed a Letter Report without showing me first that contained factual inaccuracies (I never called him 10 times in any day but did call him numerous times in a give week when he failed to return my calls repeatedly.)  If this Court

3

MMW:F-817

wishes, I can further outline more material inaccuracies in the Letter Report at a later date.

**4.    Request to File Discovery Requests Against Defendants within 28 Days:** I would like leave to file written discovery within 28 days against the defendants. I would also like to take a number of depositions.

*(Note: In light of the possibility of Harold Hirschman representing my interest in this matter, I would defer to his judgement in deciding what discovery, including depositions, need to be taken.)*

**5.   Certain Misstatements in the Letter Report of Dan Gallagher, Esq.**

In the interest of time, I have addressed some of this in paragraph 2 and 3 above.

**6.   Request to Have Access to My Computer for Legal Research and Communication:**

I was permitted to have my laptop in my room at Chicago Read with unlimited access in 2017. Presently, IDHS refuses to grant me access to my laptop. I ~~also had~~ request access to my own portable internet connection which I would ask this Court to be able to use to do legal research and to communicate with my legal team or counsel via email. In addition, IDHS has taken away my ability to send or receive faxes; and further, has prevented me from receiving timely access to my charts at Read; which makes timely correcting inaccuracies, and substantive ones, virtually impossible.

**6.    90 Day NGRI Treatment Plan Report Dated February 19, 2021, states that I am "No longer in need of inpatient psychiatric hospitalization" and that my "mental health needs could better be addressed in a less restrictive outpatient treatment environment":**

The February 19, 2021 Court report by IDHS concludes that I do not meet the standards to be confined any longer because I am not mentally ill or a danger to myself or others. There continues to be serious factual inaccuracies in this report that I can address at a later time. Dr. Anatoliy Pyslar, my treating psychiatrist at Chicago Read for a year and a half admitted to me,

MMW:F-817

"there is nothing in this report they can keep you locked up with." And after assessing me he

showed me my chart notes on April 30, 2021, stating: "I recommended your release to where you

have the most support, Arizona...either state, oops...I should have just said Arizona." Then Dr.

Pyslar resigned. IDHS refused to attach that assessment and chart note to a May 11, 2021, court

report as I requested, listing his name as unavailable for signature.


***


The above Status Report was read to me *verbatim* on Tuesday, August 17, 2021, at 2:45 pm at

which time I authorized my name to be placed on this Status Report and filed with the Court, *Pro

Se*.


Dated: Wednesday, August 18, 2021


Respectfully submitted,


By: */s/ Marci M. Webber*


Marci M. Webber
c/o Chicago-Reed Mental Health Center
4200 N. Oak Park Avenue
Chicago, IL 60634
(773) 794-4000
MarciWebber101@gmail.com


Attached:    90 Day NGRI Treatment Plan Report Dated 2/19/2021 (10 pp)

Marci Webber
CRMHC (C-5)
4200 N. Oak Park Av
Chicago, IL 60634

10/13/2021-3

Clerk of the US Dist. Court (prisoner
219 S. Dearborne St. 20th correspondence)
Chicago, IL 60604 Habeas
II
Floor

RECEIVED

OCT 13 2021

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

1:21-cv-05444
Judge Charles P. Kocoras
Magistrate Judge Sunil R. Harjani
PC 10/Direct



UNITED STATES POSTAGE
$ 008.550
PITNEY BOWES
02 1P          0000808982   OCT 06 2021
MAILED FROM ZIP CODE 60634