**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARCI MARIE WEBBER, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-5444 |
| | ) | Judge Charles P. Kocoras |
| RICARDO FERNANDEZ, IDHS | ) | |
| Respondent. | ) | |
| | ) | |

**PETITIONER'S AMENDED PETITION FOR A WRIT OF
<u>HABEAS CORPUS PURSUANT TO 28 U.S.C. §2254</u>**

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 404
Chicago, IL 60604
Tel: (312) 909-0434
jherman@joshhermanlaw.com

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................ 1

II.  INFORMATION PROVIDED PURSUANT TO APPROVED
    HABEAS CORPUS FORM (LR 81.3(a)) ............................................ 4

III.  BACKGROUND OF TRIAL AND POST-TRIAL PROCEEDINGS .............................. 8

   A.  Webber is Acquitted by Reason of Insanity  for the Murder of Her Young Daughter....... 8

   B.  Conditional Release and Discharge Proceedings Before the Trial Court ........................ 10

      1.  The First Conditional Release Proceeding.................................................... 10

      2.  The Second Conditional Release Proceeding and Hearing........................... 14

      3.  The Trial Court's Order Granting Webber's Petition. .................................. 21

      4.  Appellate Arguments and the Second District Court of Appeals' Reversal ................ 25

      5.  Petition for Leave to Appeal ..................................................................... 28

      6.  Petition for Certiorari to the United States Supreme Court .......................... 30

      7.  Webber's Current Conditions of Confinement in IDHS.............................. 30

IV.  PETITIONER'S CLAIMS FOR HABEAS RELIEF ...................................... 32

   A.  General Legal Habeas Standards. ...................................................... 34

   B.  Webber Has Exhausted Her *Foucha* Claim. ............................................ 38

   C.  *Foucha* is Clearly Established Federal Law. ............................................. 39

   D.  Webber is Entitled to Habeas Relief Because the Appellate Court's
       Reversal of the Trial Court's Order Granting Conditional  Release
       Was Contrary to *Foucha*. ................................................................. 44

   E.  Webber is Entitled to Habeas Relief Because the Appellate Court's
       Reversal of the Trial Court's Order Granting Conditional Release
       Unreasonably Applied *Foucha*. ........................................................ 49

   F.  The Appellate Court Unreasonably Determined Facts in Light of the
       Evidence in Finding that Webber Must be Confined as a Potential Danger. .................. 50

V.  REQUEST FOR AN EVIDENTIARY HEARING................................................ 55

VI.  CONCLUSION.............................................................................................. 56

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allen v. Chandler*, 555 F.3d 596 (7th Cir. 2009) ........................................................ 35

*Bell v. Cone*, 535 U.S. 685 (2002) ................................................................................ 36

*Ben-Yisrayl v. Davis*, 431 F.3d 1043 (7th Cir. 2005) ...................................... 36, 38, 50

*Blake v. United States*, 841 F.2d 203 (7th Cir. 1988) .................................................. 32

*Bolton v. Akpore*, 730 F.3d 685 (7th Cir. 2013) .......................................................... 38

*Bracy v. Gramley*, 520 U.S. 899 (1997) ...................................................................... 55

*Brady v. Maryland*, 373 U.S. 83 (1963) ...................................................................... 32

*Braun v. Powell*, 227 F.3d 908 (7th Cir. 2000) ........................................................... 37

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ............................................................... 38

*Burt v. Titlow*, 571 U.S. 12 (2013) ............................................................................... 36

*Canaan v. McBride*, 395 F.3d 376 (7th Cir. 2005) ...................................................... 37

*Chapman v. California*, 386 U.S. 18 (1966) ................................................................ 38

*Cone v. Bell*, 556 U.S. 449 (2009) ............................................................................... 37

*Cullen v. Pinholster*, 131 S.Ct. 1388 (2011) .......................................................... 34, 36

*Foucha v. Louisiana*, 504 U.S. 71 (1992) ............................................................. passim

*Gilbert v. McCullough*, 776 F.3d 487 (7th Cir. 2015) ................................................. 41

*Harris v. Nelson*, 394 U.S. 286 (1969) ........................................................................ 55

*Harris v. Thompson*, 698 F.3d 609 (7th Cir. 2012) ..................................................... 37

*Hough v. Anderson*, 272 F.3d 878 (7th Cir. 2001) ...................................................... 38

*Janusiak v. Cooper*, 937 F.3d 880 (7th Cir. 2019) ...................................................... 36

*Jones v. United States*, 463 U.S. 354 (1982) ........................................................ passim

*Kansas v. Hendricks,* 521 U.S. 346 (1997) .................................................................. 39

*McNary v. Lemke*, 708 F.3d 905 (7th Cir. 2013) ......................................................... 38

*O'Sullivan v. Boerckel*, 526 U.S. 838 (1999) .............................................................. 38

*People v. Bethke*, 2014 IL App (1st) 122502 ............................................................... 49

*People v. Bledsoe*, 2015 IL App (1st) 133734-U ......................................................... 49

*People v. Grant*, 295 Ill. App. 3d 750 (1st Dist. 1998) ............................................... 49

*People v. Robin*, 312 Ill. App. 3d 710 (1st Dist. 2000) ............................................... 49

*People v. Webber*, Case No. 10 CF 2643 (DuPage County Court) ................................ 4

*People v. Webber*, 2019 IL App (2d) 170998-U .......................................................... 13

*People v. Webber*, 2021 IL App 2d 191090-U ........................................................... 2

*People v. Webber*, 2021 Ill. LEXIS 777; 175 N.E.3d 111; 2021 WL 4592168 ............ 5

*Perruquet v. Briley*, 390 F.3d 505 (7th Cir. 2004) ................................................ 32, 38

*Poree v. Collins*, 866 F.3d 235 (5th Cir. 2017) ....................................... 33, 42, 43, 44

*Ramirez v. Tegels*, 963 F.3d 604 (7th Cir. 2020) .......................................................... 37

*Revels v. Sanders*, 519 F.3d 734 (8th Cir. 2008) ................................... 33, 41, 42, 45

*Richardson v. Lemke*, 745 F.3d 258 (7th Cir. 2014) .................................................... 38

*Subdiaz-Osorio v. Humphreys*, 947 F.3d 434 (7th Cir. 2020) ................................... 37

*Toliver v. Pollard*, 688 F.3d 853 (7th Cir. 2012) ........................................................ 36

*United States ex rel. Hampton v. Leibach*, 347 F.3d 219 (7th Cir. 2003) ................. 37

*Whatley v. Zatecky*, 833 F.3d 62 (7th Cir. 2016) ........................................................ 38

*Wiggins v. Smith*, 539 U.S. 510 (2003) ......................................................................... 36

*Williams v. Taylor*, 529 U.S. 362 (2000) ....................................................... 35, 37, 44

*Wilson v. Sellers*, 138 S. Ct. 1188 (2018) .................................................................... 37

*Winfield v. Dorethy*, 956 F.3d 442 (7th Cir. 2020) ................................................ 36, 50

*Woodford v. Visciotti*, 537 U.S. 19 (2002) ................................................................... 36

*Yarborough v. Gentry*, 540 U.S. 1 (2003) ................................................................... 35

## Statutes

28 U.S.C. §2243 .............................................................................................................. 37

28 U.S.C. §2254 ........................................................................................ 1, 32, 34, 37

28 U.S.C. §2254(b) ........................................................................................................ 38

28 U.S.C. §2254(d)(1) .................................................................................................... 36

28 U.S.C. §2254(d)(2) .................................................................................................... 36

28 U.S.C. §2254(e)(2) .................................................................................................... 56

28 U.S.C. §2254(e)(1) ............................................................................................... 36, 50

720 ILCS 5/9-1(A)(1), (2) ............................................................................................... 4

730 ILCS 5/5-2-4 .................................................................................................... passim

## Rules

Local Rule 81.3(a) ............................................................................................................ 3

Petitioner, **MARCI MARIE WEBBER,** by and through her appointed counsel, **JOSHUA G. HERMAN**, and pursuant to 28 U.S.C. §2254, the Rules Governing Proceedings in the United States District Courts under 28 U.S.C. §2254, and the Fifth and Fourteenth Amendments to the United States Constitution, respectfully submits this Amended Petition for a Writ of Habeas Corpus, through which she requests that the Court order her discharge or release from the ongoing custody of the Illinois Department of Human Services ("IDHS") and any other relief consistent with this Petition. An evidentiary hearing is requested should the Court deem one necessary to grant the relief requested herein; however, it is further asserted that the constitutional violations caused by Webber's ongoing confinement are manifest from the record and should be remedied in her favor based on the pleadings.

## I. <u>INTRODUCTION</u>

Every day that Webber is forced to remain in IDHS custody against her will is an unconstitutional deprivation of her liberty interests and basic freedoms. She remains confined in an inpatient mental health facility even though she was found not guilty based on insanity (NGRI) on June 7, 2012, for the murder of her young daughter. She is locked in the mental facility despite the fact that on December 11, 2019, the Circuit Court of DuPage County (the "Trial Court")—the same court that acquitted her—ordered that she be conditionally released from IDHS after concluding that she was not a danger to herself due to a mental illness, and after further finding that she would never receive adequate mental health care in IDHS.

Her unconstitutional confinement is due to the June 9, 2021, order by the Illinois Court of Appeals for the Second District ("Appellate Court"), which improperly reversed the Trial Court's decision to grant Webber conditional release from confinement. The Appellate Court erroneously ordered that Webber remain confined even though it never found that Webber was

dangerous because of an existing mental illness. The Appellate Court's finding thus was contrary to and unreasonably applied *Foucha v. Louisiana*, 504 U.S. 71 (1992), the clearly established federal law. Instead of finding that Webber was dangerous, the Appellate Court required Webber to show by clear and convincing evidence that "she would not reasonably be expected to inflict harm upon herself if granted conditional release" and further relied on a "potential" and even hypothetical standard of dangerousness. Ex. C, *People v. Webber*, 2021 IL App 2d 191090-U, ¶54.[1] Thus, the Appellate Court effectively ordered Webber confined because she could not prove the absence of potential future dangerousness. That is an unconstitutional burden that erodes *Foucha's* standard of "dangerousness," which must be proven before depriving an insanity acquittee of her liberty.

Moreover, the Appellate Court unreasonably applied the facts that were before the Judge George J. Bakalis of the Trial Court, who presided over the matter for close to 10 years. During that tenure, Judge Bakalis presided over the NGRI trial, two conditional release hearings, and had multiple opportunities to observe and interact with Webber directly both as a represented and pro se litigant. Judge Bakalis reasonably found that continued confinement provided no therapeutic benefit to Webber, including after questioning the testimony of the IDHS witnesses and the veracity of information in their reports. The Appellate Court effectively relied on the testimony of a single doctor who had met with Webber for a mere five hours; reviewed records that did not support her ultimate diagnosis; never performed any testing, and at most testified that

---

[1] The Appellate Court record is attached hereto, along with the relevant appellate briefs, petition for leave to appeal, and petition for certiorari. For ease of reference, the different records are identified as separate Exhibits. Due to size limitations for e-filed exhibits, it was necessary to divide certain voluminous portions of the record, specifically the common law record (which is divided into two files) and the reports of proceedings (which involve four separate files, that are each subdivided into smaller files for the purpose of e-filing). When possible, those parts of the record are identified by Exhibit number as well as the pinpoint record citation. For instance, the citation Ex. K4, R. 1450 refers to page 1450 of Exhibit K, which is part of the report of proceedings and was divided into five separate files for the purpose of e-filing. A separate index will be filed for the exhibits and state court record.

Webber could potentially be a danger to herself if she did not have access to therapeutic support systems—systems that the Trial Court ensured that Webber had prior to ordering conditional release. To show that Webber could potentially be a danger to herself in the future if released from IDHS, the Appellate Court pointed only to a 2017 suicide attempt *that occurred inside IDHS*, was caused by situational stress, and was not followed by any other attempts at self-harm. The Appellate Court simply ignored the manifest weight of the evidence and testimony from multiple mental health professionals who opined over the years that Webber was not a danger to herself or others and that she did not even have an existing mental illness.

Importantly, while several years have passed since the Trial Court's December 11, 2019, order granting Webber conditional release, the urgency for release remains. As the Trial Court astutely observed in 2019, Webber is not receiving and never will receive adequate treatment in IDHS, which she described as a "hell" where she was repeatedly attacked by other inpatients. The Trial Court also recognized that Webber had a detailed release plan, a support network, and trusted therapists outside of IDHS. Yet, the Appellate Court ignored the record as it was determined to keep Webber locked away, perhaps motivated more by the nature of the offense *for which Webber was acquitted*. But the constitution demands more, and the clear remedy for the ongoing confinement of a non-dangerous acquittee is release.

This amended petition begins by generally following the format of the approved form for habeas corpus petitions submitted by persons in custody. *See* Local Rule 81.3(a). However, many of the items requested in the approved form are inapplicable given the procedural posture of Webber's habeas petition. Following counsel's efforts to provide the pertinent information requested in the approved format, this amended petition provides further detail of the procedural

history prior to presenting Webber's claims for habeas relief and arguments in support of the same.

## II.   INFORMATION PROVIDED PURSUANT TO APPROVED HABEAS CORPUS FORM (LR 81.3(a))

1. Name and location of court where conviction entered:

   Circuit Court of DuPage County, 18th Judicial Circuit
   505 N. Country Farm Road
   Wheaton, Illinois 60187

   Second District Appellate Court
   55 Symphony Way
   Elgin, Illinois 60120

2. Date of judgment of acquittal by reason of insanity :

   Not Guilty by Reason of Insanity Verdict
   June 7, 2012

   *People of the State of Illinois v. Marci Webber*, Case No. 10 CF 2643
   (Circuit Court of DuPage County)

3. Offenses of which Petitioner was acquitted by reason of insanity:

   Murder (720 ILCS 5/9-1(a)(1), (2) (Counts 1 through 5) (C 211-216)

4. Sentence imposed:

   N/A.   Petitioner was acquitted by reason of insanity, and initially ordered committed to custody of Illinois Department of Human Services for inpatient treatment.

5. Plea:

   Not Guilty

## PART I: TRIAL AND DIRECT REVIEW

1. Kind of trial:
   Bench Trial

2. Webber did not testify at trial

3. Petitioner appealed from the conviction and sentence imposed.

   No appeal was taken after the acquittal by reason of insanity on June 7, 2012. Following the Trial Court's granting of Webber's petition for conditional release on December 11, 2019, the State appealed.

   A. Direct Review

      1) Name of Court:

         Illinois Appellate Court, Second Division

      2) Result:

         Reversed, *People v. Webber*, 2021 IL App (2d) 191090-U (Exhibit C).

      3) Date of Ruling:

         June 9, 2021

      4) Issues Raised by State in its appeal:

         i.    Whether the trial court erred in finding that defendant, acquitted of the first degree murder of her daughter after a finding of not guilty by reason of insanity, should be released from inpatient treatment after failing to show that she is not a danger to herself or others.

4. Mr. Webber sought leave to appeal to the Illinois Supreme Court.

   A. (1) Webber's Petition for Leave to Appeal was denied

      (2) The date of this denial was on March 26, 2008 (*People v. Webber*, 2021 Ill. LEXIS 777 *; 175 N.E.3d 111; 447 Ill. Dec. 743; 2021 WL 4592168 (Exhibit G).

5. Mr. Webber petitioned the United States Supreme Court for a writ of *certiorari* on December 30, 2021. (Exhibit R). *Certiorari* was denied on February 22, 2022.

## PART II: COLLATERAL PROCEEDINGS

1. Post-conviction relief related to the claim presented in this habeas petition was not sought by Webber in State Court.

3. Petitioner has previously filed a petition for habeas corpus in federal court.

    A. Case title and case number: *Webber v. Fernandez, et al.*, 1:21-cv-00656

        1. The habeas petition was dismissed without prejudice, with the Court noting that the dismissal "does not count as a 'first' petition for purposes of the prohibition on unauthorized and successive habeas corpus petitions.

4. There are no other collateral proceedings pending.

## PART III – PETITIONER'S CLAIMS

In her *pro se* habeas petition, Webber raised, in summary, the following claims (Case No. 1:21-cv-5444, Dkt. #1):

(A) Petitioner is "not mentally ill and dangerous." The clear and convincing standard is too high; dangerousness requires a reasonable expectation; and "in remission" means not mentally ill by law. One must be "both mentally ill and dangerous" under *Foucha v. Louisiana* and *United States v. Jones*. Ongoing confinement is punishment precluded by the Supreme Court for a not guilty by reason of insanity acquittee.

(B) Exculpatory and material facts were concealed and treatment records were falsified in violation of *Brady v. Maryland*, as favorable evidence has been withheld thwarting efforts to correct material facts that should be offered.

In this counseled and amended petition, Webber raises the following claims for relief:

1. The Second District Appellate Court's June 9, 2021, order reversing the DuPage County Trial Court's December 11, 2019, order that granted Webber's petition for conditional release was contrary to and unreasonably applied clearly established federal law, namely *Foucha v. Louisiana*, 504 U.S. 71 (1991), in that the Appellate Court ordered Webber confined without finding that she was dangerous, but instead relying on contested testimony that Webber had a "potential" risk of dangerousness and that Webber did not herself show that she is not "reasonably expected" to be a danger to herself at some point in the future, when federal law requires a showing of dangerousness caused by mental illness before confining an acquittee.

2. The Second District Appellate Court's June 9, 2021, order reversing the DuPage County Trial Court's December 11, 2019, was premised on an unreasonable determination of the facts because the evidence did not show that Webber was dangerous as required by federal law.

Should it be necessary and not cause delay, Webber would seek an evidentiary hearing.

## PART IV – REPRESENTATION

(A) At preliminary hearing:

      None

(B) At arraignment and plea:

      Jeffrey York
      DuPage County Public Defender's Office
      503 N. County Farm Road
      Wheaton, IL 60187

(C) At trial:

      Jeffrey York
      DuPage County Public Defender's Office
      503 N. County Farm Road
      Wheaton, IL 60187

(D) At sentencing:

      N/A

(E) On appeal:

    Direct Appeal and Petition for Leave to Appeal:

      Stacey A. Aschemann
      Equip for Equality
      300 E. Main Street, Ste. 18
      Carbondale, IL 62901

      Julie Meglan
      Equip for Equality
      906 Olive Street, Ste. 200
      St. Louis, MO 63101

      Susan O'Neal
      Equip for Equality
      1 W. Old State Capitol Plaza, Ste. 816
      Springfield, IL 62701

Petition for *Certiorari*

Terrence M. Johnson
North Pier Chicago
505 East Illinois Street
Lower Level Unit 1
Chicago, Illinois 60611

Thomas C. Cronin
Cronin & Co., Ltd.
120 North LaSalle Street, 20th Floor
Chicago, Illinois 60602

(F) In any post-conviction proceeding:

N/A

(G) Other (state):

N/A

**PART V – FUTURE SENTENCE**

Webber does not have any future sentence to serve.

III. **BACKGROUND OF TRIAL AND POST-TRIAL PROCEEDINGS**

A. **Webber is Acquitted by Reason of Insanity
for the Murder of Her Young Daughter.**

On November 10, 2010, Webber was indicted with First Degree murder for the killing of

her four-year-old daughter, Maggie, on November 3, 2010. (Ex. I1, C. 137-142). As

established at the June 7, 2012, bench trial before Judge George J. Bakalis, Webber was in a

psychotic state and believed that she needed to protect her daughter from a satanic cult that

intended to kidnap her daughter and subject her to sexual slavery. (Ex. K1, R. 211). The State's

trial evidence consisted of a lengthy stipulation read into the record. (Ex. K1, R. 191-217). The

defense elicited the testimony of Dr. Orest Wasyliw, a psychiatrist whom the DuPage County

State's Attorney initially sought to evaluate Webber and her state of mind during the commission

of the NGRI offense. (Ex. I1, C. 189-191, Ex. K1, R. 220-272). Dr. Wasyliw diagnosed Webber with major depressive disorder with psychotic symptoms. (Ex. K1, R. 254). He also testified that Webber loved her daughters, and there was "no chance whatsoever" that she would have killed her youngest daughter had she not entered into a psychotic state. (Ex. K1, R. 267-268).

In addition to Dr. Wasyliw's testimony, the evidence and record before the Trial Court, also provided extensive detail and background regarding Webber's mental health issues, history of prescribed psychotropic medications, and changes in her behavior, which were often related to changes in her medication, including increased paranoia about her surroundings and fear that others would harm or even kill her and her daughters. (Ex. K1, R. 229-30, R. 240; Ex. O2, Sec. C. 329, 489; Sec. C. 472). Indeed, police who were called to the scene of the NGRI offense found a backpack that contained ten different psychotropic medications. (Ex. O2, Sec. C. 327). When Webber stopped taking the medications, she began to feel anxious, paranoid, and afraid of people. (Ex. O3, Sec. C. 487). The evidence also indicated that about a week before the NGRI offense, Webber stopped taking some or all of these medications, and then suffered physical illness, cramps, hot flashes, and "substantially more" depression as well as more suspicion and paranoia. (Ex. K1, R. 243). She also described having great fear for her own safety and that for her daughters. (Ex. K1, R. 243-44).

On November 3, 2010, the day of the NGRI offense, the record indicated that Webber recalled hiding in a bathroom fearing that a demon was after her and her daughter. (Ex. O3, Sec. C. 487-88). In addition to killing her daughter in the bathroom, Webber cut her own neck and wrist and wrote messages on the bathroom wall in blood to warn other people. (Ex. O3, Sec. C. 472, 474; 488,). The following day, Webber indicated that she did not know if what she did was wrong because she had saved her daughter. (Ex. K1, R. 215).

After considering this and other evidence, on July 7, 2012, the Trial Court found Webber not guilty by reason of insanity for the killing of her daughter. (Ex. I1, C. 310, Ex. K1, R. 346). Following this acquittal, on July 13, 2012, the Illinois Department of Human Services (IDHS) found, pursuant to 730 ILCS 5/5-2-4, that Webber was in need of inpatient mental health services. (Ex. O1, Sec. C 8-13). Judge Bakalis concurred and ordered that Webber be treated by IDHS for continued inpatient treatment. (Ex. K1, R. 353).

### B. Conditional Release and Discharge Proceedings Before the Trial Court

Under Illinois law, insanity acquittees can seek conditional release and discharge. Pursuant to 730 ILCS 5/5-2-4, the director of the facility in which the insanity acquittee is housed must submit treatment plan reports every 90 days. Pursuant to statute, those 90-day reports must include opinion "as to whether the defendant is currently in need of mental health services on an inpatient basis or in need of mental health services on an outpatient basis," must also summarize the basis for that recommendation, and must summarize various items from the acquittee's treatment plan, including "(1) an assessment of the defendant's treatment needs, (2) a description of the services recommended for treatment, (3) the goals of each type of element of service, (4) an anticipated timetable for the accomplishment of the goals, and (5) a designation of the qualified professional responsible for the implementation of the plan." 730 ILCS 5/5-2-4(b). These reports are utilized by the courts to determine if a patient is progressing towards release or requires more inpatient treatment.

### 1. The First Conditional Release Proceeding.

On August 21, 2014, Webber petitioned the Trial Court for conditional release or discharge. (Ex. I1, C. 352-354). On November 12, 2014, the Trial Court appointed a psychiatrist, Dr. Seltzberg, to evaluate Webber and determine if she was still in need of inpatient

treatment. (Ex. I1, C. 391). Dr. Seltzberg submitted a report to the Trial Court on January 20, 2015. In her report, Dr. Seltzberg opined that Webber was no longer psychotic even without taking medication, but believed that she met most of the diagnostic criteria for Schizophrenia. (Ex. O3, Sec. C. 365- 366). Dr. Seltzberg did not testify and consequently her report and the findings were not subject to cross-examination by the defense.

The hearing on Webber's petition for conditional release or discharge did not take place until September 26, 2017. (Ex. K1, R. 661). During that hearing, Webber presented testimony from Dr. Toby Watson, a clinical psychologist, Lucy Menezes, a social worker at Chicago-Read Mental Health Center, Dr. Craig Jock, a clinical psychologist at Chicago-Read, and Mir Obaid, a psychiatrist at Chicago-Read. (Ex. K1, R. 797-798, 842, 882).

Dr. Watson testified that Webber did not meet "any criteria for any mental illness," specifically the diagnosis given by Chicago-Read that was major depressive disorder, severe with psychotic features in full remission. (Ex. K1, R. 713). He added that he did see that Webber "has sadness, she is frustrated, she gets emotionally upset, she will verbally raise her voice, she does not make any threat, but those are behaviors and feelings, she feels victimized, she feels at times entitled. So there's a fair number of things that we could, again, symptoms are all thoughts, feelings, and behaviors. She is human like anyone else, she has got a lot of those things. But nothing that falls to a level or in any category of a mental illness." (Ex. K1, R. 713- 14). Dr. Watson also testified about testing that he performed in 2015, which indicated that Webber was a "low risk" for committing an "act of violence" and that there was nothing he had heard which indicated the testing needed to be redone. (Ex. K1, R. 714). He further testified that Webber was not suicidal homicidal, or a danger to anyone. (Ex. K1, R. 715-716).

Dr. Craig Jock, Webber's treating psychologist at Chicago-Read Mental Health Center testified to Webber's lack of dangerousness and mental illness. (Ex, K1, R. 842-879). Dr. Jock saw Webber two times per week for individual psychotherapy sessions for nearly a year. (Ex. K1, R. 843-44). Dr. Jock testified that Webber did not meet the criteria for mental illness, and that she did not exhibit the symptoms of major depressive disorder, bipolar disorder, psychotic disorder, or schizophrenia. (Ex. K1, R. 844). Specifically, he noted that he was aware that Chicago-Read had Webber's diagnosis as "major depressive disorder, severe with psychotic features in remission," but added that he did not believe that Webber currently met the criteria for any mental illness. (Ex. K1, R. 844). He noted that Webber was not symptomatic to a "diagnosable level" with depressive disorder or bipolar disorder, which were both mood disorders. (Ex. K1, R. 845). Dr. Jock also testified that Webber would often verbalize her frustrations with the staff members of Chicago-Read Mental Health Center but had not expressed suicidal behavior and that she was not dangerous in any way. (Ex. K1, R. 846).

Dr. Mir Obaid, a psychiatrist at Chicago Read Mental Health Center who had worked there for twenty-eight years, and had a significant amount of contact with Webber, also testified. (Ex, K1, R. 882-892). Dr. Obaid testified that Webber had been a lengthy participant in the group therapy session he ran, titled "Understanding Mental Illness," in which he and Webber discussed her refusal to medicate. Dr. Obaid testified that he would not have recommended that she take any medication, even if she were willing to do so. (Ex, K1, R. 886). He also testified that Webber did not have any active symptoms of mental illness, was not a danger to herself or others, and even admitted that it could be hard to "shake" diagnoses, even if they were incorrect. (Ex. K1, R. 888-889). Thus, Webber's witnesses each opined that she did not meet the standard for inpatient treatment (Ex. K1, R. 676, 715-716, 797-798, 807, 842, 849, 882, 889-890).

The State presented evidence from, Dr. James Corcoran, a psychiatrist and the medical director of Chicago-Read Mental Health Center. (Ex. K1, R. 969-970). Dr. Corcoran recognized that Webber was not suicidal, homicidal, or reasonably expected to cause bodily harm to herself or another. (Ex. K1, R. 1019-1020).

On November 13, 2017, the Trial Court issued its order denying Webber's petition for conditional release or discharge. (Ex. I2, C. 524, Ex. K1, R. 1118). However, the Trial Court also established a transition program that could lead to Webber's eventual conditional release. (C. 524). The transition program would allow the Trial Court to assess Webber's conduct and behavior outside of a secure facility. (Ex. I2, C. 524). The Trial Court also ordered IDHS to transfer Webber to a chronic care unit, increase her privileges, and also research "what resources will be made available for [Webber] when conditional release is granted." (Ex. I2, C. 524-525). The Trial Court further ordered Webber to participate in group and individual therapy, and indicated that it would reconsider the request for conditional release in six months' time. (Ex. I2, C. 525).

Three days after the Trial Court's denial of her petition, Webber attempted suicide by taking 30 pills of Fioricet, a medication that she took to treat her severe headaches. (Ex. 02, Sec. C. 224). After consuming the Fioricet, Webber approached the staff at Chicago-Read to inform them about what she had done. (Ex. L4, R. 1847). IDHS transferred Webber from Chicago-Read to Elgin Mental Health Center following this suicide attempt. (Ex. O2, Sec. C. 195).

Webber appealed the Trial Court's denial of her petition. (Ex, I2, C. 529). On August 1, 2019, the Second District Court of Appeals affirmed the Trial Court's decision. (Ex. I2, C. 792-804); *People v. Webber*, 2019 IL App (2d) 170998-U.

2.   **The Second Conditional Release Proceeding and Hearing.**

On June 26, 2018, Webber filed a second petition for conditional release or discharge with the Trial Court.   (Ex. I2, C. 585).   Then on July 10, 2018, Webber filed an amended petition for discharge. (Ex. I2, C. 592).   She then filed a second amended Petition for discharge on July 18, 2018, in which she specifically argued that she must be held in the least restrictive environment pursuant to 405 ILCS 5/2-102.   (Ex. I2, C. 597).   On October 1, 2018, the Trial Court appointed Dr. Lesley Kane to evaluate Webber.  (Ex. I2, C. 619).

The hearing on Webber's second petition for conditional began on May 8, 2019.  (Ex, L3, R. 1753).   Through the course of the hearing, Webber presented testimony from Dr. Cindy Perlin, Dr. Watson, Dr. Gail Tash, and Dr. Dathan Paterno.  (Ex. L3, R. 1718, 1754, Ex. L5, R. 1879, Ex. L6, R. 1949). Webber also testified herself, and additionally called Terry Nichols, a former IDHS employee.  (Ex. N5, R. 2877).   The State called Dr. Richard Malis and Dr. Kane. (Ex. N1, R. 2511, Ex. N3, R. 2717).

Dr. Perlin, a psychologist who acknowledged that she helped raise funds for Webber to pay for experts, testified that Webber did not have a history of mental illness as a child or a familial history of mental illness.  (Ex. L3, R. 1729-31, 1766-68). Dr. Perlin was not admitted as an expert, but testified that Webber's character was not one of violence.  Dr. Perlin testified that she was not a danger to herself and others. (Ex. L3, R. 1724).  In his testimony, Dr. Watson reiterated his opinions that Webber did not suffer from a mental illness.  Rather, he diagnosed Webber with PTSD, personality disorder not otherwise specified, and alcohol dependence by history in 2015.   The Trial Court asked Dr. Watson whether he believed that Webber "has any type of psychiatric disorder of any kind, not necessarily insanity?"   (Ex. L5. R. 1859).   Dr. Watson responded, "Post-traumatic stress disorder she meets criteria for. She has alcohol

dependence by history. If I stretched even, you can maybe say that she has personality disorder not otherwise specified, some sort of traits where she has that personality conflict." (Ex, L5, R. 1859). Dr. Watson also reiterated that Webber was not a danger to herself or others, which he also asserted in his 2017 testimony. (Ex, L3, R. 1762-1764). Dr. Watson opined that Webber did not meet the threshold for mental illness. (Ex. L4, R. 1819). He also explained that when a mental illness is in "remission" that means "you don't have it." (Ex. L4, R. 1804).

Regarding her November 2017 suicide attempt, Dr. Watson acknowledged it was serious, but also asserted that it was situational and not the product of mental illness. (Ex. L4, R. 1802, 1847). On this point, Dr. Watson testified as follows:

> I believe that her suicide attempt was situational. This was not evidence of some prolonged, quote-unquote, mental illness. This was directly related, and as her own account said, this is why she did it. And when it failed, she acknowledged that and even went to staff. I mean, she could have hid it. She could have just – it's not like they discovered her.

> This was something that she went and told staff, hey, I did this, just letting you know. She has seen herself as being victimized. She is going to them and saying, look, I am dying here. I literally would rather be dead. Stop doing this to me. Stop telling me I'm ill. Stop telling me I have to take meds. Stop telling me that I am a baby killer.

(Ex. L4, R. 1847, Ex. L5, R. 1848). Dr. Watson also acknowledged that even in an outpatient mental health care facility, she would also need to have daily check-ins to manage stress related to finding an apartment or job. (Ex. L5, R. 1857).

Dr. Tasch, a board-certified psychiatrist, testified that Webber did not have a serious mental illness and had not been psychotic since the NGRI offense in November 2010. (Ex, L5, R. 1879-80, 1885, 1893). Dr. Tasch also testified that Webber did not pose a danger to herself or others, even though she had been attacked by her peers in the facility. (Ex. L6, R. 1931, 1935). Dr. Paterno, a psychologist, agreed with Dr. Watson that Webber's 2017 suicide attempt was

situational.  He further opined that that Webber would have a lower risk of suicide if she were not housed inpatient in an IDHS facility.   (Ex. L6, R. 1949-1950, Ex. M3, 2221).  He also did not believe that Webber suffered from a serious mental illness.  (Ex. L6, R. 1952,).  Dr. Paterno acknowledged that Webber would need psychotherapy.  (Ex. L7, R.1993).

Webber testified about the difficult and abusive conditions inside Elgin Mental Health Center.  (Ex. L7, R. 1997-2001, Ex. M5 & M6, R. 2374-2431).  She described how other patients physically attacked her thirty-two times, her headaches, and about the lack of access to the gym and outside air.   (Ex. L7, R. 2000, Ex. M5, R. 2386-88, Ex. M6, R. 2407).   She testified about how staff and patients called her "baby killer" and caused her distress.  (Ex. M5, R. 2383).  Webber described her two suicide attempts.  The first attempt was on November 3, 2010, the date of the NGRI offense when she was psychotic and "trying to send [herself] and [her] daughter to heaven."  (Ex. M5, R. 2392-93).  The second attempt "was at Chicago-Read on November 15, 2017, two days after [she] was denied discharge."  (Ex, M5, R. 2393).  She also explained that the restrictions at Chicago-Read were becoming harsher, and on the day of the attempted suicide she had begged staff to let her off-unit.  (Ex, M5, R. 2394).  When asked if there was a connection between the denial of the discharge petition and suicide attempt, Webber responded, "Yes. Of course.  I felt hopeless.  I know darn well that you may say two months of this past no incidents, three months of this past no incidents, that all it takes is one staff that doesn't like me to create an incident.  This is proof of how many incidents are manipulated, orchestrated, what have you, or taken out of context that will keep me, and I am afraid that someone could do this to me again and I get sent back again because of the nature of my case."  (Ex. M5, R. 2394).  She bluntly stated that, unlike the first suicide attempt, she was not "out of her mind" during the second attempt, which she agreed was a rational decision based on the

"hopelessness" of her surrounding circumstances.  (Ex. M5, R. 2395).  Webber also described her concerns about taking medication, and noted that if she was ordered to take medication, she would not do so because she would "rather stay locked up than become dangerous to someone again." (Ex. M6, R. 2421).

Dr. Jock, who testified at the first conditional release hearing, was called again by Webber.  (Ex. M6, R. 2432-2464).  Dr. Jock explained that he was Webber's treating physician from October 2016 until November 2017.  (Ex. M6, R. 2433).   Dr. Jock saw Webber twice a week as her treating psychologist.   Dr. Jock testified that he understood Webber's November 2017 suicide attempt to be related to her disappointment at being denied conditional release. (Ex. M6, R. 2439).   Dr. Jock believed Webber when she told him in November 2017 that she was not depressed.  (Ex. M6, R. 2440-41).  He also believed that the November 2017 suicide attempt was "situational."  (Ex. M6, R. 2443).

As noted above, the State called two witnesses, Dr. Malis and Dr. Kane.   (Ex. N1, R. 2511, Ex. N3, R. 2717). Dr. Malis was Webber's treating psychiatrist at Elgin Mental Health Center.  However, he had not provided Webber with treatment because he had not established a therapeutic relationship with her that would enable him to treat her.  (Ex. N1, R. 2513, 2520, Ex. N2, R. 2595-2596).  Despite conceding that he had no rapport with Webber, Dr. Malis told the Trial Court that no another psychiatrist could be assigned to her.  (Ex. N2, R. 2643, 2647).  In fact, at the time of the hearing, approximately one year had passed since Dr. Malis had met with Webber and when the meetings did occur, they were not substantive in nature.  (Ex. N1, R. 2547-2548).  Dr. Malis' diagnosis of Webber was schizoaffective disorder bipolar type, alcohol use disorder, and borderline personality traits, and that she required mental health services on an inpatient basis.  (Ex. N1, R. 2528).  Dr. Malis also opined that Webber was likely to harm herself

17

or others.  (Ex. N1, R. 2527, 2571). He also acknowledged that Webber did not attack any peers in the facility who attacked her.  (Ex. N3, R. 2691).  Dr. Malis asserted that it would be his recommendation that Webber take psychotropic medication, which she had refused to do, in order to reduce symptoms of delusional beliefs and the mood disorder symptoms. (Ex. N1, R.2539).

Dr. Kane was the Chief Psychologist for DuPage County Probation and Court Services, and was appointed by the Court to provide an independent evaluation of Webber. (Ex. N3, R. 2717-18, 2728).   She met with Webber on two occasions for a total of five hours and also reviewed IDHS treatment records and reports, and records prepared after the NGRI offense, including from Elgin Mental Health Center and Chicago-Read, to arrive at her diagnosis and recommendations for Webber's mental health treatment. (Ex. N3, R. 2718, 2730, Ex. N4, R. 2798-2799).  Dr. Kane opined that Webber had borderline personality disorder with narcissistic traits. (Ex. M5, R. 2378-2379, Ex. N4, R. 2753).  She explained that those with borderline personality disorder see things in black and white terms.  (Ex. N4, R. 2756).  Dr. Kane described borderline personality disorder in the following way "a pervasive pattern of mood instability, unstable relationships, and impulsivity.  The criteria would –I'll just name a couple of criteria. One would be impulsivity.  Another would be a history of unstable, sort of more volatile, turbulent relationships; an unstable sense of self; paranoid ideation is part of this disorder as well, particularly under periods of stress, so it tends to be more transient, although it can reach the level of psychosis at different times; feelings of emptiness; a fear of abandonment. One of the main criteria is also effective instability, so extreme moodiness or dysphoria, agitation.  Also, an inability or difficulty – I would say marked inability to control anger and another would be inappropriate anger or agitation."  (Ex. N4, R. 2753-54).

18

Dr. Kane also diagnosed Defendant with major depressive disorder with psychosis in remission, and rule out bipolar disorder with psychosis in remission (Ex. N3, R. 2741, 2743). Regarding the rule out bipolar disorder diagnosis, Dr. Kane explained that she qualified her diagnosis as rule out because she is not confident that Webber met that diagnosis but did demonstrate some symptoms. (Ex. N3, R.2742). She added that Webber did not exhibit "significant symptoms of mental illness," such as psychotic behavior, hearing voices, or "distractibility to the point where she looked as though she was seeing things in the room that weren't there. (Ex. N3, R. 2734-35, Ex. N4, R. 2753). Dr. Kane did not agree that Webber's treatment caused her symptomology. (Ex. N4, R.2759).

Regarding the risk of danger, Dr. Kane testified that she saw no indication that Webber would be dangerous to others. (Ex. N4, R. 2875). When asked by the State, who called her as a witness, about having a depressive disorder in remission while being unable to identify triggers and stressors, Dr. Kane opined that such an individual with "this diagnosis" "could put themselves in a situation that could escalate or trigger her symptoms; and not being aware of when it's escalating or not having the self-awareness or insight, their symptoms could go on untreated and they might not seek help prior to it escalating to the point where they might actually do something to harm themselves." (Ex. N3, R. 2746-47). This limited "insight into this mental illness to identify her triggers or stressors" led to a "risk" of Webber being "in a more vulnerable state than the general public as far as another suicide attempt." (Ex. N3, R. 2747).

Dr. Kane relayed what Webber told her about the November 2017 suicide attempt at Chicago-Read as follows: "I think she had told me that she had thought – a number of people had given her positive feedback and had indicated that she would probably be released into the community. And then she discovered that that was not going to happen, and she has feeling upset

about that, and she also had added that she couldn't provide for her children and that was something that she was concerned about. And by committing suicide, they – the children could sue for wrongful death and then they would be provided for financially." (Ex. N4, R. 2767-68). Yet, Dr. Kane also testified that "I wouldn't say she's in imminent danger to hurt someone or hurt herself. I think the potential could be there, particularly for the suicide ideation. I'd be concerned about that." (Ex. N4, R. 2782). When asked again by the State if she had formed an opinion if Webber was "expected to inflict serious harm upon herself or others," Dr. Kane responded, "I wouldn't say she's at imminent risk. In other words, today right now, here and now, I think the potential is there if she isn't able to, I guess, acquire better coping skills and recognize that she does have some mental health issues that need to be addressed." (Ex. N4, R. 2791). And when asked by the State if Webber "has sufficient skills to cope without having therapy in order to not be a danger to herself and others?" Dr. Kane replies: "I would be concerned if she didn't have some type of therapy or treatment in place." (Ex. N4, R. 2791-92). On cross-examination, Dr. Kane repeated the essence of this opinion that she did not believe Webber to be "at imminent risk in this moment in time in the very near future." (Ex. N5, R. 2861-62). She reiterated that there was a "potential to harm herself" if a therapist was not around and she was in a high-stress environment and she did not have the coping mechanisms. (Ex. N5, R. 2864-65).

Thus, Dr. Kane explained that the "potential" could exist if Webber was not in some form of treatment and having her mental health monitored. (Ex. N3, R. 2746, Ex. N4, R. 2782, 2791, Ex. N5, R. 2861-2862). In response to the Trial Court's query as to whether Webber would have the "skills necessary to seek out the help she would need in an outpatient basis," Dr. Kane responded, "I think that if [Webber] really trusted a therapist, she would probably seek them

out." (Ex. N5, R. 2870). Dr. Kane agreed that Webber would not seek treatment or assistance from Dr. Malis. (Ex. N6, R. 2967).

Dr. Kane still concluded that Webber required ongoing inpatient treatment "Because she hasn't progressed enough in treatment. She's not aware of the mental health symptoms that she does have, and because she's not aware of that or doesn't have insight into it, she hasn't been able to address them properly and set up a relapse prevention plan to transition into the community." (Ex. N4, R 2792).

In her rebuttal case, Webber called Terry Nichols, a retired nurse from Elgin Mental Health Center. (Ex. N5, R. 2877-2878). Nichols described how he had made notes of positive interactions in Webber's chart, but was then told by his immediate supervisor that Dr. Malis was not pleased with that. (Ex. N5, R. 2880). Nichols explained how his supervisor told him that Dr. Malis wanted to build a case for court-ordered medication against Webber's will not to be medicated. (Ex. N5, R. 2881).

### 3. **The Trial Court's Order Granting Webber's Petition.**

On September 18, 2019, the Trial Court issued a Memorandum Order, in which it found that Webber did not meet the standard for inpatient care and ongoing confinement. (Ex. I2, C. 779-788). The Trial Court specified that if Webber met several conditions, then it would consider granting her request for conditional release within sixty days. (Id.).

In its detailed order, the Trial Court specifically cited Nichols' testimony as well as that of several witnesses called at the 2017 conditional release hearing who testified regarding the preparation of the treatment plan reports. The Trial Court noted that this testimony "causes the court pause to consider whether or not the ninety-day reports which have been submitted to the court, are completely accurate regarding [Webber]." (Ex. I2, C. 784). In a similar vein, the Trial

Court stated concerns about the testimony of Dr. Malis because "he will never acknowledge petitioner is proper for release until she consents to the taking of psychotropic medications even though her psychosis has been in remission for over eight years without medication." (Ex. I2, C. 784). The Trial Court further discussed the statutory factors set forth in 730 ILCS 5/5-2-4(g). Those are factors that courts "may" consider when determining whether conditional release is appropriate.

The Trial Court disagreed with Webber's experts' opinions concerning her lack of a mental illness. Instead, the Trial Court agreed with Dr. Kane's conclusion that Webber suffered from borderline personality disorder. It concluded that Webber's symptomology was "largely consistent with borderline personality disorder." (Ex. I2, C. 781, Ex. N4, R. 2754-2756, Ex. N5, R. 2915). It also found that Webber's "prior psychotic episodes are now in remission" and had been so "for an extended period of time without medication." (Ex. I2, C. 785). The Trial Court also agreed with Dr. Kane's conclusion that Webber needed "to have good mental health treatment and therapy." (Ex. I2, C. 784). However, that mental health care was not realistic at IDHS, as the Trial Court reasoned: "for reasons previously discussed, both the fault of [Marci] and the fault of IDHS, will never receive that treatment while in the custody of IDHS." (Ex. I2, C. 784). The Trial Court also ordered IDHS to transfer Webber from Elgin to Chicago-Read, where Webber was to engage in mental health counseling, cooperate with staff at Chicago-Read, and follow IDHS regulations. (Ex. I2, C. 787-788).

As to the issue of dangerousness, the Trial Court found no evidence that Webber posed a danger to others. And as to being a danger to herself, the Trial Court expressed concerns about Webber's November 2017 suicide attempt but concluded that the incident was "solely based on the denial of discharge or conditional release at that time." (Ex. I2, C. 785). The Trial Court's

findings on the issue of dangerousness are reflected in its consideration of the eleventh statutory

factor of 730 ILCS 5/5-2-4(g)(11), when it stated as follows:

> Based on the findings of Dr. Kane, the court believes that the petitioner is not a danger to others. There was testimony that she may be a danger to herself based on the suicide episode in November of 2017 after this court's denial of her request for discharge or conditional release. The court believes this was solely based on the denial of discharge or conditional release at that time. As previously indicated, petitioner continues to show irritability and aggressiveness, but no physically violent behavior has been shown toward staff or other patients. In fact, the petitioner has been the subject of abuse by other patients without retaliating. It is not possible to determine the dangerousness to herself unless a transition program is established to see how the petitioner conducts herself in unsecured environment situations.

(Ex. A, pp. 7-8).

During the September 18, 2019, hearing, the following exchange occurred between the

Trial Court and Webber, during which she emphasized the hellish environment at Elgin:

> THE COURT: I have to be sure that I am giving you the opportunity to be outside of that facility, but I have to be sure that you are able to deal with the outside world, so-to-speak, and that you don't have any problems and that you are involved in counseling. If you can show me that over some period of time, I can consider a modification.

> THE DEFENDANT: I completely understand that and respect that. Please take in mind for 43 years; law school, the Army, Office of Mental Retardation Developmental Disabilities, Office of Mental Health Disabilities Advocates. I have been out there in the world. I have never been through a more stressful environment than Elgin Mental Health Center. I am standing here before you today lucid, together, yet I have gone through hell at Elgin Mental Health Center.

> THE COURT: You have to understand, you are an intelligent woman. You have to acknowledge that you do have some mental health issues. There is nothing wrong with that. There's all kinds of people out there who have mental health issues and they deal with it. They deal with it through counseling It's more personality issues I think than anything else that you have to show me that you can at least make the effort to deal with that to understand what the things are to become a viable member of society without having these problems.

> THE DEFENDANT: I can do that, your Honor, in a normal environment.

THE COURT: I think you can, otherwise I wouldn't be saying this. But again, I have to have a period of time where you can show me that you can do that.

THE DEFENDANT: Okay. If Chicago-Read gives me the opportunity, I am going to take it. They need to treat me the way they treat other people there and give me the opportunity.

THE COURT: There is no reason why they shouldn't treat you like anybody else.

THE DEFENDANT: It wasn't as bad as Elgin, so I am very grateful you are transferring me from Elgin. That place is hell.

(Ex. N5, R. 2914-2916).

After issuing its September 18, 2019, Order, the Trial Court held hearings in October and November 2019 to monitor Webber's progress and IDHS's compliance. Webber advised the Trial Court of her efforts to comply with the Order and to secure her potential release. (Ex. N6, R. 2925-2941, 2943-2953). The Trial Court advised that if no provider facility would agree to accept Webber as a resident (likely due to her not consenting to medication), then Webber could provide a lease, bank account with funds, and proof of independent housing. (Ex. N6, R. 2945-47). The Trial Court then set a hearing for December 11, 2019, for further discussion on the conditional release conditions. Before that hearing, Webber submitted a detailed memorandum with her plans for conditional release. (Ex. Q, A-49-68). IDHS also submitted an additional progress report, which indicated that outpatient facilities would not accept Webber because she did not consent to medication. (Ex. P, Sec. C. 5-7). The IDHS progress report showed that Webber had participated in group and individual therapy, including substance abuse treatment. (Ex. P, Sup. Sec. C. 11-14). Webber submitted proof that she was able to secure outpatient mental health treatment and housing on her own and with the assistance of supporters. (Ex. I2, C. 851). After reviewing this material, the Trial Court ordered Webber's conditional release on

December 11, 2019.  (Ex. I2, C. 907).[2]  Consistent with that order, Webber was released from custody.  (Exhibit B)

The State appealed the Trial Court's order.  It also filed an emergency motion to stay the Trial Court's decision. (Ex. I2, C. 907-908).  The Appellate Court granted the emergency motion.  As a consequence, Webber was ordered back to IDHS custody on December 20, 2019. She complied with that order, turned herself in without incident, and has been in IDHS custody since that date.

4.  **Appellate Arguments and the Second District Court of Appeals' Reversal**

As set forth in its brief, the State phrased the issue on appeal as:  "Whether the trial court erred in finding that defendant, acquitted of the first degree murder of her daughter after a finding of not guilty by reason of insanity, should be released from inpatient treatment after failing to show that she is not a danger to herself or others."  (State Appellate Brief, p. 1).  Its argument as to dangerousness focused on the eleventh factor of 730 ILCS 5/5-2-4(g) and relied on Dr. Kane's testimony.  As the State wrote, Dr. Kane:

> testified that if Defendant is not in treatment or being monitored, there is the potential that she could harm herself.  (R.2746).  Dr. Kane believed that that potential is greater on conditional release than at an inpatient facility because there is less monitoring on conditional release. (R.2746). There is a risk that she could put herself in a situation that could escalate or trigger her symptoms; and not being aware of when it's escalating or not having the self-awareness or insight, her symptoms could go on untreated and she might not seek help prior to it escalating to the point where she might actually do something to harm herself. (R.2746-2747).

(Ex. D, pp. 40-41).

---

[2] Pursuant to Illinois law, the period of conditional release was set for five years.  Webber was also required to participate in mental health services and counseling, submit to drug and alcohol testing, have no unsupervised contact with any person under the age of seventeen, register as a violent offender against youth, and abstain from use of non-prescribed drugs, marijuana, and alcohol. (C. 786-88, 907).  The Trial Court specified that failure to meet the terms of conditional release could result in its revocation or extension beyond the five-year term. *See also* 730 ILCS 5/5-2-4(a-1)(D).

Webber, now represented by attorneys from the non-profit Equip for Equality, framed the two issues on appeal as follows:

1. Whether the trial court's conclusion that the defendant-appellee, Marci Webber, is not reasonably expected to inflict physical harm upon herself or another was against the manifest weight of the evidence.

2. Whether the trial court's conclusion that defendant-appellee, Marci Webber, is not benefiting from or in need of inpatient care was against the manifest weight of the evidence.

(Appellee Brief, p. 1). Webber's brief expressly cited *Foucha* and *Jones* in its arguments. See id., p. 28 (citing *Foucha*) ("Because the purpose of confinement is treatment, not punishment, it is unconstitutional to continue to confine a harmless, mentally ill person."); *id*, p. 34 (citing *Foucha*) ("Moreover, confining someone due to personality conflicts, where the evidence does not establish dangerousness, violates constitutional requirements. *Foucha*, 504 U.S. at 77.").

In its opinion, and relevant to the arguments set forth in this habeas petition, the Appellate Court focused on the eleventh statutory factor set forth in 730 ILCS 5/5-2-4(g)(11), which permits courts to consider "the defendant's potential to be a danger to himself, herself, or others." The Appellate Court noted that this factor "is of particular import to this case as the determination of whether defendant can be expected to be a danger to herself or others is also a necessary element in the definition of someone who is in need of inpatient services." (Ex. C, ¶49). It ultimately concluded that Webber's November 2017 suicide attempt—which occurred three-and-a-half years prior to its decision—provided the grounds to reverse the Trial Court's decision that Webber was not a danger to herself was against the "manifest weight of the evidence." (Ex. C, ¶50). To arrive at that conclusion, the Appellate Court relied on Dr. Lesley Kane's testimony.

The Appellate Court faulted the Trial Court for relying on Dr. Kane's diagnosis of Defendant having borderline personality disorder, but then disagreeing with Dr. Kane's opinion that Defendant "should continue with inpatient treatment."  (Ex. C, ¶50).  On this point the Appellate Court summarized Dr. Kane to having "testified that suicide attempts were consistent with borderline personality disorder and further stated that those who have attempted suicide, like defendant, are more at risk of attempting suicide again and more at risk of succeeding on another attempt."  (Ex. C, ¶50).  The Appellate Court also disagreed with the Trial Court's finding that Webber's November 2017 suicide attempt was "solely based on the denial of discharge or conditional release at the time."  (Ex. C, ¶51).  Relying again on Dr. Kane's testimony, the Appellate Court wrote that it believed that "defendant may remain a danger to herself" because, according to Dr. Kane, "defendant said she was worried that she could not provide for her children and believed her death could benefit her children through a wrongful death suit against DHS."  (Ex. C, ¶51).  Thus, according to the Appellate Court, the Trial Court's "reliance on Kane's diagnosis of borderline personality disorder makes its finding that defendant is no longer a danger to herself unreasonable and seems to selectively ignore Kane's testimony as a whole."  (Ex. C, ¶51).

The Appellate Court agreed with the Trial Court's rationale that it is not possible to determine Webber's dangerousness unless a transition program is established in an unsecured environment, but ultimately disagreed that Webber "should be granted conditional discharge based on the evidence presented."  (Ex. C, ¶52).  The Appellate Court repeated its belief that the Trial Court could not accept Dr. Kane's diagnosis of borderline personality disorder without also accepting her "concerns regarding defendant's November 2017 suicide attempt based on this diagnosis" and her belief that "defendant's potential for self-harm was greater on conditional

release because she would be monitored much less." (Ex. C, ¶52). The Appellate Court also made comments regarding Webber's alcohol abuse disorder, which was in remission but "could be subject to relapse" when she is not in a controlled setting and "could exacerbate" her mental health symptoms. (Ex. C, ¶52). It further observed that Webber would face "day-to-day problems and annoyances" in the community if released. (Ex. C, ¶53).

The Appellate Court concluded that Webber had not proven by "clear and convincing evidence that she is not reasonably expected to inflict serious physical harm upon herself or another or would not benefit from inpatient care or is not in need of inpatient care" and, as such, the Trial Court's finding "that defendant is not a danger to herself is not supported by the manifest weight of the evidence." (Ex. C, ¶54).

## 5.  Petition for Leave to Appeal

Through her attorneys at Equip for Equality, on July 14, 2021, Webber moved the Illinois Supreme Court for a supervisory order pursuant to Illinois Supreme Court Rule 383. (Ex. H). The motion sought the vacatur of the Appellate Court's June 9, 2021, order. The Illinois Supreme Court denied that motion on August 4, 2021. Webber also filed a Petition for Leave to Appeal with the Illinois Supreme Court on July 14, 2021. The brief framed the issue as follows:

> The Second District's decision violated her constitutional rights by grossly deviating from standards that this Court and Illinois statute require to protect the liberty interests of people committed to inpatient care and by failing to comport with the applicable standard of review, reversing without sufficient grounds the trial court judge's thoughtful decision. Petitioner respectfully requests that this Honorable Court accept this case for review to address the constitutional violations and to provide guidance to appellate courts reviewing a trial court's grant of an acquittee's conditional release to ensure compliance with constitutional and statutory requirements.

(Ex. G, p. 1). The brief further explained that the Appellate Court's decision was "contrary to rulings of this Court, as well as the Supreme Court of the United States, that establish that Not

Guilty by Reason of Insanity (NGRI) acquittees have constitutionally protected liberty interests." (Ex. G, pp. 1-2) (citing *Foucha v. Louisiana*, 504 U.S. 71 (1992)). *See id.*, p. 2 ("The Second District's disregard for the proper standard of review confines a harmless, mentally ill person in violation of *Foucha*, 504 U.S. at 71 and *Jones v. United States*, 463 U.S. 354 (1982).").

In this petition to the Illinois Supreme Court Webber further argued that the Appellate Court improperly concluded that her need for inpatient care was "not at issue," when the Trial Court had expressly ruled that she did not "require inpatient attention" and, moreover, that she would never receive adequate mental health care while in DHS custody. (Ex. G, p. 10). As to the issue of dangerousness, Webber argued that the Appellate Court sought a "guarantee" that she would not be at risk of inflicting harm to herself. (Ex. G, p. 11). Webber specifically noted that Dr. Kane, the sole basis for the Appellate Court's disagreement with the Trial Court, only testified that there was a "potential" that Webber could harm herself if not receiving treatment or being monitored. (Ex. G, p. 11). She added, "If the law required a guarantee of future behavior, NGRI acquittees would never be conditionally released." (Ex. G, p. 12). Webber directly and pointedly argued that the Appellate Court's "failure to follow the required standard of review, reversing the trial court's finding that Webber is not reasonably expected to be harmful to herself, is in violation of *Foucha*. As a matter of substantive due process, continued confinement of a harmless, mentally ill person is unconstitutional. *Foucha*, 504 U.S. at 77." (Ex. G, p. 14). Webber's petition also noted that she "has remained at Chicago-Read Mental Health Center since December 2019 due to the Second District's stay order and decision. (Ex. G, A. 52). Since returning to Chicago-Read Mental Health Center, Webber's treatment team determined that she "is no longer in need of continued inpatient psychiatric treatment" and that she could be treated

through a "more optimal and less restrictive environment that would help to keep both the patient and the community safe." (Ex. Q, A-61). (Ex. G, p. 9).

### 6. Petition for Certiorari to the United States Supreme Court

On December 30, 2021, Webber, through *pro bono* counsel, petitioned the United States Supreme Court for a writ of *certiorari*. A copy of that petition is attached hereto as Exhibit R. The question presented in the petition was stated as follows:

> Petitioner has been detained in a state mental health center since her bench trial in June 2012, which adjudicated her Not Guilty by Reason of Insanity (NGRI) for killing her young daughter. The predicate offense was committed while the Petitioner was acutely psychotic. For years, Petitioner has not been psychotic.

> In addition, the trial judge who sentenced and later conditionally released her, along with her medical treatment team where she is confined, both state that Petitioner is not mentally ill, not a danger to herself or others, and is not in need of inpatient mental health care. The State's Attorney appealed the trial court's order of conditional release. The Illinois Appellate Court reversed; the Petitioner was returned to confinement after nine days of freedom. The Illinois Supreme Court denied a Petition for Leave to Appeal.

> Whether a State's judicially-enforced, indefinite confinement of an NGRI acquittee, who is no longer psychotic, mentally ill, a danger to herself or others, or in need of inpatient mental health care, constitutes punishment and is a significant deprivation of liberty that violates the due process and/or equal protection clauses of the Fourteenth Amendment to the United States Constitution prohibited by *Foucha v. Louisiana*, 504 U.S. 71 (1992).

(Exhibit R, p. i). On February 22, 2022, the U.S. Supreme Court denied the petition.

### 7. Webber's Current Conditions of Confinement in IDHS

Webber remains confined by IDHS at Chicago-Read to this day. Treatment Plan reports are submitted to the Trial Court every 90 days pursuant to 730 ILCS 5/5-2-4.[3] On February 19,

---

[3] Judge George J. Bakalis, who presided over Webber's case since its inception and for over 10 years and issued the December 11, 2019, order granting conditional release has retired and no longer presides over the case in the Circuit Court of the 18th Judicial Circuit. At the time of this submission, any ongoing proceedings in the Circuit Court have been assigned to Judge Daniel Guerin.

2021, a Treatment Plan Report was submitted in which all six members of Webber's IDHS treatment team opined that Webber was "no longer in need of continued inpatient psychiatric treatment, and that her mental health needs could be more adequately addressed in a less restrictive outpatient treatment environment." (Ex. G, A61). Among those recommending her release from inpatient psychiatric treatment was Dr. Anatoliy Pyslar, Webber's attending psychiatrist and Dr. Robert Sobut, the Medical Director. The Treatment Team stated that, "[f]ollowing a prolonged assessment of Ms. Webber's mental status and her continued need for treatment, the Treatment Team is proposing that her continued inpatient commitment does not appear to be achieving any further measurable benefit for her." (*Id*., A60). The mental illness that led to the NGRI acquittal was observed to be in full remission. (*Id*.). The Treatment Team further noted that there were less restrictive environments to help keep Webber safe. (*Id*., at A61). This February 19, 2021, Treatment Plan Report was presented to the Appellate Court as part of a motion to vacate its December 20, 2019, of the Trial Court's December 11, 2019, order that required Webber to return to custody. The motion was denied.

And while not part of the record before the Appellate Court, the most recent Treatment Plan Report, dated February 9, 2022, makes several salient conclusions regarding the issue of dangerousness, which is the focus on this habeas petition. In particular, the February 9, 2022, report opines that "Ms. Webber is not believed to be at any increased risk for harming herself or others at the present time." (Ex. S, p. 2). And notwithstanding concerns regarding Webber's behavior and managing day-to-day social and personal interactions at Chicago-Read, which Webber would dispute, the Treatment Plan asserts as follows: "Be that as it may, there is no reasonable expectation that Ms. Webber would inflict any serious physical harm upon herself or another." (Ex. S, p. 8). The February 9, 2022, report reflects how Webber's treatment team

"continues to believe that continued inpatient commitment does not appear to be achieving any measurable benefit for her." (Ex. S, p. 9). Accordingly, Webber remains confined based on the Appellate Court's order, despite the fact that her Treatment Team has recommended release from inpatient care for more than a year, including after finding that she was not a danger to herself.

## IV.    PETITIONER'S CLAIMS FOR HABEAS RELIEF

In her *pro se* habeas petition, Webber raised two grounds for habeas relief. (Dkt. #1). Affording her *pro se* pleading the liberal reading it is due (*see, e.g.*, *Blake v. United States*, 841 F.2d 203, 205 (7th Cir. 1988); *Perruquet v. Briley*, 390 F.3d 505, 512 (7th Cir. 2004)), Webber raised two claims. She argued that the Appellate Court ordered her ongoing confinement in IDHS even though she was acquitted of a crime and was not mentally ill and dangerous. (Dkt. #1). As part of that claim, she identified specific points that the Appellate Court overlooked regarding testimony about her mental illness being in remission and her lack of dangerousness. She also faulted the Appellate Court's use of a "reasonable expected" standard to measure dangerousness. Her *pro se* petition specifically cited *Foucha v. Louisiana* and *United States v. Jones.* In her second claim, Webber argued that the exculpatory information was withheld from the treatment records that were presented to the state court on an ongoing basis, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (Dkt. #1). This amended petition focuses on the first ground of relief that Webber raised in her *pro se* petition, namely that the Appellate Court ordered her confines in direct contravention of the clearly establish standards set forth in *Foucha*.[4] As noted above, Webber raises the following two related claims for relief under 28 U.S.C. 2254:

---

[4] As discussed below, this amended petition does not advance Webber's second claim raised in her *pro se* petition. That claim was based on alleged constitutional deprivations related to the manipulation of records and the withholding of exculpatory material. By not advancing that claim in this amended

1. The Second District Appellate Court's June 9, 2021, order reversing the DuPage County Trial Court's December 11, 2019, order that granted Webber's petition for conditional release was contrary to and unreasonably applied clearly established federal law, namely *Foucha v. Louisiana*, 504 U.S. 71 (1991), in that the Appellate Court ordered Webber confined without finding that she was dangerous, but instead relying on contested testimony that Webber had a "potential" risk of dangerousness and that Webber did not herself show that she is not "reasonably expected" to be a danger to herself at some point in the future, when federal law requires a showing of dangerousness caused by mental illness before confining an acquittee.

2. The Second District Appellate Court's June 9, 2021, order reversing the DuPage County Trial Court's December 11, 2019, was premised on an unreasonable determination of the facts because the evidence did not show that Webber was dangerous as required by federal law.

Petitioner's claims are straightforward. *Foucha*, the clearly established federal law, expressly holds that an individual who has been acquitted of a crime based on insanity cannot be confined unless they are both mentally ill and dangerous. The Trial Court soundly found that Petitioner was not a danger to herself due to any mental illness. But the Appellate Court reversed, finding that Webber required inpatient hospitalization "as no clear and convincing evidence was presented to support the notion that she would not reasonably be expected to inflict harm upon herself if granted conditional release." (Ex. B, ¶54). That finding was contrary to *Foucha's* standard for dangerousness on two grounds.

First, the Appellate Court allowed for continued confinement of an innocent person without ever finding that Webber was dangerous, and instead relying on significantly lowered standards including "potential" dangerousness in possible future scenarios. *See Revels v. Sanders*, 519 F.3d 734 (8th Cir. 2008); *but see Poree v. Collins*, 866 F.3d 235 (5th Cir. 2017). Second, and using that lowered "dangerousness" standard that obviated the need to find Webber was actually dangerous, the Appellate Court ordered her confined without finding that any

---

petition, Webber seeks to ensure that no ruling or judgment is entered on those arguments that could impact in any way her ability to advance those arguments in the future.

"dangerousness" stemmed from the mental illness that it identified, which is also contrary to the dictates of *Foucha*. In short, the Appellate Court's purported finding that Webber was "dangerous" was both contrary to and unreasonably applied *Foucha*. Third, the Appellate Court's purported findings of dangerousness are objectively unreasonable in light of the record, as it relied on a single doctor who voiced some concerns about the potential for violence if certain controls were in place. However, the Trial Court effectively addressed that doctor's concerns through a treatment plan that the doctor never addressed. The Appellate Court ignored that critical fact as well as the overwhelming evidence in the record showing that Webber was not dangerous to herself due to a mental illness (and in fact, ample evidence questioned whether she is mentally ill at all).

Due to the Appellate Court's erroneous and unconstitutional findings, Petitioner has remained involuntarily confined in the custody of IDHS even though she is not dangerousness as required by the Supreme Court. She is an innocent, non-dangerous individual improperly locked in an inpatient hospital where she continues to receive inadequate care. Habeas relief should be granted.

### A.  <u>General Legal Habeas Standards.</u>

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") governs federal review of a petition for habeas corpus filed by a petition in state custody. *See* 28 U.S.C. § 2254. Under AEDPA, a federal court "shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see also Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

Habeas relief is warranted when a petitioner can show that the state court adjudicated a claim in a manner that "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d)(1)-(2). Those two standards have independent meaning. *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000).

A decision is "contrary to" clearly established federal law if a state court applies a rule different than the governing law, as established by Supreme Court cases, or if it decides a case differently than the Supreme Court, on facts that are materially the same. *Williams*, 529 U.S. at 404-06; *Premo v. Moore*, 562 U.S. 115, 128 (2011) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court's decision meets the "unreasonable application" standard if it identifies the correct governing legal principle from Supreme Court decisions, but it unreasonably applies it to facts in a particular case. *Williams*, 529 U.S. at 407-08. The Seventh Circuit has explained that "the unreasonable application of federal law will lie 'well outside the boundaries of permissible differences of opinion' and will be a clearly established Supreme Court precedent unreasonably extended to an unsuitable context or the unreasonable refusal to extend that rule somewhere it should have applied." *Long v. Butler*, 809 F.3d 299, 312 (7th Cir. 2015) (*quoting Allen v. Chandler*, 555 F.3d 596, 602 (7th Cir. 2009)); *see also Yarborough v. Gentry*, 540 U.S. 1, 5 (2003); *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Wiggins v. Smith*, 539 U.S. 510, 520 (2003)).

To determine whether a state court makes an "unreasonable determination of the facts in light of the evidence," a federal habeas court "must be objectively convinced that the record

before the state court does not support the state court's findings in question." *Ben-Yisrayl v. Davis*, 431 F.3d 1043, 1047-48 (7th Cir. 2005). Under this provision, "an unreasonable determination of the facts in light of the evidence can occur where the state-court finding is unsupported by sufficient evidence." *Id*. (citing *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003)). Thus, federal courts may intervene when a state-court decision is "objectively unreasonable." *Woodford v. Visciotti*, 537 U.S. 19, 27 (2002). An objectively unreasonable application "is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002). The Supreme Court has stated that to be unreasonable, a state court's decision must be "so lacking in justification that there was an error ... beyond any possibility of fairminded disagreement." *Burt v. Titlow*, 571 U.S. 12, 19-20 (2013) (internal quotation omitted).

Additionally, under 28 U.S.C. §2254(e)(1), when considering whether the state court's decision was based on an "unreasonable determination of the facts" under 28 U.S.C. §2254(d)(2), the federal habeas court presumes a state court's factual determinations to be correct, which can be rebutted by clear and convincing evidence. *Winfield v. Dorethy*, 956 F.3d 442, 452 (7th Cir. 2020) (citing *Janusiak v. Cooper*, 937 F.3d 880, 888 (7th Cir. 2019)).

Pursuant to 28 U.S.C. §2254(d)(1), the federal habeas court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 181-82 ("Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.*, the record before the state court."). *See also Toliver v. Pollard*, 688 F.3d 853, 859 (7th Cir. 2012).

Accordingly, a federal habeas court's focus is on the last state court decision that previously addressed a habeas petitioner's claims. *Williams*, 529 U.S. at 412-13; *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 245 (7th Cir. 2003) (relevant decision for § 2254(d) assessment is decision of the last state court to rule on claims). Thus, when the "last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion,' this presents a 'straightforward inquiry' for the federal habeas court." *Subdiaz-Osorio v. Humphreys*, 947 F.3d 434, 443 (7th Cir. 2020) (quoting *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018)).

But to be subject to the deference and limitations set forth in 28 U.S.C. §2254(d), the claims must have been "adjudicated on the merits" in state court. 28 U.S.C. §2254(d); *Cone v. Bell*, 556 U.S. 449, 472 (2009); *Braun v. Powell*, 227 F.3d 908, 916 (7th Cir. 2000) (standards provided in 28 U.S.C. §2254(d)(1) and (2), however, only apply to a claim that was adjudicated on the merits in state court proceedings); *Canaan v. McBride*, 395 F.3d 376, 382 (7th Cir. 2005) ("When a state court is silent with respect to a habeas corpus petitioner's claim, that claim has not been 'adjudicated on the merits' for purposes of § 2254(d)."). A state court does not make an "adjudication on the merits" if it fails to resolve all determinative issues of federal law.

The Seventh Circuit recently reiterated that "'[w]hen no state court has squarely addressed the merits of a habeas claim, we review the claim under the pre-AEDPA standard of 28 U.S.C. §2243, under which we dispose of the matter as law and justice require.'" *Ramirez v. Tegels*, 963 F.3d 604, 612 (7th Cir. 2020) (quoting *Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012)). Thus, when the state court overlooks a federal claim, even inadvertently, the federal habeas court will review the federal claim "de novo." *Ramirez*, 963 F.3d at 613 (citing *Adorno v. Melvin*, 876 F.3d 917, 921 (7th Cir. 2017)); *Canaan*, 395 F.3d at 382 (citing *Hough v. Anderson*,

272 F.3d 878, 904 n.13 (7th Cir. 2001) for *de novo* review standard). The federal habeas court will then determine whether an individual is in custody in violation of the Constitution by analyzing: (1) whether substantive constitutional rules were respected; and (2) whether, if a constitutional error was committed, it caused a substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). A constitutional error will warrant relief if the error "had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Ben-Yisrayl*, 431 F.3d at 1051-52 (quoting *Brecht*, 507 U.S. at 638). Thus, the Seventh Circuit has held that constitutional errors that are "'harmless beyond a reasonable doubt'" may not require writs of habeas corpus. *Ben-Yisrayl*, 431 F.3d at 1052 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1966)).

### B. <u>Webber Has Exhausted Her *Foucha* Claim.</u>

Before petitioning a federal court for habeas relief, a state prisoner must exhaust her remedies in state court. *See, e.g.*, *Whatley v. Zatecky*, 833 F.3d 62, 770 (7th Cir. 2016) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999)); *see also* 28 U.S.C. §2254(b). A habeas petitioner must present her federal claim "through one complete round of state court review, whether on direct appeal or in post-conviction proceedings." *Whatley*, 833 F.3d at 770–71 (citing *Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014)) and *Bolton v. Akpore*, 730 F.3d 685, 694 (7th Cir. 2013)). Exhaustion requires that the broad claim be raised in addition to the legal arguments and operative facts supporting it. *McNary v. Lemke*, 708 F.3d 905, 919 (7th Cir. 2013). The exhaustion requirement provides "the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan*, 526 U.S. at 842 (emphasis omitted). *Perruquet v. Briley*, 390 F.3d 505, 513 (7th Cir. 2004). ("Exhaustion

serves an interest in federal-state comity by giving state courts the first opportunity to address and correct potential violations of a prisoner's federal rights.").

Respondent acknowledges that Webber's *Foucha* claim is exhausted and thus ripe for review. (Dkt. #11, p. 4) ("To the extent that petitioner challenges the state appellate court's June 2021 decision reversing the trial court's order granting her conditional release, she has exhausted her available state remedies because her requests for further review in the Illinois Supreme Court have been denied."). Further to the point, Webber has consistently argued that her ongoing confinement was unconstitutional under *Foucha* in her brief before the Appellate Court and in her petition for leave to appeal to the Illinois Supreme Court. (Ex. E and G). While not controlling for the exhaustion analysis, she continued this argument in her petition for *certiorari* to the U.S. Supreme Court. (Ex. R). Webber also cited *Foucha* in her *pro se* habeas petition when she argued that she was confined even though she was not mentally ill and dangerous. (Dkt. #1). The claim is exhausted.

### C. *Foucha* is Clearly Established Federal Law.

Webber's habeas claims are based on a denial of her federal constitutional rights, as defined by the U.S. Supreme Court. In *Foucha*, the Supreme Court held that the purpose of confinement of an individual who has been acquitted of an offense on insanity grounds is treatment, not punishment. It is therefore unconstitutional to confine someone who is mentally ill but harmless. *Foucha*, 504 U.S. at 77. Indeed, "[f]reedom from physical restraint 'has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.'" *Kansas v. Hendricks,* 521 U.S. 346, 356 (1997) (quoting *Foucha,* 504 U.S. at 80).

In *Foucha* itself, the defendant/petitioner was no longer mentally ill. *Foucha*, 504 U.S. at 78; *id*. at 80 ("the State does not claim that Foucha is now mentally ill."). Yet, the State sought

and obtained his continued confinement in a mental institution based on the argument that he was still dangerous. As such, he could not obtain his release "unless he prove[d] that he is not dangerous" regardless of whether he was insane. *Id.* at 73. State law required the court to hold a hearing to determine dangerousness, but the acquittee bore "the burden of proving that he is not dangerous." *Id.* The State sought to continue Foucha's confinement "on the basis of his antisocial personality which … the court found rendered him a danger to himself or others." *Id.* at 78. The Supreme Court found three problems with the State's position.

First, it held that keeping an individual confined "against his will in a mental institution is improper absent a determination in civil commitment proceedings of current mental illness and dangerousness." *Foucha*, 504 U.S. at 78. That is because due process required that the reason and nature of the commitment "bear some reasonable relation to the purpose for which the individual is committed." *Id.* at 79. The Supreme Court reasoned that because Foucha was not mentally ill, he should not be held as a mentally ill person. *Id.* Second, since Foucha should not be confined as an insanity acquittee, "he is entitled to constitutionally adequate procedures to establish the grounds for his confinement." *Id.* at 79. Third, the substantive component of the Due Process clause "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Id.* at 80 (quotation and citation omitted).

Turning to the facts of the case before it, the Supreme Court first observed that the State did not contend that Foucha was mentally ill. The Supreme Court then noted that when the State's doctor was asked if Foucha was dangerous, this doctor "said only, 'I don't think I would feel comfortable in certifying that he would not be a danger to himself or to other people.'" *Foucha*, 504 U.S. at 82. The Supreme Court determined that such an opinion "is not enough to defeat Foucha's liberty interest under the Constitution in being freed from indefinite confinement

in a mental facility." *Id.* at 82. The Supreme Court also rejected the State's reasoning for holding insanity acquittees who were not mentally ill but "who could be shown to have a personality disorder that *may lead* to criminal conduct." *Id.* at 82 (emphasis added). Thus, under *Foucha*, an insanity acquittee may only be confined if they are shown to be both mentally ill and dangerous due to the mental illness. *Id.* at 80.

Turning to the application of *Foucha* and, specifically, the requirement of "dangerousness," in *Gilbert v. McCullough*, 776 F.3d 487 (7th Cir. 2015), the Seventh Circuit addressed the issue in a habeas petitioner's challenge to Wisconsin's sexually violent persons statute. In analyzing *Foucha*, the Seventh Circuit underscored how the Supreme Court had emphasized "that it had already held that a person committed because of an insanity verdict is entitled to release when he recovers his sanity or is no longer dangerous." *Gilbert*, 776 F.3d at 494. As the habeas petitioner in *Gilbert* was a "sexually violent person," "dangerousness" was effectively a foregone conclusion. *Id.*, at 496, footnote 3. The Seventh Circuit would deny the petitioner habeas relief, based in large part on its finding that the Wisconsin statutory scheme for sexually violent persons specifically permitted individuals to be confined only so long as thy were both mentally ill and dangerous, fully consistent with *Foucha*. *Id.* at 495.

While the Seventh Circuit does not appear to have addressed *Foucha's* requirement for "dangerousness" for an insanity acquittee—and particularly whether "potential" or "future" dangerousness is sufficient to justify ongoing commitment—the Eight Circuit's decision in *Revels v. Sanders*, 519 F.3d 734, 738 (8th Cir. 2008) presents a cogent analysis that should be followed. In *Revels*, the Missouri Court of Appeals denied an insanity acquittee's motion for unconditional release from confinement because the acquittee could not show, "by clear and convincing evidence, that (1) he is not presently mentally ill; (2) he is not dangerous; (3) he is

not likely to suffer a mental disease; and (4) he is not likely to become dangerous in the reasonable future." *Revels*, 519 F.3d at 742. Thus, the Missouri state court held that the insanity acquittee had to show by clear and convincing evidence that "he will not be a danger to himself or others." *Id.* at 738. The Eight Circuit found the application of the Missouri state statute to be clearly contrary to *Foucha*, as it held as follows:

> Requiring an insanity acquittee to prove both a lack of present mental illness and dangerousness, is clearly contrary to *Foucha*, and violates the substantive protections of the Due Process Clause as defined by the Supreme Court. *See* 504 U.S. at 77. Here, the Missouri Court of Appeals went even further, requiring Revels to also show the absence of a probability of a future mental illness and future dangerousness, stepping even further over the line drawn by the Supreme Court in *Foucha*.

*Revels*, 519 F.3d at 742. The Eighth Circuit's opinion also described the state court's ruling as an unreasonable application of *Foucha* "in determining that the state could continue to hold Revels based on future dangerousness alone," in addition to being in "direction contradiction" of *Foucha*. *Id*. at 743.

Undersigned counsel acknowledges that the Fifth Circuit took a different approach to the issue of "potential" dangerousness in *Poree v. Collins*, 866 F.3d 235 (5th Cir. 2017). There, a divided panel held *Foucha* required the state to prove mental illness and dangerousness, with the latter being "inherently predictive." *Id*. The Fifth Circuit found that it was not "clearly established" that a finding of "potential" dangerousness along with mental illness was "insufficient to justify continued confinement." *Id*. at 249. The panel reached that conclusion over a strenuous dissent from Judge Patrick Higginbotham. *Id*. at 251-254.

Judge Higginbotham viewed that confining an acquittee based on perceived "potential" dangerousness, as opposed to dangerousness, was contrary to clearly established federal law. He

then offered a number of reasons why the majority's holding was flawed.  He began by noting

the significance of the use of the qualifier "potential" to the dangerousness standard:

> The state court made no finding of dangerousness. Instead, it made a finding of
> *potential* dangerousness. What at first blush seems like an innocuous, semantic
> difference is actually a potent one: the state court's potentially dangerous standard
> renders the Supreme Court's dangerousness requirement meaningless. "Potential"
> means merely "[c]apable of coming into being; possible."  But because it is
> *possible* for every insanity acquittee to become dangerous, the state court's
> standard lacks any limit. Although the Supreme Court has not explicitly decided
> how dangerousness may be determined, the dangerousness standard has a
> constitutional floor that a standard of potential dangerousness fails to reach.
>
> Under the state court's standard, the state must only prove that the possibility
> exists for someone to become dangerous. This understanding of the
> dangerousness requirement lowers the bar to the point of conflicting with the
> clearly established law of *Foucha* and *Jones*. In relying on a standard of potential
> dangerousness, the state court "applie[d] a rule different from the governing law
> set forth in" those cases.

*Poree*, 866 F.3d at 252 (Higginbotham, dissenting) (emphasis in original and footnotes omitted).

Judge Higginbotham then identified "three missteps" in the majority's holding.

First, in *Jones* the Supreme Court discussed "potential dangerousness" in the context of

initial civil commitment of an insanity acquittee, and not for "assessing dangerousness" of one

seeking release.  *Id*. at 252.  Indeed, *Jones* itself noted that an acquittee is entitled to release

when he is sane or "no longer dangerous," *not* "no longer *potentially* dangerous."  Second, the

majority's use of "predictive" and "probable" were irrelevant because the state court instead

made a finding of "potential" dangerousness.  *Id*. at 253.  Third, the majority misapplied habeas

law by first concluding that federal law was clearly established, in that it required dangerousness,

and then finding that the state court did not err because "potential" dangerousness was not

clearly established.  *Id*. at 254.

Judge Higginbotham then reiterated the problem with a "potential" dangerous standard:

> Because the state court's standard of potential dangerousness strips the dangerousness precondition of meaning, I would find that the state court's decision was contrary to clearly established Supreme Court law. Civil confinement is not punitive. It may not be used to accomplish what the criminal system could not—here, a life sentence. The systems are distinct in both justification and operation. They will remain so only if courts are faithful to the requirements of continued civil confinement. The state court decision went beyond those bounds in direct conflict with Supreme Court law. I dissent.

*Poree*, 866 F.3d at 254 (Higginbotham, dissenting). With *Revels* and Judge Higginbotham's bottom dissent in mind and, most importantly, the plain language of *Foucha*, which itself warned against confining someone who had a personality disorder that "may lead" to criminal conduct, clearly established federal law requires proof of dangerousness, and not some lower standard based on "potential" dangerousness or the possibility that one "may" or "could be" dangerousness based on hypothetical future circumstances. As discussed below, the Appellate Court's ruling not only imposed an unconstitutionally lower standard, it also placed the burden on Webber to disprove a future risk of dangerousness, a nearly impossible task in and of itself.

### D. Webber is Entitled to Habeas Relief Because the Appellate Court's Reversal of the Trial Court's Order Granting Conditional Release Was Contrary to *Foucha*.

As discussed above, a state court's decision is "contrary to" clearly established law when it applies a rule different than clearly established federal law, or if it decides a case differently than the Supreme Court on materially identical facts. *Williams*, 529 U.S. at 404-06. Here, the Trial Court concluded that Webber is not a danger to others. (Ex. A, pp. 7-8). The Appellate Court did not disagree with that finding.[5] Instead, the Appellate Court focused its review "of the trial court's findings as to whether [Webber] remains a danger to herself based on Kane's

---

[5] There was ample evidence supporting the conclusion that Webber was not a danger to others, including the testimony of Dr. Kane as well as all of Webber's testifying experts. (R. 2875, 1831, 1885, 1952).

testimony." (Ex. C, ¶42). Thus, the Appellate Court's decision rested solely on Dr. Kane's opinion.

The Appellate Court's reversal of the Trial Court's order of conditional release was contrary to *Foucha* in several material ways. First, the Appellate Court never actually found that Webber was dangerousness. Rather, it found that Petitioner had not proven by clear and convincing evidence, that she "would not reasonably be expected to inflict harm upon herself," which a different rule than *Foucha's* requirement that the state show "dangerousness." Second, the Appellate Court made no finding that Webber's purported risk of danger to herself was due to her existing mental illness. Third, the Appellate Court's exclusive reliance on Dr. Kane's testimony, at best, suggested that there could be a risk of future or potential dangerousness or possible suicidal ideation, which is also different than *Foucha's* standard.[6]

The requirement that an insanity acquittee must be dangerous in order to be confined is clearly established federal law. While the Appellate Court cited *Foucha* for the proposition that due process prohibits the "continued confinement of a harmless, mentally ill person," (Ex. C, ¶38), it never made a finding that Webber was dangerous. Rather, it concluded that she had not demonstrated that she was not reasonably expected to be a danger to herself. (Ex. C, ¶54). On its own, this critical error warrants habeas relief, as the finding applies a different standard than clearly established federal law. *Revels* is directly analogous. As discussed above, the Eighth Circuit granted habeas relief after the State court required an insanity acquittee to prove lack of dangerousness. Doing so was contrary to *Foucha* and violated the individual's substantive due process rights. The same holds true here. Moreover, just as in *Revels*, the Appellate Court

---

[6] As discussed in Section F below, the Appellate Court unreasonably determined the facts based on Dr. Kane's testimony, in that Dr. Kane's testimony was equivocal and conditioned on hypothetical facts. Her concerns about potential dangerousness were also offset by safeguards that the Trial Court contemplated and put in place in its conditional release order.

required Webber to show that she was not reasonably expected to be a danger in the future, "stepping even further over the line drawn by the Supreme Court in *Foucha*." *Revels*, 519 F.3d at 742. In effect, the Appellate Court required Webber prove that she was not a danger, even in uncertain future circumstances. *See* Ex. C, ¶53 ("Undoubtedly, defendant would face the same day-to-day problems and annoyances that every other person in our community faces.").

Second, the Appellate Court never determined that any purported danger, or even risk of danger, was linked to an existing mental illness. Importantly, the Trial Court determined that Webber's symptomology reflected, at most, borderline personality disorder, consistent with Dr. Kane's diagnosis—which, as noted below, may even be unsupported by the record evidence. All other diagnoses were in full remission—and had been so for years without medication. Webber was not and could not have been found to be mentally ill based on illnesses that are in remission. The Appellate Court did not disagree with the Trial Court's finding of borderline personality disorder. Nor did it conclude that Webber's other diagnoses were not in remission, and was somehow mentally ill on other grounds. However, the Appellate Court never linked Webber's existing borderline personality disorder to any dangerousness. Instead, the Appellate Court relied almost exclusively on its disagreement with the Trial Court's assessment of Webber's November 2017 suicide attempt as caused by situation stress related to the denial of her conditional release petition.

In particular, the Appellate Court asserted that it "does not agree with the trial court that the defendant's November 2017 suicide attempt was solely based on the denial of her discharge petition, and we believe that defendant may remain a danger to herself." (Ex. C, ¶ 51). *See id*. ("The finding that defendant's November 2017 suicide attempt was based solely on the denial of her earlier discharge petition is not supported by the evidence presented.").

As an initial point, the Appellate Court's reliance on the suicide attempt from November 2017—approximately three-and-a-half years before its decision in June 2021—is a weak and dubious measuring stick for present dangerousness. Notably, the Appellate Court pointed to no evidence of attempted self-harm after November 2017. That includes after June 2018, when Webber's second conditional release petition was filed. The Trial Court granted that petition in September 2019. (Ex. C). The Trial Court specifically acknowledged that "[i]n the almost two years since her 2017 suicide attempt, there have been no indications of any further suicidal ideation." (C. 782). No witness testified as to any dangerous conduct by Webber following the November 2017 suicide attempt. Moreover, the Trial Court astutely observed that Webber's first suicide attempt from 2010 occurred at the time of the NGRI offense when she was psychotic. (C. 782). However, at the time of the 2017 suicide attempt, Webber's psychosis was in remission (Ex. N5, R. 2871, Ex. L5. R. 1858, 1893, Ex. L6, R. 1952), and it stood to reason that the suicide attempt should not be attributed to her mental health. Rather, as multiple witness stated, the November 2017 suicide attempt was situational and related to learning that the petition for discharge was denied.

But even if the November 2017 suicide attempt was a reasonable starting point to determine whether Webber was dangerous to herself, the Appellate Court made no attempt to link that historic event to any existing mental illness. The Appellate Court referenced Dr. Kane's diagnosis of borderline personality disorder, but only in criticizing the Trial Court's apparent reliance on Dr. Kane's diagnosis of borderline personality disorder makes its finding that defendant is no longer a danger to herself unreasonable and seems to selectively ignore Kane's testimony as a whole." (Ex. C, ¶51). That criticism of the Trial Court's analysis, which as discussed below lacks merit, does not reflect an independent evaluation or finding that Webber

was a danger to herself based on an existing mental illness. While the Appellate Court also referenced Dr. Kane's "concerns regarding defendant's November 2017 suicide attempt based on this diagnosis" (Ex. C, ¶51), it still made no effort to find that there was a present risk of self-harm caused by borderline personality disorder. Rather, the Appellate Court's rationale was entirely speculative and hypothetical—perhaps by necessity because that was how Dr. Kane couched her testimony. She repeatedly suggested that Webber "could be" a danger to herself under certain conditions, such as if she encountered stressors without a support network in place. (*See*, *e.g.*, Ex. N4, R. 2784).

Indeed, as the third point of error, rather than finding that Webber was a danger to herself based on a mental illness, the Appellate Court consistently referenced Webber's "potential" for dangerousness. The Appellate Court's reliance on the "potential" standard may stem from its reliance on the factors set forth in 730 ILCS 5/5-2-4(g), namely subsection (g)(11), which asks the trial court to determine the "defendant's potential to be a danger to himself, herself, or others." Importantly, that and the other factors set forth in 730 ILCS 5/5-2-4(g) are permissive considerations that courts may consider when determining whether an insanity acquittee may be discharged or conditionally released. They are not independent gatekeeping factors, and certainly do not override federal law. However, the Appellate Court's focus on Webber's "potential" dangerousness to herself plainly illustrates how it applied a rule different than clearly established federal law. That much is evident in the Appellate Court's references to how Webber "*may* remain a danger to herself" (Ex. C, ¶51); how Dr. Kane believed Webber's "*potential* for self-harm was greater on conditional release" than in custody. (Ex. C, ¶51). Reliance on

speculative danger is directly contrary to *Foucha's* requirement for dangerousness.[7]  From this standpoint, *Revels* is nearly indistinguishable.

### E.  Webber is Entitled to Habeas Relief Because the Appellate Court's Reversal of the Trial Court's Order Granting Conditional Release Unreasonably Applied *Foucha*.

A state court's decision is an "unreasonable application" of clearly established federal law when it identifies the correct legal standards but unreasonably applies them to the facts in a particular case.  As noted above, the Appellate Court cited *Foucha* for the proposition that, "[a]s a matter of due process, continued confinement of a harmless, mentally ill person is unconstitutional."  (Ex. C, ¶ 38).  However, for the reasons discussed above, the Appellate Court applied a different standard than *Foucha* to find that Webber met the criteria of dangerousness or "potential" or future dangerousness, and thus rendered a decision contrary to *Foucha*.

But even if it could be said that the Appellate Court somehow applied *Foucha*, then, and also for the reasons set forth above, its application was entirely unreasonable.  *Foucha* prohibits the ongoing commitment of an insanity acquittee who is not dangerous.  In relying on Dr. Kane's testimony, the Appellate Court ordered the commitment of Webber based on its belief that Webber "may" be dangerous to herself in the future if faced with stress and without proper therapeutic supports.  Not only does that reasoning lie "well outside the boundaries of

---

[7] It is worth noting that the Appellate Court's reliance on the potential risk of future dangerousness as a gatekeeping factor for conditional release is also inconsistent with Illinois law.  *See People v. Bledsoe*, 2015 IL App (1st) 133734-U, ¶ 25 (citing *People v. Bethke*, 2014 IL App (1st) 122502, ¶ 18, 379 Ill. Dec. 271, 6 N.E.3d 348) ("A defendant committed upon an NGRI disposition may be held only so long as he is both mentally ill and dangerous, and it is improper to require a guarantee of future behavior or harmlessness.").  Additionally, Illinois courts have directly refuted the Appellate Court's apparent reliance on the potential that Webber may have difficulty adjusting to the stress of life while on conditional release.  *People v. Robin*, 312 Ill. App. 3d 710, 716, 728 N.E.2d 736, 741 (1st Dist. 2000) ("The possibility that an insanity acquittee might have difficulty adjusting to the stresses of noninstitutional life is insufficient to sustain the denial of conditional discharge."); *see also People v. Grant*, 295 Ill. App. 3d 750, 760, 692 N.E.2d 1295, 1302 (1st Dist. 1998).

differences of opinion" (*Long*, 809 F.3d at 312) in terms of applying *Foucha*, it also resembles the problematic rationale rejected in *Foucha* itself.    There, the Supreme Court rejected the state's attempt to hold an insanity acquittee who "could be shown to have a personality trait that *may lead* to criminal conduct." *Foucha*, 504 U.S. at 82.

### F.  The Appellate Court Unreasonably Determined Facts in Light of the Evidence in Finding that Webber Must be Confined as a Potential Danger.

Habeas relief is also warranted because the Appellate Court made an unreasonable determination of the facts in light of the evidence and record.  *See* 28 U.S.C. §2254(d)(2).  As discussed above, relief on this theory is appropriate when the state court's findings are "unsupported by sufficient evidence" (*Ben-Yisrayl*, 431 F.3d at 1047-48) and are ultimately "objectively unreasonable."  As discussed below, the Appellate Court's conclusion that Webber was "potentially" dangerous or "may" pose a danger to herself if conditionally released from IDHS custody is soundly rebutted by clear and convincing evidence to the contrary.  28 U.S.C. §2254(e)(1); *Winfield v. Dorethy*, 956 F.3d 442, 452 (7th Cir. 2020).

The Appellate Court's determination of dangerousness turned entirely on its interpretation of Dr. Kane's testimony.  *See* Ex. C, ¶42 ("we will focus our review of the trial court' findings as to herself based on Kane's testimony.").  Dr. Kane spent just five hours with Webber in two separate settings.  She conducted no testing of Webber.  She also reviewed the IDHS progress reports and other medical records.  But she never even reviewed the thorough release and treatment plan that Webber put together, which included, among other things, proof of funds, a residential lease, and an affidavit from Dr. Laura Bauhof, a licensed clinical psychologist who agreed to provide treatment and additional referrals—all of which Webber herself secured.  (*See* Ex. Q). In stark contrast, Judge Bakalis had spent nearly 10 years with Webber's case and personally observed her demeanor, presided through two conditional release

hearings, heard multiple expert witnesses from both the State and Webber, and review all the IDHS progress reports as well as numerous other medical reports submitted by Webber. He also found Webber not guilty by reason of insanity after a bench trial in 2012 and denied Webber's first petition for conditional release (which was affirmed by the Appellate Court). Judge Bakalis also benefited from interacting with Webber directly, both as a represented party and pro se litigant over the years. He further considered Webber's release and treatment plan that Dr. Kane never reviewed. (Ex. Q).

Put simply, the Trial Court had extensive experience over the case, the subject matter, and most importantly the arc of Webber's experiences in IDHS. He reasonably concluded that Webber was never going to receive adequate mental health treatment in IDHS. That finding was underscored by the testimony of Dr. Malis, who stated that Webber refused to seek help from him due to a complete breakdown of trust and lack of rapport, and assigning another lead psychiatrist was impossible. Ordering conditional release from IDHS was not only soundly based on the evidence and consistent with *Foucha* and Webber's liberty interests—it was the humane thing to do.

The Appellate Court's decision to keep Webber confined is "objectively reasonable" because it cherry-picks even from Dr. Kane's testimony. Even Dr. Kane admitted that Webber would likely seek help from a therapist whom she trusted. The Trial Court asked Dr. Kane directly whether Webber had "the skills necessary to seek out the help she would need in an outpatient basis." Dr. Kane responded, "I think that if [Webber] really trusted a therapist, she would probably seek them out." (Ex. N5, R. 2870). The Trial Court accepted a carefully crafted release plan that was designed to surround Webber with supports of trusted professionals. Indeed, after the Trial Court signaled its intent to grant Webber's petition for conditional release

in September 2019, it prudently waited 60 days until December 2019 to ensure that Webber had the proper safeguards in place prior to her conditional release. The Appellate Court ignored the significance of that 60-day period and the importance of Webber's efforts in establishing a support network outside of IDHS.

Instead, and while also ignoring the Trial Court's extensive background and experience and exercise of sound judgment, the Appellate Court effectively found that Dr. Kane's testimony was unassailable and that the Trial Court's refusal to accept *all* of Dr. Kane's conclusions— particularly as to the potential for dangerousness—was against the manifest weight of the evidence and thus reversible. The Appellate Court's rationale is rebutted by the record as a whole and is objectively unreasonable.

First, the Appellate Court's rationale turned exclusively to the opinion of Dr. Kane, who expressed some concerns about Webber's risk of danger to herself if granted conditional release. Those concerns primarily related to Webber's purported lack of insight into her mental illness and questions about her ability to seek help from mental health professionals if needed, especially when confronted with the stresses of daily life. The Appellate Court somehow determined that those open questions reflected Webber's potential dangerousness and compelled her ongoing confinement. Those findings cannot be reconciled with the full record before the Trial Court, which included testimony detailed wellness and treatment plans (Ex. Q). Indeed, serious questions can be made even about Dr. Kane's conclusions that Webber had borderline personality disorder when she conducted absolutely no testing of Webber and when the record established that the doctors who actually tested Webber never found borderline personality disorder. Nor was there a documented history of borderline personality disorder that the Appellate Court cited in its opinion. Setting aside those concerns, the Appellate Court's

conclusion that Webber would face the "same day-to-day problems and annoyances that every other person in our community faces" completely overlooked how Webber was enduring—and continues to live through what she describes as "hell" in the mental facility. She testified about being physically attacked over thirty times, having her room subjected to regular searches, and not having basic access to the gym or outdoors. These experiences involve far greater stress than what Webber would face in the "community."

Moreover, the Appellate Court simply ignored the fact that Dr. Kane did not and could not have reviewed the actual conditional release plans that Webber herself arranged and then presented to the Trial Court for its approval. That is because Dr. Kane testified before Webber presented her release plan, which included a commitment from a licensed clinical psychologist who agreed to provide therapy to address her "emotional and mental health needs as [Webber] transitions from custody" (Ex. Q, A-66); a Community Forensic Monitoring Program under which a licensed professional would submit reports to the Trial Court, including if Webber failed to comply with her conditional release plan. (Ex. Q, A-68).

The Appellate Court also ignored the Trial Court's carefully crafted release plan that included a step-down program that included the measures, checks, and safeguards that arguably went above and beyond even what Dr. Kane suggested would be sufficient to warrant Webber's release. For instance, Dr. Kane expressed concerns about Webber decompensating from the stress of finding a place to live and supporting herself financially. (Ex. N4, R. 2782). However, Webber presented the Trial Court with evidence that she had made living arrangements upon release and had a bank account with a $10,000 balance for rent and living expenses. (Ex. Q, A-49-64; Ex. N6, R. 2947-48). The Appellate Court ignored that evidence, which renders its decision objectively unreasonable based on the record as a whole.

Dr. Kane opined that Webber did not have a trusted treatment team, which was important to safeguard against her potentially harming herself at some point in the future. (Ex. N5, R. 2870, 2868). Yet, the Trial Court was presented with evidence that Webber had arranged for outpatient mental health treatment with a psychologist who agreed to provide treatment and progress plan reports to the Court and IDHS. This provider also agreed to notify the State if Webber violated the conditions of her release. (Ex. N6, R. 2933; 2963; Ex. Q, A-66-68). Webber also agreed to attend weekly meetings with a local branch of the National Alliance on Mental Illness (NAMI). (Ex. N6, R. 2963).

The Appellate Court found significant how Dr. Kane also emphasized the importance of Webber identifying triggers to avoid the potential for self-harm. (Ex. N3, R. 2746). However, the Trial Court ultimately heard evidence that Webber agreed to report changes in her mental health status to trusted mental health providers, particularly regarding symptoms of depression, mania, hypomania, psychosis, and suicidal or homicidal ideations. (Ex. P, Sup. Sec. C. 13). Relatedly, the Appellate Court also credited Dr. Kane's testimony that Webber needed to improve her coping skills in order to prevent another self-harm incident. (Ex. N3, R. 2747). But the Appellate ignored the fact that the Trial Court reviewed Webber's treatment and release plan that included action-steps to assist her transition to the community and to take action if her mental health declined. (Ex. I2, C. 869-887; Ex. Q). The Appellate Court also emphasized Dr. Kane's testimony regarding the risk of relapse of alcohol abuse in the community. (Ex. N5, R. 2836). But the Trial Court's conditional release order prohibited Webber from consuming alcohol and also required her to participate in counseling and random alcohol and drug testing. (Ex. Q, A-32-33, 35). The Appellate Court's exclusive emphasis on Dr. Kane's concerns of

potential risks that could possibly lead to self-harm absent certain safeguards ignored how the Trial Court ultimately put those safeguards in place in its conditional release order.

Put simply, the Appellate Court relied on Dr. Kane's concern that, "if [Webber] is not in treatment or some form of treatment being monitored, that there is the potential there that she could harm herself," (Ex. C, ¶24) while ignoring that the core stated purpose of the Trial Court's conditional release order was to extricate Webber from IDHS—where she attempted self-harm and had no trusted doctors—to a setting where she would have access to trusted mental health professionals. Thus, the Appellate Court's selective reliance on Dr. Kane's concerns without acknowledging how the record established that the Trial Court addressed those concerns resulted in an objectively unreasonable determination of the facts in light of the record.

## V.  REQUEST FOR AN EVIDENTIARY HEARING

Webber contends that the record before the Court is sufficient to warrant habeas relief, and that further delay necessitated by an evidentiary hearing would cause further harm to her Due Process and liberty interests. But if the Court is not prepared to grant Webber a writ on the record as it stands, counsel submits that the record should be developed in greater detail. District courts have considerable discretion as to discovery matters. *See Bracy v. Gramley*, 520 U.S. 899, 909 (1997). Discovery should be granted when "good cause" exists under Habeas Rule 6(a). "Good cause" exists when specific allegations "show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" *Bracy*, 520 U.S. at 908-09 (quoting *Harris v. Nelson*, 394 U.S. 286, 299 (1969)). Where good cause exists, "'it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry.'" *Id*. The request for an evidentiary hearing may very well depend on the

Attorney General's response and position on Webber's claims and its position on if any facts are in dispute and the development of the record. 28 U.S.C. §2254(e)(2).

## VI.    CONCLUSION

Based on the foregoing, Petitioner Marci Webber respectfully requests that this Court: (1) Vacate the Appellate Court's Order of June 9, 2021; (2) Issue a Writ of Habeas Corpus relieving Webber of the illegal restraint of her liberty because that would permit her to be released; (3) Order and conduct an evidentiary hearing at which time proof may be offered in support of the allegations of this Petition if relief cannot be granted on the pleadings; and, (4) in the event of denial of relief, issue a Certificate of Appealability so that Webber may elect to pursue the claims raised herein to the Seventh Circuit Court of Appeals.

Respectfully submitted,

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 404
Chicago, IL 60604
Tel: (312) 909-0434
jherman@joshhermanlaw.com

## CERTIFICATE OF SERVICE

Joshua G. Herman, Attorney at Law, hereby certifies that the foregoing was served on April 15, 2022, in accordance with Fed.R.Crim.P. 49, Fed.R.Civ.P.5., LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 404
Chicago, IL 60604
Tel: (312) 909-0434
jherman@joshhermanlaw.com