IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARCI MARIE WEBBER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 21 C 5444 |
| | ) | |
| RICARDO FERNANDEZ, | ) | |
| Hospital Administrator, | ) | |
| Chicago-Read Mental Health Center, | ) | The Honorable |
| | ) | Charles P. Kocoras, |
| Respondent. | ) | Judge Presiding. |

## ANSWER TO AMENDED HABEAS PETITION

Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, respondent answers petitioner's amended petition for a writ of habeas corpus. For the reasons discussed below, this Court should deny the amended petition without an evidentiary hearing and decline to issue a certificate of appealability.

## BACKGROUND

Petitioner is confined as an NGRI (not guilty by reason of insanity) acquittee at Chicago-Read Mental Health Center, an Illinois Department of Human Services (IDHS) mental health facility, pursuant to a 2012 judgment of the Circuit Court of DuPage County. *See* Doc. 15-3, ¶ 5; Doc. 15-9 at 311, 317.

## I. Statutory Background

Under Illinois law, "[a] person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, [s]he lacks

substantial capacity to appreciate the criminality of h[er] conduct."  720 ILCS 5/6-2(a).  If a defendant raises this affirmative defense, the State must prove beyond a reasonable doubt that the defendant committed the charged conduct, and the defendant must then prove "by clear and convincing evidence that [she] is not guilty by reason of insanity."  720 ILCS 5/6-2(e).

After a defendant is found NGRI, the trial court must determine whether the defendant is "in need of mental health services on an inpatient basis," "in need of mental health services on an outpatient basis," or "not in need of mental health services."  730 ILCS 5/5-2-4(a).  An NGRI defendant is "[i]n need of mental health services on an inpatient basis" if, "due to mental illness, [she] is reasonably expected to inflict serious physical harm upon h[er]self or another and . . . would benefit from inpatient care or is in need of inpatient care."  730 ILCS 5/5-2-4(a-1)(B).  An NGRI defendant is "[i]n need of mental health services on an outpatient basis" if she does not meet the standard for inpatient services, "but is in need of outpatient care, drug and/or alcohol rehabilitation programs, community adjustment programs, individual, group, or family therapy, or chemotherapy."  730 ILCS 5/5-2-4(a-1)(C).

If the trial court finds that an NGRI defendant needs mental health services on an inpatient basis, the court must commit the defendant to IDHS custody, 730 ILCS 5/5-2-4(a), "for an indefinite period of time . . . not [to] exceed the maximum length of time that the defendant would have been required to serve . . . had [s]he been convicted of and received the maximum sentence for the most serious crime for

which [s]he has been acquitted by reason of insanity," 730 ILCS 5/5-2-4(b).  If the trial court finds that an NGRI defendant needs mental health services on an outpatient basis, the court must "conditionally release the defendant, under such conditions . . . as will reasonably assure the defendant's satisfactory progress and participation in treatment or rehabilitation and the safety of the defendant, the victim, the victim's family members, and others."  730 ILCS 5/5-2-4(a).  If an NGRI defendant does not need mental health services, the court must discharge the defendant from custody.  *Id.*

When an NGRI defendant is committed to IDHS custody for inpatient mental health services, IDHS must submit a "treatment plan report" to the trial court every 90 days, summarizing the progress of the defendant's treatment and opining as to whether the defendant remains in need of inpatient mental health services.  730 ILCS 5/5-2-4(b).  The report may also recommend that the trial court approve the defendant for "unsupervised on-grounds privileges" and/or "off-grounds privileges (with or without escort by [IDHS] personnel . . . )".  *Id.*

An NGRI defendant committed to IDHS custody may petition the trial court for conditional release or discharge.  730 ILCS 5/5-2-4(e).[1]  At a hearing on such petition, the defendant bears the burden of proof by clear and convincing evidence.  730 ILCS 5/5-2-4(g).  If the trial court finds that the defendant no longer meets the standard for inpatient mental health services, but needs mental health services on

---

[1]  IDHS may also petition for an NGRI defendant's conditional release or discharge. 730 ILCS 5/5-2-4(d).

an outpatient basis, the court must conditionally release the defendant.  730 ILCS 5/5-2-4(h).  If the trial court finds that the defendant "is no longer in need of mental health services it shall . . . discharge the defendant."  *Id.*

## II.    Factual Background and Procedural History

### A.    Petitioner is found not guilty by reason of insanity of the first degree murder of her daughter.

In November 2010, petitioner killed her four-year-old daughter, Magdalene, while suffering from the psychotic delusion that a satanic cult was planning to kidnap and have sex with Magdalene.  Doc. 15-3, ¶ 4.  Petitioner cut Magdalene's throat with a knife, nearly decapitating her.  R198, 206.[2]  She then cut her own wrists and scrawled religious messages on the walls in blood.  R199, 201, 211.

Petitioner was charged with first degree murder and raised the affirmative defense of insanity.  Doc. 15-3, ¶ 4; R183.  At a June 2012 bench trial, the State established the facts of the crime via stipulated testimony.  R190-216.  Petitioner then called Dr. Orest Wasyliw, a forensic psychologist, to testify about her mental state.  R220.  Wasyliw diagnosed petitioner with major depressive disorder with psychotic features, borderline personality traits, and a history of alcohol abuse and post-traumatic stress.  R254, 259-60; *see also* Doc. 15-39 at 146.  He noted that petitioner had a history of psychiatric hospitalizations and may have stopped taking her psychotropic medications shortly before the murder.  R237-38, 243.  Wasyliw

---

[2] "R__" refers to the reports of proceedings in the state trial court, as consecutively paginated in the bottom right corner, which petitioner submitted as Exhibits K-N and electronically filed as Docs. 15-12 through 15-36.

recounted that petitioner had become obsessed with a lawsuit against her former psychologist and convinced that the legal system was corrupt. R 226-27, 237. She came to believe that the psychologist was involved with the mafia and Illuminati and was surreptitiously reporting her to child welfare authorities. R226-29. She also began visiting a Catholic shrine and eventually started to believe that a nefarious group was kidnapping, sexually abusing, and killing children. R229, 239; Doc. 15-39 at 143.

The trial court found that the State had proven beyond a reasonable doubt that petitioner murdered Magdalene. R340. But the trial court also found that petitioner had proven by clear and convincing evidence that she lacked substantial capacity to appreciate the criminality of her conduct due to a mental disease or defect. R346. The court thus entered a verdict of not guilty by reason of insanity. *Id.*; *see also* Doc. 15-9 at 311.

### B.      Petitioner is committed to IDHS custody for inpatient mental health treatment.

The trial court then directed IDHS to evaluate whether petitioner was in need of mental health services, as required by 730 ILCS 5/5-2-4(a). R346-47. In July 2012, IDHS submitted a report opining that petitioner needed mental health services on an inpatient basis. Doc. 15-37 at 10. IDHS diagnosed petitioner with schizoaffective disorder, bipolar type, and a history of alcohol dependence. *Id.* at 12. The report noted that petitioner was receiving antipsychotic medication and was not actively delusional at that time. *Id.* at 12-13. It explained that petitioner needed to achieve "improved insight" and "understanding of her mental illness and

5

the importance of consistent treatment and medication compliance." *Id.* at 12. At a hearing at which the parties stipulated to the report, the trial court found that petitioner was in need of mental health services on an inpatient basis — that is, that due to mental illness she was reasonably expected to inflict serious physical harm upon herself or another and would benefit from or was in need of inpatient care, *see* 730 ILCS 5/5-2-4(a-1)(B) — and committed her to IDHS custody for treatment. R352-53; *see also* Doc. 15-9 at 317.

### C. The trial court denies petitioner's first petition for conditional release or discharge.

In August 2014, petitioner filed a pro se petition for conditional release or discharge, asserting that she no longer needed inpatient mental health treatment because "she experienced an iatrogenic (caused by medication) psychosis in 2010 which was not due to a mental illness." Doc. 15-9 at 355.

The trial court appointed Dr. Roni Seltzberg, a psychiatrist, to independently examine petitioner. *Id.* at 392. In a January 2015 report, Seltzberg diagnosed petitioner with a schizophrenia spectrum disorder and alcohol use disorder and opined that petitioner was not ready for discharge or conditional release. Doc. 15-38 at 161; Doc. 15-39 at 14. Seltzberg noted that the acute psychotic symptoms of petitioner's illness were in remission even though, against IDHS's recommendation, she had refused to take any psychotropic medication since September 2013. Doc. 15-38 at 162; *see also* Doc. 15-37 at 57-58 (October 2013 treatment plan report). But Seltzberg explained that petitioner continued to experience "other ongoing difficulties" and "present[ed] with similar thoughts and behaviors" as she did before

6

she killed her daughter. Doc. 15-38 at 162. Seltzberg noted that petitioner was prone to "easy agitation" and engaged in "a nearly constant struggle" with her treatment team, frequently violating hospital rules, exhibiting "provocative and manipulative behaviors," and claiming that staff were fabricating and planting evidence against her. Doc. 15-39 at 15. Seltzberg explained that petitioner refused to "engage[ ] in treatment" and "spen[t] much of her time" focused on "perceived abuses" by staff, even though it was "apparent that her perceptions [were] likely distorted by her underlying mental illness." *Id.* at 15-16. Seltzberg also opined that it was "unlikely" that petitioner's prior psychosis was caused by medication rather than mental illness. *Id.* at 16.

In August 2017, through counsel, petitioner filed an amended petition. Doc. 15-10 at 45-47. At a hearing the following month, petitioner called Dr. Toby Watson, Dr. Lucy Menezes, Dr. Craig Jock, and Dr. Mir Obaid. The State called Dr. James Corcoran.

Dr. Watson, a clinical psychologist associated with the Citizen's Commission on Human Rights, "an antipsychiatry group," evaluated petitioner at her request in 2015 and 2017. R676, 687-88, 695-97, 733-34. He described petitioner as "hard to deal with" and "very needy emotionally." R706-07. He also acknowledged that petitioner "has sadness," gets "frustrated" and "emotionally upset," and "will verbally raise her voice." R713. But he opined that petitioner did "not meet any criteria for any mental illness." *Id.* He also believed that petitioner was a low risk for violence, not homicidal or suicidal, and not "a danger to anybody." R714-16.

Dr. Menezes had been petitioner's social worker at IDHS for about a year. R800. She opined that petitioner was not suffering from any mental illness and was not a danger to herself or others. R801, 805. But she explained that petitioner's treatment team had never recommended her for any supervised or unsupervised off-grounds privileges and that the only on-grounds privilege she had earned was a pass allowing her to move about the facility with an escort. R827-29. Menezes testified that petitioner "can be verbally aggressive" and "vents her frustration and anger" on a daily basis, but is not "physically aggressive." R801, 804-05, 837.

Dr. Jock had been petitioner's psychologist at IDHS for about a year. R842-44. He opined that petitioner did not meet the criteria for any mental illness and was not dangerous to herself or others. R844, 846-47. He also opined that petitioner no longer needed inpatient treatment. R849. He acknowledged signing treatment plan reports that recommended continued inpatient treatment, but he stated that he was not responsible for completing those sections of the reports and did not review them before signing. R851-52, 855-61.

Dr. Obaid was a psychiatrist at IDHS who conducted a weekly group therapy session that petitioner attended, but he was not petitioner's treating psychiatrist and had not fully reviewed her medical file. R883-84, 895. He opined that petitioner did not have active symptoms of mental illness, did not need medication, and was not a danger to herself or others. R886, 888-89.

Dr. Corcoran was the medical director at Chicago-Read and a psychiatrist at the DuPage County jail. R969-70. He treated petitioner for about 18 months at the

county jail after her arrest. R973-74. He had also recently assumed responsibility for her treatment at IDHS. R978. He opined that petitioner suffers from mood instability, with symptoms of irritability, argumentativeness, temper tantrums, recluseiveness, and episodes of depression. R993. He noted that petitioner has a long history of mood instability and will likely have that condition for life. R995. He explained that petitioner is "very difficult to treat" because she is "resistive" to working with her treatment team and refuses to acknowledge her mental illness and history of substance abuse. R993-94, 996-97, 999-1002. He also explained that mood-stabilizing medication would be beneficial for petitioner and noted that he "had treated her successfully before in the jail with [such] medication." R983, 1051.

Corcoran opined that petitioner did not pose a danger to herself or others "[f]rom an immediate standpoint" and was not reasonably expected to harm herself or others "[r]ight now." R1012, 1019-20. But he explained that it "would be very difficult for her to live with" her mood instability outside a controlled setting. R1012. In such a setting without medication, he opined, "it's likely that she could reoffend." *Id.* Corcoran explained that, in the normal course, NGRI patients are first afforded unsupervised, on-grounds privileges, followed by supervised, off-grounds privileges, before being considered for conditional release or discharge. R990-91, 1041-42. He explained that this process allows the treatment team to observe how the patient handles potential stressors when given increased freedom and responsibilities. R991, 1009.

Following the hearing, in November 2017, the trial court denied petitioner's request for conditional release or discharge. Doc. 15-10 at 65-73. Nevertheless, the court ordered IDHS to "establish a plan for petitioner's eventual conditional release" and stated that it would reconsider that request in six months. *Id.* at 71-72. The court authorized petitioner to receive "unsupervised ground privileges for a period of two months," and thereafter (if successful) "supervised off ground privileges for a period of three months," in order to assess petitioner's conduct and the status of her mental illness outside of a secured environment. *Id.* The court also instructed petitioner "to participate in all counseling established by [IDHS]" and ordered IDHS "to explore what resources will be made available for petitioner when conditional release is granted." *Id.* at 72.

Petitioner appealed, and the state appellate court affirmed. *People v. Webber*, 2019 IL App (1st) 170998-U. Petitioner did not seek review in the Illinois Supreme Court. *See* Doc. 11 at 2; Doc. 11-4.

### D. Petitioner attempts suicide after her first petition for release is denied.

Two days after the trial court denied her first petition for conditional release or discharge, petitioner "made a serious suicide attempt." Doc. 15-38 at 35. She ingested 30 pills that she had secretly stockpiled, put a plastic bag over her head, and tied shoe laces around her neck. *Id.* at 35-37. She also wrote messages on the wall about being tortured by hospital staff and stating that her daughters could sue the hospital for wrongful death. R2769. After the suicide attempt, IDHS moved petitioner to a more secure hospital. Doc. 15-38 at 31, 34. Because of the need to

10

closely monitor petitioner for her own safety, IDHS was unable to implement the series of on-grounds and off-grounds passes that the trial court had authorized. R1148-52, 1162-63.

### E. Petitioner files a second petition for conditional release or discharge.

In June 2018, petitioner filed her second petition for conditional release or discharge. Doc. 15-10 at 132. At a hearing that commenced in May 2019, petitioner called Dr. Cindy Perlin, Dr. Watson, Dr. Gail Tasch, Dr. Dathan Paterno, and Dr. Jock. Petitioner also testified. The State called Dr. Richard Malis and Dr. Lesley Kane.

Dr. Perlin is a psychologist who treated petitioner from 2002 to 2008, but she was not called as an expert witness. R1719. She spoke with petitioner by telephone while petitioner was hospitalized and raised money to pay Dr. Watson to evaluate petitioner. R1719, 1729-31. She testified that, other than when petitioner killed her daughter, she did not know petitioner to be a violent person. R1720-22.

Watson again opined that petitioner does not suffer from a mental illness and is not a danger to herself or others. R1762-63. He diagnosed petitioner with post-traumatic stress disorder, a history of alcohol dependence, and possibly an unspecified personality disorder. R1774-75, 1859. He acknowledged that petitioner "exhibit[s] agitation," "raises her voice," "gets angry with people," and "is difficult to redirect at times," but he opined that these traits are more likely the result of her adversarial relationship with hospital staff rather than a personality disorder. R1831-33. He testified that petitioner "has some depressive qualities," but opined

11

that she was "self-managing" the condition, which did not rise to the level of mental illness. R1795. He also opined that petitioner was not at risk of suffering a relapse of alcohol abuse because she had completed a substance abuse program while hospitalized. R1777. Watson acknowledged, however, that petitioner previously relapsed after attending a substance abuse program in 2002, which made her more likely to relapse in the future. R2314-15. He further acknowledged that petitioner's 2017 suicide attempt was serious, but he described it as "situational" and not evidence that she was mentally ill or a danger to herself. R1802, 1846-47.

Dr. Tasch, a psychiatrist who met with petitioner once in 2018 and spoke with her by phone numerous times, R1879, 1881-84, opined that petitioner does not have any major mental illness and is not a danger to herself or others, R1885. She acknowledged that petitioner has anxiety and mood lability, "but not to the point where it meets criteria for a major psychiatric disorder." R1892. As for petitioner's 2017 suicide attempt, she attributed it to petitioner's receipt of "bad news" and a side effect of a prescribed muscle relaxant. R1932-33, 2063.

Dr. Paterno is a clinical psychologist who interviewed petitioner in person, administered psychological tests, and spoke with her on the phone numerous times. R1950, 1952-53. He opined that petitioner was not suffering from a serious mental illness and was not a significant danger to herself or others. R1952. But he acknowledged that his testing showed that petitioner had an elevated level of paranoia, based on her description of suspicion and hostility in her relationships with others, and that she had "moderately significant levels of depression." R1973,

12

2178, 2184.  He described petitioner's 2017 suicide attempt as "situational" and "totally understandable."  R2180, 2221.

Dr. Jock testified that he had not been in contact with petitioner since shortly after her 2017 suicide attempt.  R2240-41.  Like petitioner's other witnesses, he characterized that suicide attempt as "situational."  R2443.

Petitioner testified that she is "tormented on a daily basis" in IDHS custody. R2410.  She testified that other patients physically attack her and that patients and staff call her "a baby killer."  R1997-2000, 2383, 2387-88.  She testified that her 2017 suicide attempt was caused by "a lot of circumstances," including "a combination of medications."  R2393.  According to petitioner, she was "very vulnerable" at the time because her father was dying and because she had recently seen a television news report that said she was "mentally ill" and had learned that one of her daughters was in an abusive relationship.  *Id.*  Petitioner testified that she believed that if she killed herself, her daughters could sue IDHS for wrongful death.  *Id.*  She also "felt hopeless" after her first petition for release was denied. R2394.  She recognized that the trial court granted her increased privileges when denying the petition, but she testified that "all it takes is one staff that doesn't like me to create an incident."  *Id.*

Dr. Malis was petitioner's treating psychiatrist for about four months in 2016 and from February 2018 until the time of the second hearing.  R2520-21.  He opined that petitioner had a major mental illness, was likely to harm herself or others, and needed inpatient mental health services.  R2526-27.  He diagnosed petitioner with

13

schizoaffective disorder, bipolar type, borderline personality traits, and alcohol use disorder. R2528. He explained that petitioner met the criteria for schizoaffective disorder because she exhibited delusional ideas and disorganized thinking. R2528-29. He noted that, at the time of her offense, petitioner had delusional beliefs that she was being mistreated by the legal system, that a satanic cult was threatening her and her daughter, and that her psychologist was part of the mafia and Illuminati and was conspiring against her in her child custody cases. R2532-33. He explained that petitioner currently exhibits the delusional belief that she is being deliberately tortured by her IDHS treatment providers. R2533. As for disorganized thinking, he explained that petitioner frequently exhibits pressured speech and a "flight of ideas," which he defined as a "seemingly random movement of thoughts from one idea to another without a clear connection." R2534. He explained that petitioner's schizoaffective disorder was bipolar type because she also suffers from episodes of depression and mania, the latter of which are characterized by irritability, argumentativeness, raising her voice, insulting others, swearing, and making vulgar gestures. R2535-39.

Malis recommended that petitioner take psychotropic medication to reduce her delusional beliefs, disorganized thinking, and mood symptoms, but she refuses to do so. R2539-40. He noted that when petitioner was previously medicated while in IDHS custody, she had fewer "delusional concerns," was "far less irritable," had a more stable mood, participated in treatment, engaged in less conflict, and was beginning "to show some insight into her illness." R2540-41.

14

Malis opined that petitioner did not have insight into her mental illness at present. R2543. He explained that petitioner's treatment plan included a counseling component designed to give her a better understanding of her illness and ways to avoid or manage situations that triggered her symptoms. R2543-45. But he testified that petitioner refused to meet with him or her psychologist for individual therapy and only rarely attended group therapy sessions. R2545-49. He explained that a patient's lack of insight "is generally a poor prognostic indicator for cooperating with recommended aftercare." R2673.

Malis testified that petitioner also lacked insight into her alcohol abuse disorder. R2558. He noted that petitioner has a history of regular alcohol use with negative consequences, including two DUIs, one of which involved an accident with a child in her vehicle. R2551-52. He explained that petitioner's belief that she only drank alcohol to cope with the side effects of medication is inconsistent with the history of her alcohol abuse and did not "bode well for her chances of maintaining sobriety." R2554. He noted that petitioner completed an introductory substance abuse treatment program in the hospital several years earlier, but she had not continued with recommended follow-up treatment, including regular attendance in an Alcoholics Anonymous program and other group therapy. R2552-53. He expressed concern that, without treatment, petitioner's alcohol abuse was at risk of relapse, which could worsen her psychiatric symptoms. R2555-56.

Malis also discussed petitioner's 2017 suicide attempt after the denial of her first petition for release. R2572. He noted that even though the court's decision

granted her increased privileges and contained a roadmap for her eventual release, petitioner interpreted it as the "worst possible outcome to the point that she made a serious suicide attempt." R2591. Malis opined that the suicide attempt was not a rational reaction to petitioner's circumstances but was instead directly related to her mental illness. R2577. He also explained that "all of the risk factors that were present at that time are still present now with no new treatments or interventions or understanding on her part [of] how to address those risk factors." R2571-72.

Dr. Kane, a psychologist with the DuPage County probation department, was appointed by the trial court to independently evaluate petitioner. R2718, 2728. She met with petitioner twice for a total of five hours and reviewed petitioner's IDHS treatment records and the reports of other experts prepared at various stages of the case. R2729-32. She diagnosed petitioner with borderline personality disorder, narcissistic personality traits, major depressive disorder with psychosis in remission, and alcohol use disorder in remission in a controlled environment. R2738-39, 2743-45, 2748, 2753. She could not rule out a diagnosis of bipolar disorder with psychosis in remission. R2741-43.

Kane explained that borderline personality disorder involves "a pervasive pattern of mood instability, unstable relationships, and impulsivity." R2753. She described petitioner's symptoms as mood instability, agitation, inability to control anger, impulsivity, a history of unstable and volatile relationships, unstable sense of self, paranoid ideation during periods of stress, feelings of emptiness, and a fear of abandonment. R2753-54. She explained that major depressive disorder, bipolar

16

disorder, and borderline personality disorder share overlapping symptoms, but she opined that borderline personality disorder was presently the most appropriate diagnosis because petitioner was not exhibiting bizarre delusions as she had at the time of her offense. R2755-56. However, Kane noted that petitioner still had symptoms of paranoia, such as "feeling like she's being targeted or treated unfairly by other people." R2757-58. In particular, Kane recounted that petitioner had accused hospital staff of encouraging her 2017 suicide attempt and wrote messages on the wall about being tortured and targeted by staff. R2768-69.

Kane opined that petitioner remained in need of inpatient mental health services. R2792. She noted that petitioner lacked insight into the symptoms of her mental illness and had not yet formulated an adequate relapse prevention plan. *Id.* She also explained that petitioner's condition would not improve without treatment. R2794. She urged petitioner to consider taking psychotropic medication to reduce her agitation and help her cope better emotionally. R2764. She also recommended that IDHS create a plan for petitioner to receive unsupervised on-grounds passes, followed by supervised off-grounds passes, to assess whether "she's stable enough to move on to a less restrictive" environment. R2763. But she noted that IDHS had been unable to implement such a plan due to petitioner's frequent rule violations. *Id.*

Kane did not believe that petitioner was a danger to others. R2875. But she opined that, without treatment and monitoring, "there is the potential there that [petitioner] could harm herself." R2746. Kane noted that suicide attempts are

17

consistent with borderline personality disorder, R2757, and agreed that people who attempt suicide once have a high rate of attempting suicide again, R2770. She also agreed that petitioner's reaction to the court's ruling denying her petition for release but increasing her privileges was an example of the black-or-white thinking that is associated with borderline personality disorder. R2784-85.

Kane did not believe petitioner was "in imminent danger" of attempting suicide again, R2782, because she was "in an inpatient setting where she can be monitored," R2861-62. But she explained that petitioner's potential for self-harm would be greater on conditional release because there would be less monitoring. R2746. Given petitioner's recent suicide attempt and "predisposition to becoming anxious and not being able to cope under stressful conditions," Kane was "uncomfortable with [petitioner] not having . . . 24-hour supervision." R2849-50.

## F. The trial court grants petitioner conditional release.

On September 18, 2019, the trial court entered a written decision tentatively granting petitioner conditional release. Doc. 15-10 at 326-335. The court found that petitioner "clearly" "suffer[s] from mental illness" and accepted Dr. Kane's diagnosis of borderline personality disorder. *Id.* at 331. The court noted that petitioner's "prior psychotic episodes are now in remission," but acknowledged that such remission had "only been established in a secured environment." *Id.* at 332. The court also expressed "concerns as to whether petitioner completely understands that her prior conduct was caused by her developing mental illness and not merely caused by the medications she was taking at the time of the offense." *Id.* The court

18

stressed that petitioner "clearly needs to have good mental health treatment and therapy," but did not believe that she would "receive that treatment while in the custody of IDHS." *Id.* at 331.

The trial court found that "petitioner is not a danger to others." *Id.* at 332. But the court made no similar finding with respect to petitioner's risk of self-harm. Instead, the court believed that it was "not possible to determine" whether petitioner is a danger to herself "unless a transition program is established to see how [she] conducts herself in unsecured environment situations." *Id.* at 333. In assessing petitioner's risk of self-harm, the court discounted the relevance of her 2017 suicide attempt, finding that it "was solely based on the denial of" her earlier petition. *Id.* at 332.

Ultimately, the trial court concluded that petitioner no longer needed "mental health services on an inpatient basis," but was also not "ready for discharge." *Id.* at 333. The court determined that "the proper course of action" was "to formulate a plan for the petitioner's conditional release." *Id.* The court identified conditions for petitioner's release — including participation in "mental health counseling and therapy, alcohol counseling[,] and community adjustment programs"; no use of alcohol, cannabis, or non-prescribed drugs; random drug and alcohol testing; and no unsupervised contact with minors — and continued the matter for 60 days to allow the parties to implement them. *Id.* at 333-35. The court preferred for petitioner to initially transition to a private, inpatient facility, *see* R2905, 2945, and instructed IDHS to "attempt to place petitioner in a short-term residential facility," Doc. 15-10

at 333.  The court explained that, if no inpatient facility were available, petitioner would be required to obtain private housing in DuPage County, secure employment or otherwise demonstrate financial support, and "engage in treatment and therapy with a private psychiatrist or psychologist" on an outpatient basis.  *Id.* at 333-34.

In treatment plan reports submitted in November and December 2019, IDHS stated that it had been unable to arrange for petitioner's placement in a residential treatment facility.  Doc. 15-39 at 105-07, Doc. 15-40 at 7-9.  One intermediate care facility (ICF) declined to accept petitioner "due to her non-compliance with medication and non-compliance with treatment."  Doc. 15-39 at 106.  Another ICF refused to accept petitioner based on "her noncompliance with medication and her poor treatment of other patients."  Doc. 15-40 at 8.  IDHS attempted to place petitioner in a third ICF, but petitioner informed the intake coordinator "that she would not agree to live in an ICF," and the intake coordinator explained, in any event, that petitioner's "refusal to take psychotropic medication and her denial of having a mental illness would . . . pose a barrier to her admission."  *Id.*  IDHS also attempted to place petitioner in two transitional living programs, but one was not accepting forensic referrals, and the other would not accept petitioner given "her poor treatment of peers and her medication resistance."  Doc. 15-39 at 106-07.

On December 11, 2019, petitioner submitted a memorandum and supporting documents indicating that (1) she had secured an apartment in DuPage County, (2) Dr. Tasch had deposited $10,000 into a bank account for her benefit, and (3) she had arranged for outpatient therapy with a clinical psychologist who agreed to submit

treatment plan reports and notify IDHS of any violations of petitioner's release conditions. Doc. 15-41 at 2-21. In an affidavit, the psychologist stated that she would provide petitioner with therapy to address "her emotional and mental health needs as she transitions from custody" and explained that petitioner would "like[ly] benefit from treatment specifically focused on trauma related to her daughter's death, her role in the death and the assaults/abuse she suffered while in custody." *Id.* at 19.

At a hearing the same day, the court placed petitioner on conditional release, subject to the conditions contained in its earlier order. Doc. 15-10 at 454; *see* R2964, 2968-69.

### G. The state appellate court reverses the trial court's conditional release order.

The State appealed the trial court's decision granting petitioner conditional release and moved for a stay pending appeal. Doc. 15-3, ¶ 33. On December 20, 2019, the state appellate court granted the stay motion, returning petitioner to IDHS custody. *Id.*

On appeal, the State argued that the trial court's finding that petitioner was not a danger to herself or others was against the manifest weight of the evidence. Doc. 15-4 at 30-46. In response, petitioner argued that the trial court's findings were supported by the record. Doc. 15-5 at 34-52. In particular, petitioner argued that, under the statutory standard, she did not need to establish "a guarantee of future . . . harmlessness," but rather no "reasonable expectation" that she will harm herself or others. *Id.* at 45-46 (internal quotation marks omitted).

21

On June 9, 2021, the state appellate court reversed the trial court's decision. Doc. 15-3, ¶ 2. The appellate court recognized that "[a] defendant found not guilty by reason of insanity may be confined to a mental health institution until such time as sanity is regained or [the] defendant is no longer a danger to herself or others." *Id.*, ¶ 38 (citing *Jones v. United States*, 463 U.S. 354, 368 (1983)). But the court found that there was "no clear and convincing evidence . . . that [petitioner] would not reasonably be expected to inflict harm upon herself if granted conditional release." *Id.*, ¶ 54.

Like the trial court, the appellate court accepted that petitioner suffers from borderline personality disorder. *Id.*, ¶ 53. But the appellate court rejected the trial court's finding that petitioner was not a danger to herself, finding it unsupported by the manifest weight of the evidence. *Id.*, ¶ 54. The court was "particularly concern[ed]" about petitioner's 2017 suicide attempt, noting Dr. Kane's testimony that "suicide attempts [are] consistent with borderline personality disorder," and that those who attempt suicide once are at increased risk of doing so again. *Id.*, ¶ 50. The appellate court also rejected the notion that petitioner's 2017 suicide attempt was caused solely by her disappointment at the denial of her first release petition. *Id.*, ¶ 51. In particular, the court noted that petitioner had stockpiled pills well before the attempt, wrote on the walls of her room "in a strikingly similar fashion" to when she killed her daughter, and suggested that committing suicide would allow her daughters to sue the hospital for wrongful death. *Id.*

The appellate court agreed with the trial court that it was "not possible to determine [petitioner's] dangerousness to herself unless a transition program is established to see how [petitioner] conducts herself in unsecured environment situations." *Id.*, ¶ 52 (internal quotation marks omitted). But the appellate court rejected the trial court's conclusion that the record supported conditional release at that time. *Id.* To the contrary, the court noted that petitioner had not previously been granted even "off-unit privileges" while in IDHS custody. *Id.*, ¶ 53. And the court stressed Dr. Kane's testimony that, with minimal monitoring, petitioner faced an increased risk of self-harm and relapse of her alcoholism, which could exacerbate her mental illness. *Id.*, ¶ 52.

## H. The Illinois Supreme Court denies petitioner's requests for review.

Petitioner sought review in the Illinois Supreme Court, filing both a motion for a supervisory order (MSO) and a petition for leave to appeal (PLA). In her MSO, petitioner argued that the appellate court did not properly defer to the trial court's factual findings concerning her risk of self-harm, Doc. 15-8 at 5-8; misapplied the statutory standard for release by requiring her to show "a guarantee of future [harmless] behavior" rather than "a reasonable expectation" of it, *id.* at 8-9 (internal quotation marks omitted); and "violated [her] constitutionally protected liberty interests" by failing to address whether she would benefit from, or was need of, inpatient care, as required by statute, *id.* at 9-10. In her PLA, petitioner reasserted the arguments raised in her MSO. Doc. 15-7 at 11-14, 16-21. She also argued that the appellate court erred in treating the statutory list of evidence that a court may

consider at a conditional release hearing as "required elements," *id.* at 14-15; that her confinement is impermissibly punitive, *id.* at 15-16; and that further review was required to prevent lower courts from misapplying the law, *id.* at 21-22. The Illinois Supreme Court denied the MSO and PLA. *See* Docs. 11-5 & 11-6.

## III.   Federal Habeas Proceedings

In February 2021, petitioner filed a pro se habeas petition under 28 U.S.C. § 2254. *See Webber v. Fernandez*, No. 21 C 656 (N.D. Ill.) (Doc. 1). In July 2021, this Court dismissed the petition without prejudice, explaining that petitioner had not exhausted her available state remedies because her PLA was pending in the Illinois Supreme Court. *Id.* (Doc. 14).

In October 2021, after the Illinois Supreme Court denied the PLA, petitioner filed a new pro se habeas petition under the current case number, raising several challenges to the state appellate court's decision reversing the trial court's order granting her conditional release. Doc. 1 at 5-6. In December 2021, this Court appointed counsel to represent petitioner and ordered respondent to address whether petitioner had exhausted her state court remedies. Doc. 6. In response to that order, respondent explained that petitioner had exhausted her state court remedies with respect to the state appellate court's decision reversing the trial court's conditional release order because her requests for further review in the Illinois Supreme Court had been denied. Doc. 11 at 4. This Court then ordered petitioner to file an amended petition through counsel. Doc. 13.

In April 2022, petitioner filed an amended petition, in which she claims that her continued confinement as an NGRI acquittee is unconstitutional because she is no longer dangerous due to mental illness. *See* Doc. 14 at 5-7. She argues that the state appellate court's decision reversing the trial court's conditional release order "was contrary to and unreasonably applied" *Foucha v. Louisiana*, 504 U.S. 71 (1991), because the appellate court did not "find[ ] that [petitioner] was dangerous, but instead rel[ied] on contested testimony that [petitioner] had a 'potential' risk of dangerousness and that [petitioner] did not herself show that she is not 'reasonably expected' to be a danger to herself at some point in the future, when federal law requires a showing of dangerousness caused by mental illness before confining an acquittee." Doc. 14 at 10, 37. More specifically, petitioner contends that the state appellate court contradicted or unreasonably applied *Foucha* by: (1) requiring her to prove by clear and convincing evidence that she was not reasonably expected to harm herself; (2) failing to link her risk of self-harm to mental illness; and (3) relying on her "potential" for self-harm. *Id.* at 49. Additionally, petitioner argues that the state appellate court's decision "was premised on an unreasonable determination of the facts because the evidence did not show that [she] was dangerous as required by federal law." *Id.* at 10, 37.

## ARGUMENT

### I. Principles Governing Federal Habeas Review

A federal court may award habeas relief to a person in custody pursuant to a state court judgment "only on the ground that [the person] is in custody in violation

of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see*

*Wilson v. Corcoran*, 562 U.S. 1, 5 (2010).

A petitioner procedurally defaults a federal habeas claim if she fails to fairly

present it through a complete round of state court review. *Baldwin v. Reese*, 541

U.S. 27, 29 (2004); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). To fairly

present a claim, the petitioner "must place before the state court both the

controlling law and the operative facts in a manner such that the state court was

sufficiently alerted to the federal constitutional nature of the issue to permit it to

resolve the issue on that basis." *Hicks v. Hepp*, 871 F.3d 513, 530 (7th Cir. 2017)

(internal quotation marks omitted).

When a state court has rejected a claim on the merits, federal habeas relief

on that claim is barred unless the state court's decision was (1) "contrary to, or

involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States," or (2) "based on an

unreasonable determination of the facts in light of the evidence presented in the

State court proceeding." 28 U.S.C. § 2254(d).

Under § 2254(d)(1), a state court decision is contrary to clearly established

Supreme Court precedent "if the state court applies a rule different from the

governing law set forth in [Supreme Court] cases, or if it decides a case differently

than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts."

*Bell v. Cone*, 535 U.S. 685, 694 (2002). And a state court decision unreasonably

applies clearly established Supreme Court precedent if it "identifies the correct

governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the [petitioner's] case." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (internal quotation marks omitted).

A state court's application of Supreme Court precedent is unreasonable under § 2254(d)(1) only if it is "objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks omitted). This is a "highly deferential standard for evaluating state-court rulings, which demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (internal quotation marks and citation omitted). Review under § 2254(d)(1), moreover, "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

"Under § 2254(d)(2), a decision involves an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Morgan v. Hardy*, 662 F.3d 790, 801 (7th Cir. 2011); *see also* 28 U.S.C. § 2254(e)(1) (providing that "a determination of a factual issue made by a State court shall be presumed to be correct" on federal habeas review, and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence"). In other words, the petitioner must show that the state court's decision was "so inadequately supported by the record as to be arbitrary and therefore objectively unreasonable." *Alston v. Smith*, 840 F.3d 363, 370 (7th Cir. 2016) (internal quotation marks omitted).

## II.    Petitioner's Legal Arguments Are Procedurally Defaulted and Fail Under Section 2254(d)(1).

Petitioner contends that the state appellate court's decision violated clearly established federal law in three respects.  *See* Doc. 14 at 48-54.  But she did not fairly present her current contentions to the state courts, rendering them procedurally defaulted on federal habeas review.[3]  Alternatively, to the extent that petitioner fairly presented any of her current legal contentions in state court, the state appellate court's rejection of those arguments was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, barring federal habeas relief under § 2254(d)(1).

### A.    Petitioner did not fairly present her current arguments in state court.

Petitioner presents three legal arguments to support her contention that the state appellate court contradicted or unreasonably applied federal law in ordering her continued confinement.  First, she argues that the state appellate court violated federal law by requiring her to prove by clear and convincing evidence that she was not reasonably expected to harm herself.  Doc. 14 at 49.  Second, she argues that the state appellate court erred under federal law by failing to link her risk of self-harm

---

[3] As petitioner notes, Doc. 14 at 43, respondent previously explained that petitioner had exhausted her available state court remedies because the Illinois Supreme Court had denied her requests to review the state appellate court's decision, Doc. 11 at 4.  But respondent distinguished between a finding that petitioner exhausted her state remedies and a finding that she had properly preserved any claim, expressly reserving the right to assert procedural default in response to petitioner's habeas claims.  *Id.* at 5 & n.2.

to mental illness.  *Id.*  Third, she argues that the state appellate court contravened federal law by relying on her "potential" for self-harm.  *Id.*

But petitioner did not fairly present these federal constitutional arguments to both the state appellate court and state supreme court, as necessary to preserve them for federal habeas review.  To be sure, petitioner broadly argued in state court that "it is unconstitutional to continue to confine a harmless, mentally ill person." Doc. 15-5 at 32 (citing *Foucha*, 504 U.S. at 77); *see also* Doc. 15-7 at 16 ("As a matter of substantive due process, continued confinement of a harmless, mentally ill person is unconstitutional.") (citing *Foucha*, 504 U.S. at 77).  And she argued that proper application of the statutory reasonable-expectation-of-harm standard "was necessary to ensure the constitutionality of the statute itself" and protect NGRI defendants' "constitutional liberty interests."  Doc. 15-5 at 46 (citing *Foucha*, 504 U.S. at 80).  But to avoid procedural default, a petitioner must present the state courts not only with "the broad claim" she later raises on federal habeas review, "but also the specific arguments and operative facts within that claim."  *McNary v. Lemke*, 708 F.3d 905, 919 (7th Cir. 2013) (internal quotation marks omitted). Petitioner did not do so here.

To the contrary, petitioner's state court pleadings did not present any of the specific legal arguments that she now advances in support of her request for federal habeas relief.  With respect to the applicable burden of proof, petitioner asserted in her state appellate brief that the trial court properly "acknowledged [her] burden to prove her case by clear and convincing evidence."  Doc. 15-5 at 31.  Likewise, in the

Illinois Supreme Court, petitioner challenged the manner in which the state appellate court reviewed the trial court's factual findings, but she accepted that she bore the underlying burden of proof. *See* Doc. 15-7 at 18 (arguing that appellate court "is not supposed to look for clear and convincing evidence as if it were the original fact finder; that is the trial court's job"); *id.* at 20 (arguing that "the trial court cautiously and carefully reviewed the evidence in light of [petitioner's] burden to show that she is no longer in need of inpatient treatment by clear and convincing evidence"). At neither stage of review, therefore, did petitioner give the state court an opportunity to pass upon the constitutional challenge that she now raises concerning the state statute's allocation and definition of the burden of proof. *See Hicks*, 871 F.3d at 530 (to preserve claim for federal habeas review, "petitioner must place before the state court both the controlling law and the operative facts" so that "state court was sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve the issue on that basis") (internal quotation marks omitted)

Nor did petitioner's Illinois Supreme Court pleadings advance any argument that the state appellate court violated federal law by failing to link her risk of self-harm to mental illness. Petitioner did argue that the state appellate court "violated [her] constitutionally protected liberty interests" by failing to consider the statutory element of whether she "would benefit from inpatient care or is in need of inpatient care." Doc. 15-8 at 9-10 (citing 730 ILCS 5/5-2-4(a-1)(B)); *see also* Doc. 15-7 at 11-13. But she did not argue, as she does now, that the state appellate court "never determined that any purported danger, or even risk of danger, was linked to an

30

existing mental illness." Doc. 14 at 50. While fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts," it does "require[ ] that the factual and legal substance remain the same." *Anderson v. Benik*, 471 F.3d 811, 814-15 (7th Cir. 2006). Here, petitioner's state court argument differs materially in both factual and legal substance from the contention she now advances. In the state supreme court, she challenged the state appellate court's decision on the ground that it did not consider whether she still needed inpatient care, whereas on federal habeas review she now challenges the state appellate court's supposed failure to link her risk of danger to mental illness. Because petitioner did not give the state supreme court "a meaningful opportunity to pass upon the substance of the claim[ ] [she now] presses in federal court," *Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001) (internal quotations marks omitted), that claim is procedurally defaulted.

Finally, petitioner did not argue in either the state appellate court or the state supreme court that the federal constitution requires more than the "potential" of self-harm to justify the continued commitment of an NGRI defendant, as she does now. Instead, in the state appellate court, petitioner argued that *state law* did not require her to demonstrate a "guarantee of future . . . harmlessness," but rather only no "reasonable expectation" of self-harm. Doc. 15-5 at 45-46 (citing 730 ILCS 5/5-2-4(a-1)(B)). Likewise, in her MSO and PLA, petitioner asserted that the state appellate court "impermissibly sought . . . a guarantee" that she would not harm herself, rather than applying what she described as "the statute's constitutionally

31

adequate standard of a 'reasonable expectation.'"  Doc. 15-8 at 9; *see also* Doc. 15-7 at 13-14.  Petitioner's state court pleadings thus failed to "sufficiently alert[ ] [the state courts] to the federal constitutional nature of the issue to permit [those courts] to resolve the issue on that basis." *Hicks*, 871 F.3d at 530 (internal quotation marks omitted).  Her current argument under federal law is thus procedurally defaulted.

In sum, because petitioner did not give the state courts "a meaningful opportunity to pass upon the substance" of her current arguments, they are procedurally defaulted. *Ellsworth*, 248 F.3d at 639 (internal quotations marks omitted).

### B.   The state appellate court did not contradict or unreasonably apply any clearly established Supreme Court precedent.

Procedural default aside, petitioner's arguments also fail under § 2254(d)(1) because the state appellate court's decision reversing the trial court's conditional release order was not contrary to, and did not unreasonably apply, any clearly established Supreme Court precedent.[4]

Petitioner contends that the state appellate court's decision was contrary to, and unreasonably applied, *Foucha* in three respects.  Doc. 14 at 48-54.  But she is

---

[4]  If this Court concludes that petitioner fairly presented her current contentions to the state courts, then this Court should presume that the state appellate court adjudicated those contentions on the merits. *See Harrington v. Richter*, 562 U.S. 86, 99 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."); *see also Lee v. Avila*, 871 F.3d 565, 571 (7th Cir. 2017) ("the state courts must be given the benefit of the doubt when their opinions do not cover every topic raised by the *habeas corpus* petitioner") (internal quotation marks omitted).

wrong on all counts. In *Foucha*, state prosecutors conceded that an NGRI acquittee was no longer mentally ill, but sought to continue his inpatient hospitalization on the ground that his "antisocial personality" made him dangerous to himself and others. 504 U.S. at 78. But the Supreme Court held that the State was not permitted to hold a person as an NGRI patient if he was no longer mentally ill. *Id.* Rather, the Court held, an NGRI defendant "is entitled to release when he has recovered his sanity or is no longer dangerous." *Id.* at 77 (internal quotation marks omitted). The Court established, in other words, that an NGRI defendant "may be held as long as he is both mentally ill and dangerous, but no longer." *Id.* The state appellate court here recognized this principle. *See* Doc. 15-3, ¶ 38 ("A defendant found not guilty by reason of insanity may be confined to a mental health institution until such time as sanity is regained or [the] defendant is no longer a danger to herself or others.").

Nevertheless, petitioner argues that the state appellate court's decision was contrary to or unreasonably applied *Foucha* because the state appellate court "never actually found that [petitioner] was dangerous," but instead found that she "had not proven by clear and convincing evidence[ ] that she would not reasonably be expected to inflict harm upon herself." Doc. 14 at 49 (internal quotation marks omitted). But "*Foucha* did not address who has the burden of proof, or what the standard of proof should be, when an [NGRI] acquittee seeks release from a state hospital." *Abraham v. Black*, No. 19-cv-02858-EMC, 2020 U.S. Dist. LEXIS 79004, at *23 (N.D. Cal. May 5, 2020). And no other Supreme Court precedent "definitively

33

addresse[s] the constitutionality of release procedures that place the burden of proof upon the individual challenging continued commitment." *Taylor v. San Diego County*, 800 F.3d 1164, 1172 (9th Cir. 2015) (case involving civil commitment of sexually violent person); *see also Grass v. Reitz*, 749 F.3d 738, 742 n.2 (8th Cir. 2014) ("The burden of proof to demonstrate lack of mental illness or lack of dangerousness can be placed on an insanity acquittee without violating due process."); *United States v. Weed*, 389 F.3d 1060, 1067-70 (10th Cir. 2004) (rejecting due process challenge to provision of federal NGRI statute that placed burden of proof on insanity acquittee in release proceedings); *United States v. Wattleton*, 296 F.3d 1184, 1198-1201 (11th Cir. 2002) (same).

Contrary to petitioner's contention, *see* Doc. 14 at 49-50, the Eighth Circuit's decision in *Revels v. Sanders*, 519 F.3d 734 (8th Cir. 2008), did not grant habeas relief to an NGRI defendant on the ground that a state court had unconstitutionally required the NGRI defendant to carry the burden of proving that he was entitled to release. Instead, *Revels* held that the state court contradicted *Foucha* by requiring the NGRI defendant to prove *both* that he was not mentally ill *and* that he was not dangerous. *See Revels*, 519 F.3d at 742 ("Requiring an insanity acquittee to prove both a lack of present mental illness and dangerousness[ ] is clearly contrary to *Foucha*[.]"). *Revels* does not stand for the proposition that a State may not place the burden of proving *either* lack of mental illness *or* lack of dangerousness on the NGRI defendant, much less that *Foucha* or any other Supreme Court precedent clearly establishes such a rule. Because the Supreme Court has never squarely held that

the constitution prohibits a State from requiring an NGRI defendant to carry the burden of proof at a release hearing, including by clear and convincing evidence, the state appellate court's decision applying that burden of proof to petitioner cannot be said to have contradicted or unreasonably applied any clearly established Supreme Court precedent. *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (where Supreme Court precedent "give[s] no clear answer to the question presented, let alone one in [the habeas petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law") (internal quotation marks and brackets omitted).

Petitioner also argues that the state appellate court's decision was either contrary to, or unreasonably applied, *Foucha* because the state court "made no finding that [petitioner's] purported risk of danger to herself was due to her existing mental illness." Doc. 14 at 49. But even assuming that *Foucha* or other Supreme Court precedent clearly establishes that a state court must find a link between an NGRI defendant's mental illness and dangerousness, the state appellate court here made that finding. First, the court recognized that, under Illinois law, an NGRI defendant is subject to inpatient mental health services only if, "due to mental illness, [she] is reasonably expected to inflict serious physical harm upon h[er]self or another." Doc. 15-3, ¶ 38 (citing 730 ILCS 5/5-2-4(a-1)(B)). The court recognized, in other words, that the NGRI defendant's dangerousness must result from mental illness.

And in assessing the evidence, the state appellate court explained why petitioner had not carried her burden of establishing that her mental illness did not create a reasonable expectation that she would cause harm to herself. In particular, the court stressed Dr. Kane's testimony diagnosing petitioner with borderline personality disorder, explaining "that suicide attempts [are] consistent with" that diagnosis," and expressing "concerns regarding [petitioner's] November 2017 suicide attempt based on this diagnosis." *Id.*, ¶¶ 50-53. Further, the state appellate court rejected the trial court's conclusion that petitioner's prior suicide attempt could be attributed solely to her disappointment at the denial of her first petition for release rather than mental illness. The appellate court noted, among other things, that petitioner had accumulated the pills she used in her overdose attempt over a period of several years, and that she "had written on the walls during her suicide attempt, in a strikingly similar fashion to what she did in the bathroom where she murdered Magdalene." *Id.*, ¶ 51. Moreover, the court recalled Dr. Kane's testimony that petitioner's "alcohol abuse disorder . . . could be subject to relapse when no longer in a secure setting," which "could exacerbate [her] mental health symptoms." *Id.*, ¶ 52.

Section 2254(d) "reflect[s] a presumption that state courts know and follow the law." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted). And its "highly deferential standard for evaluating state-court rulings . . . demands that state court decisions be given the benefit of the doubt." *Woodford*, 537 U.S. at 24 (internal quotation marks omitted). Here, the state appellate court's decision provided a detailed explanation for its conclusion that petitioner had failed

to establish that her borderline personality disorder did not create a reasonable expectation that she would harm herself if conditionally released.  Petitioner's contention that the state appellate court failed to find a link between her mental illness and risk of self-harm rests on a cramped reading of the court's decision that fails to afford that decision the deference it is due under § 2254(d).  And because the state appellate court's determination was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Richter*, 562 U.S. at 103, habeas relief on this claim is barred by § 2254(d)(1).

Finally, petitioner argues that the state appellate court's decision was either contrary to, or unreasonably applied, *Foucha* because it relied on her "risk of future or potential dangerousness."  Doc. 14 at 49; *see id.* at 52-53.  But *Foucha* had no occasion to define the standard of dangerousness that is required to justify an NGRI defendant's continued confinement.  Instead, the Court decided only that a State could not continue to confine an NGRI defendant who was no longer mentally ill. *Foucha*, 504 U.S. at 77-78.  As the Fifth Circuit held when rejecting a nearly identical federal habeas claim, neither *Foucha* nor any other Supreme Court precedent "clearly establishe[s] that a finding of 'potential' dangerousness is insufficient to justify the continuing confinement of an [NGRI] acquittee."  *Poree v. Collins*, 866 F.3d 235, 249 (5th Cir. 2017).  To the contrary, as the Fifth Circuit explained, Supreme Court precedent has recognized "that the dangerousness finding is predictive in nature and that the government is permitted to protect

37

against the 'potential dangerousness' of [NGRI] acquittees." *Id.* at 248 (quoting *Jones v. United States*, 463 U.S. 354, 368 (1983)); *see also Jones*, 463 U.S. at 364 (noting that "civil-commitment proceeding[s]" involve "predictions about dangerousness").

Moreover, while petitioner asserts that the state appellate court merely found that she was potentially dangerous or that she "*may* remain a danger to herself,'" Doc. 14 at 52 (quoting Doc. 15-3, ¶ 51; emphasis supplied by petitioner), the state appellate court's decision makes clear that it found that petitioner had not satisfied her statutory burden of establishing that there was no reasonable expectation of self-harm, *see* Doc. 15-3, ¶ 54 (citing 730 ILCS 5/5-2-4 (a-1)(B)). The distinction that petitioner attempts to draw between a person who is dangerous to herself and a person who is reasonably expected to harm herself is not clear. But to the extent that there may be a distinction between the two concepts, such a distinction has never been squarely drawn by the United States Supreme Court and thus cannot support a challenge to the state appellate court's decision under § 2254(d)(1).

Petitioner contends that the Eighth Circuit reached the opposite conclusion in *Revels*. Doc. 14 at 45-46. But in *Revels*, as discussed above, the state court had required an NGRI acquittee seeking release to disprove *both* mental illness *and* dangerousness. *Revels*, 519 F.3d at 738 ("the [state] court of appeals stated that 'it [is] not enough to prove present absence from mental defect, but the person seeking unconditional release must show that he is not likely to suffer from a mental disease or defect in the reasonable future, *and also establish* by clear and

38

convincing evidence . . . that he will not be a danger to himself or others'")
(emphasis added).  As the Eighth Circuit explained in granting habeas relief,
"[r]equiring an insanity acquittee to prove *both* a lack of present mental illness *and*
dangerousness[ ] is clearly contrary to *Foucha*[.]"  *Id.* at 742 (emphasis added).  In
other words, when the Eighth Circuit later explained that the state court had erred
in "determining that the state could continue to hold Revels based on future
dangerousness alone," *id.* at 743, the Eighth Circuit was plainly referring to the
state court's requirement that an NGRI acquittee prove a lack of dangerousness
despite the fact that he was no longer mentally ill.  The Eighth Circuit simply did
not address whether *Foucha* establishes a precise standard of dangerousness that a
State must use to justify the continued confinement of an NGRI acquittee who, like
petitioner, remains mentally ill.

       In sum, the state appellate court's conclusion that petitioner was not entitled
to conditional release because she had not demonstrated that she "would not
reasonably be expected to inflict harm upon herself if granted conditional release,"
Doc. 15-3, ¶ 54, was not contrary to, or an unreasonable application of, any clearly
established Supreme Court precedent.  And because the state appellate court's
decision was not "so lacking in justification that there was an error well understood
and comprehended in existing law beyond any possibility for fairminded
disagreement," *Richter*, 562 U.S. at 103, federal habeas relief on this claim is
unavailable.

### III.     Petitioner Fails to Satisfy Section 2254(d)(2).

Petitioner also contends that the state appellate court made an unreasonable determination of the facts in concluding that she had not shown that she was not reasonably expected to inflict harm on herself.  Doc. 14 at 54-59.  But petitioner has not identified any clear and convincing evidence in the record that rebuts the state court's presumptively correct factual finding.  *See* 28 U.S.C. § 2254(e)(1).  She thus cannot demonstrate that the state court's decision was based on an unreasonable determination of the facts under § 2254(d)(2).  *See Ben-Yisrayl v. Buss*, 540 F.3d 542, 549 (7th Cir. 2008) ("A petitioner's challenge to a state court decision based on a factual determination under § 2254(d)(2) will not succeed unless the state court committed an 'unreasonable error,' and § 2254(e)(1) provides the mechanism for proving unreasonableness.").

Dr. Malis, petitioner's treating psychiatrist, testified that petitioner was mentally ill and likely to harm herself or others if released.  R2526-27.  He noted that petitioner lacked insight into her mental illness and (at the time of the hearing) was generally refusing to engage in individual or group therapy sessions designed to help her avoid or manage situations that would trigger her symptoms. R2543-49.  As for petitioner's 2017 suicide attempt, Malis attributed it to petitioner's mental illness, R2577, and explained that "all of the risk factors that were present at that time are still present now with no new treatments or interventions or understanding on her part [of] how to address those risk factors," R2571-72.

Dr. Kane, the psychologist appointed to independently examine petitioner, also opined that petitioner was mentally ill, diagnosing her with borderline personality disorder. R27453. She too explained that petitioner lacked adequate insight into her mental illness and stressed that her condition would not improve without treatment. R2792-94. Kane believed that petitioner's 2017 suicide attempt was a symptom of the black-or-white thinking associated with borderline personality disorder. R2784-85. And she noted that attempting suicide was consistent with the disorder. R2757. Kane did not believe that petitioner was "in imminent danger" of attempting suicide while she remained hospitalized, R2782, 2861-62, but she explained that the potential for self-harm would increase if petitioner were conditionally released and could not be monitored as closely, R2746.

Petitioner notes that Dr. Kane did not consider whether petitioner's risk of self-harm could be reduced through the conditions of release that the trial court ordered. *See* Doc. 14 at 54-58. But the conditions that the trial court ultimately implemented were minimal. Despite the trial court's preference that petitioner first transition from IDHS custody to a private, inpatient facility for treatment, R2905, 2945, IDHS was unable to find an inpatient facility that would accept petitioner given her "non-compliance" with medication and treatment and "her poor treatment of other patients." Doc. 15-39 at 106; Doc. 15-40 at 8. Petitioner herself thwarted the process by stating "that she would not agree to live in [such a facility]." Doc. 15-40 at 8. In the end, what petitioner refers to as her "carefully crafted release plan," Doc. 14 at 55, amounted to little more than a check for $10,000, a lease for a private

41

apartment, and arrangements for outpatient therapy with a focus on "trauma-informed treatment." Doc. 15-41 at 19; *see id.* at 2-3. Given Dr. Kane's concern that the limited monitoring of conditional release would increase petitioner's risk of self-harm, R2746, and her opinion that petitioner still needed "24-hour supervision," R2849, there is no reason to think that Kane would have supported petitioner's release under the minimal conditions that the trial court ultimately imposed.

In sum, the state appellate court's determination that petitioner did not show that she was not reasonably expected to inflict harm on herself if conditionally released was amply supported by the evidence that was presented in the state court proceedings.[5] At the very least, the state appellate court's conclusion cannot be deemed "so inadequately supported by the record as to be arbitrary and therefore

---

[5] In her amended habeas petition, petitioner discusses two treatment plan reports that IDHS submitted to the trial court in February 2021 and February 2022. *See* Doc. 14 at 34-36. These reports were submitted after the trial court granted petitioner conditional release in December 2019, and thus neither was part of the record on appeal before the state appellate court when it reversed the trial court's judgment. Indeed, the February 2022 report was submitted after the appellate court issued its decision in June 2021. And while petitioner submitted the February 2021 report to the state appellate court in support of a motion to lift that court's stay of the trial court's order, *see* Doc. 15-7 at 62, it does not appear that petitioner ever moved to supplement the record on appeal to include the report. Nor would it have been proper to do so. *See Jones v. Ford Motor Co.*, 807 N.E.2d 520, 523 (Ill. App. 2004) (explaining that record on appeal may "be supplemented only with evidence actually before the trial court"). Accordingly, because neither report was properly before the state appellate court, this Court may not consider either report when assessing the reasonableness of the state appellate court's decision. *See Pinholster*, 563 U.S. at 181 ("review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"); *id.* at 185 n.7 (noting that plain language of § 2254(d)(2) also restricts review to evidence that was before the state court). Petitioner may file a new petition for conditional release or discharge in the state trial court based on these reports. *See* 730 ILCS 5/5-2-4(e) (new petition may be filed every 180 days).

objectively unreasonable." *Alston*, 840 F.3d at 370 (internal quotation marks omitted). Federal habeas relief is thus unavailable. *See Burt v. Titlow*, 571 U.S. 12, 22 (2013) (federal court may not "set aside a reasonable state-court determination of fact in favor of its own debatable interpretation of the record") (internal quotation marks and brackets omitted).

## IV. No Certificate of Appealability Is Warranted.

When denying the amended habeas petition, this Court should also deny petitioner a certificate of appealability. *See* Habeas Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."); *Gonzalez v. Thaler*, 565 U.S. 134, 143 n.5 (2012) ("Rule 11(a) requires district judges to decide whether to grant or deny a COA in the first instance."). To obtain a certificate of appealability, a petitioner must make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), such that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where a district court denies a claim on procedural grounds, the petitioner must show that reasonable jurists would debate both the procedural ruling and the underlying merits of the claim. *Id.* Here, because reasonable jurists would not debate that petitioner's claims are either procedurally defaulted or meritless under § 2254(d), no certificate of appealability is warranted.

## CONCLUSION

This Court should deny petitioner's amended habeas petition without an evidentiary hearing and decline to issue a certificate of appealability.


June 24, 2022                           Respectfully submitted,

                                        KWAME RAOUL
                                        Attorney General of Illinois

                            By:    s/ Eric M. Levin
                                   ERIC M. LEVIN, Bar # 6284971
                                   Assistant Attorney General
                                   100 West Randolph Street, 12th Floor
                                   Chicago, Illinois 60601-3218
                                   (773) 590-7065
                                   eric.levin@ilag.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 24, 2022, I electronically filed the foregoing **Answer to Amended Habeas Petition** with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/Eric M. Levin
ERIC M. LEVIN, Bar # 6284971
Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601-3218
(773) 590-7065
eric.levin@ilag.gov