# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MARCI MARIE WEBBER,                )
                              )
         Petitioner,      )
                              )
      v.                      )     21 C 5444
                              )
RICARDO FERNANDEZ, IDHS,            )
                              )
         Respondent.      )

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge**:

Before the Court is Petitioner Marci Webber's amended petition for a writ of habeas corpus. For the following reasons, the Court denies Webber's amended petition and declines to issue a certificate of appealability.

## BACKGROUND

State court factual findings enjoy a presumption of correctness absent clear and convincing findings to the contrary. 28 U.S.C. § 2254(e)(1); *Davis v. Ayala*, 576 U.S. 257, 271 (2015). The Court's analysis of the facts[1] emerges against this backdrop.

### I.    Trial Court Proceedings

On November 3, 2010, Webber murdered her four-year old daughter, Magdalene. She thought that Satan was going to kidnap Magdalene for the purpose of

---

[1] We rely on the Illinois Appellate Court's recitation of the facts in *People v. Webber*, 2021 IL App (2d) 191090-U, as the last state court to consider Webber's claims on the merits. *See Boyd v. Boughton*, 798 F.3d 490, 492 (7th Cir. 2015); *McFowler v. Jaimet*, 349 F.3d 436, 446 (7th Cir. 2003).

sexual gratification. Webber cut Magdalene's neck in a bathroom and inscribed words on the walls in blood. On November 10, 2010, Webber was indicted on five counts of first-degree murder.

On June 7, 2012, Webber was found not guilty by reason of insanity ("NGRI"). She was remanded to the custody of the Illinois Department of Human Services ("DHS") for an evaluation as to whether she needed mental health services. On July 13, 2012, the trial court found Webber needed mental health services. Webber initially received treatment at Elgin Mental Health Center but was later moved to Chicago-Read Mental Health Center ("Chicago-Read").

On August 22, 2017, after five years of treatment, Webber filed a motion for discharge or conditional release and asked the trial court to consider her petition under the auspices of Section 5-2-4(g) of the Uniform Code of Corrections ("Code"). 730 ILCS 5/5-2-4(g). After a hearing on November 13, 2017, the trial court denied Webber's petition as it was unconvinced she was ready for discharge. Two days after the trial court's denial of Webber's petition, she attempted to kill herself by ingesting 30 Fioricet[2] pills. Thereafter, on November 27, 2017, Webber was transferred back to Elgin Mental Health Center. On August 1, 2019, the appellate court affirmed the trial court's denial of Webber's petition.

---

[2] Fioricet is used to treat tension headaches that are caused by muscle contractions. www.drugs.com/fioricet.html (last visited June 13, 2023).

During the pendency of that appeal, Webber filed another petition for discharge, or in the alternative, conditional release. She subsequently filed two amended petitions for conditional release or discharge in July 2018. Webber's second amended petition asked the trial court to consider evidence regarding her treatment plan, and whether she met the criteria for inpatient treatment pursuant to Section 5-2-4 of the Code. 720 ILCS 5/5-2-4. In response to Webber's amended petition, the trial court ordered Dr. Lesley Kane to conduct an independent evaluation of Webber prior to a hearing on her second amended petition for conditional release.

On May 8, 2019, the trial court began a bench hearing on Webber's second petition for conditional release or discharge. Webber called three expert witnesses to testify. The first was Dr. Toby Watson, a clinical psychologist and expert in forensic outcome studies as it relates to severe mental illness. Watson was hired to examine Webber on three different occasions: August 17, 2015, July 5, 2017, and March 21, 2018. Watson's testimony was based on reports he created following examination of Webber on those dates.

Watson opined that Webber does not suffer from a mental illness and is not a danger to herself or others. In 2015, he diagnosed Webber with post-traumatic stress disorder ("PTSD") and alcohol dependence by history but stated that she was not dependent on alcohol at the time of his testimony due to her having completed the mental illness substance abuse program during inpatient treatment. Watson did not believe Webber would use alcohol again if discharged. Regarding Webber's PTSD,

3

Watson testified that Webber's trauma stemmed from past verbal and physical abuse, custody battles, and the fact that she killed her daughter. Watson stated that Webber "doesn't believe that she was mentally ill, that it was actually . . . withdrawal from medication" that caused her psychosis. Watson further opined that Webber's PTSD could have been caused from being involuntarily medicated while in inpatient care. Watson reiterated that these traumas did not make Webber mentally ill or a danger to herself or others. He believed that she suffers from underlying depression. Watson acknowledged Webber's November 2017 suicide attempt following the denial of her prior petition for discharge but described it as, while serious, a singular event. He believed that Webber should be transitioned to an outpatient mental health facility and acknowledged that she would need to check in daily due to the stress of finding an apartment and a job.

Webber next called Dr. Gail Tasch, a board-certified psychiatrist, to testify. Tasch was referred to Webber by Dr. Watson and met with her on one occasion at Elgin Mental Health Center for the purpose of preparing a report and opinion as to whether Webber qualified for release. Tasch testified that she had also spoken to Webber numerous times by phone. Based on her experience and interactions with Webber, Tasch opined that Webber does not suffer from a major mental illness, nor does she have symptoms of a major mental illness. She further opined that Webber "does not have any suicidal thoughts[,] . . . no thoughts of wanting to hurt herself or anybody else, no suicide or homicidal thoughts." Based on her review of Webber's record of inpatient

4

treatment and Dr. Watson's report, she did not believe Webber to be a danger to herself or others. Tasch believed that Webber understands the nature and character of her action but did not believe Webber needed mental health treatment.

Webber then called psychologist Dr. Dathan Paterno to testify. Paterno conducted an in-person interview and psychological testing with Webber in October 2018. Additionally, Paterno stated that he had "probably 20 phone conversations" with Webber between October 2018 and the time of his testimony. Although Webber will need psychotherapy for years, he opined that Webber does not suffer from a mental illness, nor is she a danger to herself or others.

Webber then testified on her own behalf. She described having been physically attacked by other patients at Elgin Medical Health Center, as well as being called "baby killer" by patients during her time there. She blamed the November 2017 suicide attempt on "a lot of circumstances," including "a combination of medications, three different medications." Additionally, she "was very vulnerable." She had seen a report of her case on television news that described Webber as "severely mentally ill." She thought it would be better for her to take her own life and "let her [daughter] sue for wrongful death." She admitted that the denial of her discharge petition also played a role in her suicide attempt.

Webber denied suffering from any mental illness. She described her relationship with her psychiatrist at Elgin Mental Health Center, Dr. Richard Malis, as nonexistent as he refused to accept that Webber does not suffer from a mental illness and sought to

administer psychotropic medications to treat Webber. She said that she would not be willing to take any medications prescribed because she knows "that [she is] not insane . . . [and she is] not in need of medication." Although she admitted to experiencing paranoid and religious delusions at the time she killed Magdalene, she testified that she had not experienced any since. She further admitted to past alcohol abuse, including at the time of her crime, but did not believe she would abuse alcohol to cope with adversity in the future.

Dr. Malis was called to testify by the State. Malis believed that Webber needed mental health services on an inpatient basis. He opined that Webber was expected to inflict serious harm upon herself or others and diagnosed Webber with schizoaffective disorder bipolar type, alcohol use disorder, and borderline personality traits.

As to his diagnosis of schizoaffective disorder bipolar type, Malis explained that Webber met this diagnosis through continued delusional ideas and disorganized thinking. Webber's symptoms of this diagnosis started before she killed her daughter and continued throughout her treatment. Malis opined that Webber's demonstration of "flight of ideas and pressured speech" further evidences this diagnosis. Malis described the bipolar component of Webber's diagnosis as depressive episodes evidenced by depressed mood, at times with sleep disturbance, changes in weight and appetite, and loss of interest in different activities.

Malis recommended Webber take psychotropic medications but she has refused. He observed that Webber was taking psychotropic medications following the murder

of her daughter. She exhibited less of the delusional beliefs and better controlled her mood disorder symptoms when taking these medications. Additionally, Webber seemed less irritable, had more stable moods, engaged in treatment, and her reports exhibited less conflict with hospital staff. Malis opined that psychotropic medication had a positive effect on Webber.

Malis testified that Webber does not have insight into her mental illness. He stated that Webber believes her delusional ideas and is unable to consider the possibility that they are not true. Webber's refusal to participate in the recommended therapy further exacerbates this problem. She does not attend group therapy regularly. She does not participate in individual therapy at all. She has refused to meet with Malis except once every several weeks as a requirement for the grant of certain hospital privileges. At the time of Malis's testimony, Webber had not met with him in about a year, and she was not currently meeting with her psychologist for any sort of therapy as she was not interested. Malis gave Webber a list of goals each week, including a non-hostile interaction with her social worker. The week prior to his testimony was the first time Webber had met that goal.

Malis testified that Webber has a lack of insight into her alcohol abuse disorder. He recommended treatment to Webber as individuals with this disorder often relapse, as Webber has in the past. Malis additionally testified there is a higher risk of suicide attempts and violence to others from individuals that abuse alcohol with a history of mental illness.

7

Malis opined that, if released, Webber is expected to inflict serious harm upon herself or others. He based this opinion on her index offense, history of driving under the influence of alcohol with another individual in her car, physical incidents with other patients, and suicide attempts following the murder of Magdalene and in November 2017 while in DHS custody. Malis disagreed with Dr. Watson's assessment that the November 2017 suicide attempt was not the result of a mental illness.

The State next called Dr. Lesley Kane, Chief Psychologist for DuPage Probation and Court Services, to testify. Kane was appointed by the trial court to conduct an independent evaluation of Webber. Her evaluation was based on meeting with Webber for five hours and reviewing DHS treatment records. She diagnosed Webber with borderline personality disorder, other specified personality disorder with narcissistic traits, rule-out bipolar disorder with psychosis in remission, major depressive disorder with psychosis in remission, and alcohol use disorder. Regarding the borderline personality disorder diagnosis, Kane testified that someone with such a disorder may overreact to perceived slights or disagreements with another person and believe them bad or evil. She described Webber as having described feelings of being unfairly targeted by others, including DHS staff, that are beyond what would be considered normal. She opined that the severity of Webber's delusions waxed and waned.

Regarding Webber's November 2017 suicide attempt, Kane testified that, at the location of the attempt, Webber had written on the walls about DHS staff targeting, torturing, and treating her unfairly. Additionally, Webber had written a message to her

8

daughter on the wall to sue DHS for wrongful death. Kane stated that suicide attempts are consistent with borderline personality disorder. She expressed concern that "if [Webber] is not in treatment or some form of treatment being monitored, . . . there is the potential . . . that she could harm herself." Kane believed Webber's potential for self-harm was greater on conditional release because less monitoring would occur.

Kane expressed concern about Webber's alcohol abuse disorder outside of a controlled environment. She testified that there was reason to still be concerned about an alcohol use relapse when Webber was no longer in a secured environment, and that alcohol use could exacerbate symptoms of her mental illness.

Kane testified that her biggest concern for Webber was that she was not recognizing the role mental illness played in her offending behavior. She opined that psychotropic medications of the kind Webber had refused to take helped her control her mental illness when they were being administered to her. She described Webber as more stable on medication and more insightful as to her mental health condition. Kane worried that, if released, Webber would struggle with the stresses of finding a place to live, supporting herself financially, and maintaining relationships. Additionally, she expressed concern that Webber would be unable to cope with, or even recognize, her symptoms in an outside environment.

It was Kane's recommendation that Webber continue inpatient treatment and opined that her symptoms would not improve without treatment. Kane believed Webber's underlying mental illness was the core issue preventing her from receiving

9

necessary mental health treatment but acknowledged that Webber may not receive that necessary treatment while in DHS. She did not think it was possible that Webber would see Dr. Malis for treatment and stated that Webber has shown more insight into her mental illness when taking medication. Kane testified that Webber's insistence that medication is the cause of all her issues makes her unable to address her problems and recognize the symptoms of her mental illness.

In rebuttal, Webber called Terry Nichols, a former nurse at Elgin Medical Health Center, to testify that he interacted with Webber while employed there and made notes on Webber's chart. He recalled noting a positive interaction with Webber following one of his shifts and made note of it in the chart. Nichols testified that Dr. Malis believed Nichols must be being manipulated and was not pleased with the positive note. Nichols testified that his supervisor explained to him that Dr. Malis wanted to compel medications for Webber through a court order and the positive notes in her chart would hinder that course of action.

On September 18, 2019, the trial court issued a memorandum opinion that it was considering Webber for conditional release. The trial court's order stated that:

> The court, after reviewing all the testimony and reports regarding [Webber], concludes that it cannot agree with [Webber's] experts that she does not suffer from mental illness, clearly, she does. That fact by itself, however, does not automatically require continued confinement. The court also has difficulty with Dr. Malis's testimony as it is evident he will never acknowledge [Webber] is proper for release until she consents to the taking of psychotropic medications even though her psychosis has been in remission for over eight years without medication.

The court finds that the analysis of Dr. Kane is closest to what currently afflicts [Webber], basically borderline personality disorder. [Webber] clearly needs to have mental health treatment and therapy. The court, however, for reasons previously discussed, both of the fault of [Webber] and the fault of [DHS], will never receive that treatment while in the custody of the [DHS].

The court, in determining what would be proper treatment for [Webber], has again considered all evidence presented and the factors set forth in 730 ILCS 5/5-2-4(g). As to the statutory factors, the court finds:

1. [Webber] does appreciate the harm she caused in the murder of her child and is burdened by her actions.

2. The court continues to have some concerns as to whether [Webber] completely understands that her prior conduct was caused by her developing mental illness and not merely caused by the medications she was taking at the time of the offense.

3. [Webber's] prior psychotic episodes are now in remission and have been so for some time. Obviously, to date this has only been established in a secured environment. Since her confinement to the Elgin Mental Health Facility, [Webber] has shown an unwillingness to comply with the programs and counseling that DHS requires but, the problem is also, in part, due to the failure of DHS to even attempt to establish a transition program where [Webber's] conduct can be observed outside of the secured environment. [Webber] has been granted no privileges at DHS.

4. [Webber] refuses to take any medication for her mental illness and believes such medication caused her mental illness to begin with. That said, [Webber's] acute mental illness is in remission and has been for an extended period of time without medication.

5. The adverse effects of medication on the [Webber] are unidentifiable as she has refused any medication.

6. The question of [Webber's] mental health possibly deteriorating without medication cannot be assessed. As indicated, she has refused medication, however, having been off medication for a significant period of time, her psychotic features have remained in remission.

7. [Webber] has some history of alcohol abuse, but it is also in remission while in a secured setting.

11

8. [Webber] has a limited criminal history other than the crime for which she was found insane.

9. There is no evidence regarding any specialized physical or medical needs of [Webber].

10. [Webber] has a mother and a sister in the area, but their participation or involvement with [Webber] if she were to be released, was not established.

11. Based on the findings of Dr. Kane, the court believes that [Webber] is not a danger to others. There was testimony that she may be a danger to herself based on the suicide episode in November of 2017 after this court's denial of her request for discharge or conditional release. The court believes this was solely based on the denial of discharge or conditional release at that time. As previously indicated, [Webber] continues to show irritability and aggressiveness, but no physically violent behavior has been shown toward staff or other patients. In fact, [Webber] has been the subject of abuse by other patients without retaliating. It is not possible to determine the dangerousness to herself unless a transition program is established to see how [Webber] conducts herself in unsecured environment situations.

It is the court's opinion that the evidence presented does not establish that [Webber] is in need of mental health services on an inpatient basis. At the same time, the evidence does not establish that [Webber] is ready for discharge. The court believes that the proper course of action at this time is to formulate a plan for [Webber's] conditional release from the Illinois Department of Human Services. The court believes that what has been discussed herein is that the Illinois Department of Human Services cannot provide for [Webber's] mental health treatment. [Webber] needs to be in an environment where she will be able to work in conjunction with treating staff and not in opposition to them. If [Webber] cannot demonstrate an ability to do so, then this court would have to reconsider her placement.

The trial court then provided a list of conditions for Webber to meet before granting her conditional release. DHS was ordered to transfer Webber back to Chicago-Read.

On December 11, 2019, the trial court held a hearing to determine if Webber had met the requirements for conditional release. Webber filed a memorandum detailing her plans for conditional release, and DHS filed a NGRI Interim Treatment Plan Report prior to the hearing. Webber was unable to secure housing with outpatient facilities as she would not consent to medication. She was able to secure outpatient mental treatment and housing through legal and mental health advocates. She provided a lease for an apartment in Glen Ellyn and a bank account statement showing an account containing $10,000 deposited by Dr. Tasch. Webber had secured the services of licensed clinical psychologist Dr. Laura Bauhof to provide further mental health treatment. Dr. Bauhof agreed to submit Webber's treatment progress reports to the trial court and DHS every 90 days. Dr. Bauhof further agreed to notify DHS of any violations by Webber of her conditional release.

DHS's NGRI Interim Treatment Plan Report stated that Webber's treatment team "remains concerned about her ability to manage stress and cope effectively with day-to-day problems in living in the community." Additionally, the report stated that Webber "continues to be consumed by her antipathy toward DHS and its staff. She struggles to focus on very little else . . . ."

Following the trial court's review of the evidence presented at the December 11, 2019, hearing, Webber was granted conditional release for a period of five years and required to cooperate with mental health and counseling services, submit to random

13

alcohol testing for at least six months, and have no unsupervised contact with any person under the age of 17. Webber was released from the custody of DHS.

## II.   Appellate Proceedings

On December 20, 2019, the state appellate court granted the State's emergency motion to stay the trial court's conditional release order and Webber was returned to DHS custody. On June 9, 2021, the appellate court concluded that "no clear and convincing evidence was presented to support the notion that [Webber] would not reasonably be expected to inflict harm upon herself if granted conditional release." 2021 IL App (2d) 191090-U, ¶ 55. The appellate court determined that the trial court's finding that Webber was not a danger to herself was not supported by the manifest weight of the evidence, and therefore reversed the trial court's conditional release order.

On July 14, 2019, Webber moved the Illinois Supreme Court for a supervisory order pursuant to Illinois Supreme Court Rule 383. The motion sought the vacatur of the appellate court's order. The Illinois Supreme Court denied the motion. Webber also filed a Petition for Leave to Appeal with the Illinois Supreme Court on July 14, 2021. The Illinois Supreme Court denied the Petition, and on December 30, 2021, Webber petitioned the United States Supreme Court for a writ of *certiorari*. The Supreme Court denied the petition on February 22, 2022. Webber now seeks habeas corpus relief in this Court under 28 U.S.C. § 2254.

14

## LEGAL STANDARD

This Court can grant a petition for a writ of habeas corpus by a petitioner in state custody only if she is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under this statute, we must give "full effect" to state judgments that are consistent with federal law. *Williams v. Taylor*, 529 U.S. 362, 383 (2000). Thus, we apply a deferential standard of review and give the Illinois court rulings the benefit of the doubt. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

Federal habeas relief may be granted to a petitioner who can establish that the state court's adjudication of his claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or where the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

Under Section 2254(d)(1), the "contrary to" and "unreasonable application" clauses are given independent meaning. *Williams*, 529 U.S. at 405. A state court decision is "contrary to" established Supreme Court precedent if the state court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or if the state court "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an opposite result]." *Id.*

A state court decision is "an unreasonable application" of Supreme Court precedent if the state court "identifies the correct governing legal rule from [the

15

Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or if the state court "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. The reasonableness inquiry "is quite deferential, such that a state decision may stand so long as it is objectively reasonable, even if the reviewing court determines it to be substantively incorrect." *Barrow v. Uchtman*, 398 F.3d 597, 602 (7th Cir. 2005).

"Under [Section] 2254(d)(2), a decision involves an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010) (citing *Ward v. Sternes*, 334 F.3d 696, 704 (7th Cir. 2003)). A state court's factual determinations are presumed correct, and the burden rests upon the petitioner to rebut that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## ANALYSIS

In her amended petition, Webber raises two claims:

**Claim One**:

The Second District Appellate Court's June 9, 2021, order reversing the DuPage County Trial Court's December 11, 2019, order that granted Webber's petition for conditional release was contrary to and unreasonably applied clearly established federal law, namely *Foucha v. Louisiana*, 504 U.S. 71 (1991), in that the Appellate Court ordered Webber confined without finding that she was dangerous, but instead relying on contested testimony that Webber had a "potential" risk of dangerousness and that Webber did not herself show that she is not "reasonably expected" to be a danger to herself at some point in the future,

16

when federal law requires a showing of dangerousness caused by mental illness before confining an acquittee.

**Claim Two**:

The Second District Appellate Court's June 9, 2021, order reversing the DuPage County Trial Court's December 11, 2019, [order] was premised on an unreasonable determination of the facts because the evidence did not show that Webber was dangerous as required by federal law.

## I.  Procedural Default

First, we address Respondent's argument that Webber's claims are procedurally defaulted.  A petitioner procedurally defaults a federal habeas claim if she fails to fairly present it through a complete round of state court review.  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  To fairly present a claim, the petitioner "must place before the state court both the controlling law and the operative facts in a manner such that the state court was sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve the issue on that basis."  *Hicks v. Hepp*, 871 F.3d 513, 530 (7th Cir. 2017) (internal quotation marks omitted).  "It is not enough for a petitioner to phrase drop from the federal constitution; he must fairly present his federal claims for review."  *Bowers v. Buss*, 422 F. Supp. 2d 985, 987 (N.D. Ind. 2006) (citing *Riggins v. McGinnis*, 50 F.3d 492, 493 (7th Cir. 1995)).  When applying these standards, however, courts should "avoid hypertechnicality."  *Chambers v. McCaughtry*, 264 F.3d 732, 738 (7th Cir. 2001) (quoting *Verdin v. O'Leary*, 972 F.3d 1467, 1474 (7th Cir. 1992)).  Indeed, "a petitioner may reformulate her claims so long as the substance of the claims remains the same."  *Sweeney v. Carter*, 361 F.3d 327, 332 (7th Cir. 2004); *see also Anderson v.*

*Benik*, 471 F.3d 811, 814–15 (7th Cir. 2006) ("Fair presentment . . . does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same.").

Whether a claim has been fairly presented to a state court is evaluated using four factors: (1) whether the petitioner relied on federal cases that engage in a constitutional analysis; (2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; (3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and (4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation. *Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001). In determining whether a claim has been fairly presented, the court's "overall task is to determine in practical terms whether the state courts were sufficiently alerted to the nature of the petitioner's federal constitutional claim." *Hicks*, 871 F.3d at 531 (cleaned up).

We think Webber has met her burden here. Although Webber's briefing in the state courts fails as to the first and second factors, the overarching theme in all of Webber's arguments is the appellate court's failure to find present dangerousness, which Webber contends was both constitutionally and statutorily required for her continued confinement. In her Petition for Leave to Appeal, Webber invoked the standards for continued confinement set forth in *Foucha* (mental illness and dangerousness) and argued, as she does here, that the appellate court impermissibly

18

sought a "guarantee of future behavior," a standard contrary to *Foucha*'s mandate. We will therefore address merits of Webber's amended petition.

## II.    Webber's Claims

Webber brings claims under Sections 2254(d)(1) and (2). We address each claim in turn.

> **A. Claim One:** The Second District Appellate Court's June 9, 2021, order reversing the DuPage County Trial Court's December 11, 2019, order that granted Webber's petition for conditional release was contrary to and unreasonably applied clearly established federal law, namely *Foucha v. Louisiana*, 504 U.S. 71 (1991), in that the Appellate Court ordered Webber confined without finding that she was dangerous, but instead relying on contested testimony that Webber had a "potential" risk of dangerousness and that Webber did not herself show that she is not "reasonably expected" to be a danger to herself at some point in the future, when federal law requires a showing of dangerousness caused by mental illness before confining an acquittee.

Claim 1 is brought under Section 2254(d)(1) and requires Webber to demonstrate that the appellate court's ruling against her was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). To obtain relief under Section 2254(d)(1), "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (internal quotation marks omitted). This standard is both "difficult to meet" and "highly deferential." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

19

Weber contends the appellate court's decision was contrary to, or involved an unreasonable application of, the United States Supreme Court's decision in *Foucha*. There, state prosecutors conceded that an NGRI acquittee was no longer mentally ill but sought to continue his inpatient hospitalization on the ground that his "antisocial personality" made him dangerous to himself and others. *Id.* at 78. The Supreme Court held that the state was not permitted to hold a person as an NGRI acquittee if he was no longer mentally ill. *Id.* Rather, the Court held, an NGRI acquittee "is entitled to release when he has recovered his sanity or is no longer dangerous." *Id.* at 77 (internal quotation marks omitted). In other words, an NGRI acquittee "may be held as long as he is both mentally ill and dangerous, but no longer." *Id.* Because the state did not contend that Foucha was mentally ill, the basis for holding Foucha in a psychiatric facility as an NGRI acquittee had disappeared and the state was no longer entitled to hold him on that basis. *Id.* at 78.

In Webber's case, to be entitled to conditional release under Illinois law, Webber was required to prove, by clear and convincing evidence, that "she is not reasonably expected to inflict serious physical harm upon herself or another or would not benefit from inpatient care or is not in need of inpatient care." 2021 IL App (2d) 191090-U, ¶ 54 (citing 730 ILCS 5/5-2-4(a-1)(B)). The appellate court concluded that Webber did not present any clear and convincing evidence "to support the notion that she would not reasonably be expected to inflict harm upon herself if granted conditional release." *Id.* More specifically, the appellate court, relying exclusively on the testimony of Dr. Kane,

held that the trial court's finding that Webber was not a danger to herself was against the manifest weight of the evidence.

### 1. The State Court's Decision Was Not Contrary To Clearly Established Supreme Court Precedent

"One of the most obvious ways a state court may render a decision 'contrary to' the Supreme Court's precedents is when it sets forth the wrong legal framework." *Van Patten v. Deppisch*, 434 F.3d 1038, 1042 n.2 (7th Cir. 2006) (citing *Williams*, 529 U.S. at 397–98). Here, the appellate court correctly noted that, "[a]s a matter of due process, continued confinement of a harmless, mentally ill person is unconstitutional." 2021 IL App (1st) 191090-U, ¶ 38 (citing *Foucha*, 504 U.S. at 77). However, Webber argues that although the appellate court initially identified the correct legal principle, it proceeded to apply a different framework to the facts of Webber's case, namely that it required Webber to show not only that she was not presently dangerous, but also show she would not be dangerous in the future.

Webber argues that the appellate court's ruling was contrary to *Foucha* in three ways. First, she argues the appellate court never actually found that she was presently dangerous; rather, it found Webber had not proven by clear and convincing evidence that she "would not reasonably be expected to inflict harm upon herself," which is a different standard than mentally ill and dangerous. Second, Webber contends the appellate court made no finding that her purported risk of danger to herself was due to

21

her existing mental illness.[3]  And third, Webber says the appellate court's exclusive reliance on Dr. Kane's testimony, at best, suggested that there could be a risk of future or potential dangerousness or possible suicidal ideation, which is again a different standard than set forth in *Foucha*.

Webber relies on *Revels v. Sanders*, 519 F.3d 734 (8th Cir. 2008), in support of her claim.  In *Revels*, the Eighth Circuit addressed a Missouri appellate court's denial of an insanity acquittee's motion for unconditional release from confinement because the acquittee could not show, "by clear and convincing evidence, that (1) he is not presently mentally ill; (2) he is not dangerous; (3) he is not likely to suffer a mental disease; and (4) he is not likely to become dangerous in the reasonable future."  *Id.* at 742.  The Eighth Circuit's review was confined to the issue of whether the appellate court unreasonably applied *Foucha* in determining that the state could continue to hold Revels "based on future dangerousness alone."  *Id.* at 743.  The court concluded that "[r]equiring an insanity acquittee to prove *both* a lack of present mental illness and dangerousness, is clearly contrary to *Foucha,* and violates the substantive protections of the Due Process Clause as defined by the Supreme Court.  Here, the Missouri Court of Appeals went even further, requiring Revels to also show the absence of a probability

---

[3] We agree with Respondent that this argument is a nonstarter.  The Illinois statute defines an NGRI defendant in need of mental health services on an inpatient basis due to mental illness as "a defendant who has been found NGRI but who, *due to mental illness*, is reasonably expected to inflict serious physical harm upon himself or another and who would benefit from inpatient care or is need of inpatient care.  730 ILCS 5/5-2-4(a-1)(B) (emphasis added).  In other words, the appellate court recognized that Webber's dangerousness must result from mental illness.

of a future mental illness and *future dangerousness*, stepping even further over the line drawn by the Supreme Court in *Foucha*." *Id.* (citation omitted) (emphasis added). There was "no way to construe the court of appeals's assertion other than in direct contradiction of *Foucha*." *Id.*

The Fifth Circuit, on the other hand, held in *Poree v. Collins* that a state court had not violated clearly established federal law when it found continued confinement appropriate where it was "not 'satisfied [the petitioner] does not present a *potential* for both danger to himself and to others' and that [the petitioner's] current asymptomatic status 'does not negate the *potential* that [the petitioner] . . . would not manifest or relapse into the delusions and/or the behavior that presented itself through the years . . . .'" 866 F.3d 235, 250 (5th Cir. 2017) (emphasis in original).

There, the petitioner argued, like Webber does here, that the state court's "potential" dangerousness standard is contrary to clearly established Supreme Court law because "[m]odifying dangerousness with 'potential' renders it meaningless." *Id.* at 249. The Fifth Circuit rejected this argument, stating that the Supreme Court had only "clearly established that a finding of dangerousness is one of two prerequisites to continued civil confinement." *Id.* at 248. *Poree* held that the Supreme Court had not explicitly addressed how a state may make its dangerousness determination," but that the Court in *Jones* had "indicated that the dangerousness finding is predictive in nature and that the government is permitted to protect against the 'potential dangerousness' of [NGRI] acquittees." *Id.* (citing *Jones v. United States*, 463 U.S. 354, 368 (1983)). The

court thus went on to conclude that neither *Foucha* nor any other Supreme Court precedent "clearly establishe[s] that a finding of 'potential' dangerousness, coupled with a finding of mental illness, is insufficient to justify continued confinement." *Id.* at 249.

We cannot say that the standard applied by the appellate court or its conclusion that Webber failed to present clear and convincing evidence "to support the notion that she would not reasonably be expected to inflict harm upon herself if granted conditional release" is contrary to the clearly established precedent of *Foucha*, such that Webber's continued confinement constitutes a violation of her due process rights. Notably, in her Petition for Leave to Appeal to the Illinois Supreme Court, Webber specifically argued "this Court's review is needed to enforce the correct and constitutionally acceptable standard of whether Ms. Webber is 'reasonably expected' to harm herself if no longer in DHS custody."[4] Dkt. # 15-7, at 14. This is the standard the appellate court applied; it did not require Webber to "guarantee" a lack of dangerousness in the future. To the extent Webber is attempting to distinguish present dangerousness and "reasonably expected" dangerousness, or impose some sort of temporal limitation on a finding of dangerousness, the Supreme Court has not provided clear guidance on the issue and it is not this Court's province to speculate about what the Supreme Court might say.

---

[4] To the extent Webber argues that the trial judge erred in applying state statutes, such an alleged error is not cognizable in federal habeas. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

24

### 2. The State Court Did Not Unreasonably Apply Clearly Established Supreme Court Precedent

We also cannot say that the appellate court unreasonably applied *Foucha* to the facts of Webber's case. In reviewing Webber's amended petition, the Court is mindful that under Section 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Williams*, 529 U.S. at 410) (emphasis in original). "A state-court decision can be a reasonable application of Supreme Court precedent even if, in our judgment, it is an incorrect application." *McDaniel v. Polley*, 847 F.3d 887, 893 (7th Cir. 2017), *cert. denied sub nom. McDaniel v. Foster*, 138 S. Ct. 554 (2017); *Winston v. Boatwright*, 649 F.3d 618, 632 (7th Cir. 2011). A state court decision can be a reasonable application even if the result is clearly erroneous. *White v. Woodall*, 572 U.S. 415, 419 (2014). And a state court decision can withstand habeas review even when the petitioner presents "a strong case for relief." *Harrington*, 562 U.S. at 102.

The "unreasonable application" prong means the state court's decision lies "well outside the boundaries of permissible differences of opinion." *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002); *see also Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003) ("We have held that under this criterion, habeas relief should not be granted if the state court decision can be said to be one of several equally-plausible outcomes."). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly

established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Instead, "the state-court decision must be both incorrect and unreasonable." *Woods v. McBride*, 430 F.3d 813, 817 (7th Cir. 2005). This demanding standard allows us to issue a writ only in cases "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents. It goes no farther." *Harrington*, 562 U.S. at 102; *Carter v. Butts*, 760 F.3d 631, 635 (7th Cir. 2014). While we agree that Webber presents a strong case for relief, she has not met this demanding standard.

Dr. Kane testified that individuals with Webber's diagnosis of borderline personality disorder are at an increased risk of suicide. She opined that Webber lacked insight into her mental health condition and was concerned that Webber would be unable to cope with, or even recognize, her symptoms in an outside environment. Based on Kane's testimony, the appellate court concluded that Webber may remain a danger to herself and thus in need of continued inpatient care. The appellate court's decision was not an unreasonable application of *Foucha*'s mandate. Webber's petition is denied as to Claim One.

**B. Claim Two: The Second District Appellate Court's June 9, 2021, order reversing the DuPage County Trial Court's December 11, 2019, [order] was premised on an unreasonable determination of the facts because the evidence did not show that Webber was dangerous as required by federal law.**

Webber's second claim is brought under Section 2254(d)(2). Under this section, habeas relief may only be granted if the state court decision "was based on

26

an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). A state court's factual findings are presumed correct, and it is the petitioner's burden to rebut that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Wood v. Allen*, 558 U.S. 290, 293 (2010). To prevail under Section 2254(d)(2), the state court's decision must be "so inadequately supported by the record as to be arbitrary and therefore objectively unreasonable." *Ward*, 334 F.3d at 704 (internal citations omitted).

Webber argues the appellate court's decision was premised on an unreasonable determination of the facts because, in her view, the evidence did not show that Webber was dangerous as required by federal law. Webber's arguments fail to overcome the deference we must afford to the state court.

The appellate court focused its review on the trial court's findings as to whether Webber remained a danger to herself based on Dr. Kane's testimony. Kane met with Webber twice, for a total of five hours. She reviewed the DHS progress reports and other medical records, but conducted no independent testing. Kane did not review Webber's release and treatment plan.

The appellate court found the November 2017 suicide attempt to be "particularly troubling," and concluded that the trial court's finding that the suicide attempt was solely based on the denial of the discharge petition "is not supported by the evidence." In so concluding, the appellate court pointed to Kane's testimony about Webber's concerns she could not provide for her children and her belief that her death could

27

benefit her children through a wrongful death suit against DHS.  Kane also observed that Webber wrote on the walls during the suicide attempt which was strikingly similar to what she did when she murdered her daughter, and noted Webber's stashing of the Fioricet pills over an extended period of time raised concerns about plans for self-harm.

We, too, find the November 2017 suicide attempt troubling.  But we also note that even accepting that the denial of the petition for release was not the sole cause of the suicide attempt, at the time the trial court ordered Webber conditionally released in December 2019, there had been no evidence of self-harm or intent to self-harm since the November 2017 attempt.  Perhaps of even greater significance is the fact that Webber's psychosis had been in remission for over eight years without medication.

We share Webber's concerns that much of Kane's testimony amounted to speculation or conjecture about what could or might happen in the future.  For example, Kane testified generally that suicide attempts are consistent with a diagnosis of borderline personality disorder and that individuals who have attempted suicide are generally more at risk of making another attempt (and succeeding).  She opined that Webber's *potential* for self-harm was greater upon release because she would be monitored much less.  Kane worried about the risk that Webber *could* put herself in a situation that could escalate or trigger her symptoms.  Kane was also concerned that Webber's alcohol abuse disorder *could be* subject to relapse outside of a secure setting.

The appellate court "fear[ed] she will not be able to fulfill the requirements of her conditional release as defendant has not even met DHS's requirements for off-unit

28

privileges during her time as a patient." 2021 IL App (1st) 1910990-U, ¶ 54. However, there is no indication that the appellate court considered how Webber's proposed release and treatment plan might have influenced Kane's testimony or assuaged some of her concerns about Webber's risk of self-harm if conditionally released. For example, Kane expressed concern that if Webber was not in treatment or some form of treatment being monitored" there was the "potential" that she could harm herself. But, as part of her release plan, Webber found a licensed clinical psychologist to provide outpatient mental health treatment, and that psychologist agreed to submit treatment progress reports to the trial court and DHS every 90 days and to notify DHS of any violations of Webber's conditional release. The appellate court agreed with the trial court's statement that "[i]t is not possible to determine [Webber's] dangerousness to herself unless a transition program is established to see how the petitioner conducts herself in unsecured environment situations," yet seemingly disregarded the import of the release and treatment plan approved by the trial court.

The appellate court's reliance on Kane's testimony about Webber's risk of self-harm to the exclusion of all other testimony on the issue also gives us pause. Other qualified mental health professionals testified as to their belief that Webber was not a danger to herself. These professionals had at least as much, if not more, contact with Webber. Of additional concern is the trial court's firm conviction and Kane's testimony acknowledging that Webber would not get the mental health treatment and therapy she needs while in the custody of DHS.

Nevertheless, despite our above misgivings, we cannot conclude that the appellate court's determination of the facts was "so inadequately supported by the record as to be arbitrary and therefore objectively unreasonable." *Ward*, 334 F.3d at 704. Webber has failed to rebut the appellate court's factual findings by clear and convincing evidence. "If 'reasonable minds reviewing the record might disagree about the finding in question,' the finding cannot be unreasonable." *Powell v. Fuchs*, 4 F.4th 541, 549 (7th Cir. 2021) (quoting *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (internal citations omitted)). Here, reasonable minds reviewing the record and evidence before the appellate court could differ. For these reasons, Webber's amended petition is denied as to Claim Two.

## III.  Certificate of Appealability

For the reasons stated above, Webber's amended petition is denied, and the Court declines to issue a certificate of appealability. Webber cannot make a substantial showing of the denial of a constitutional right, namely that reasonable jurists would not debate, much less disagree, with this Court's resolution of Webber's claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

Webber is advised that this is a final decision ending her case in this Court. If Webber wishes to appeal, she must file a notice of appeal with this Court within 30 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Webber need not bring a motion

to reconsider this Court's ruling to preserve her appellate rights. However, if Webber wishes the Court to reconsider its judgment, she may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion under Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

## <u>CONCLUSION</u>

For the foregoing reasons, Webber's amended petition for a writ of habeas corpus [14] is denied and the Court declines to issue a certificate of appealability. The Clerk directed to enter a Rule 58 judgment in favor of Respondent and against Webber. Status hearing set for 8/3/23 is stricken. Case terminated.

It is so ordered.

Dated: June 22, 2023

31

Charles P. Kocoras
United States District Judge